```
 1                    IN THE UNITED STATES DISTRICT COURT
                         FOR THE DISTRICT OF COLUMBIA
 2

 3       United States of America,     ) Criminal Action
                                       ) No. 21-cr-208
 4                       Plaintiff,    )
                                       ) JURY TRIAL - DAY 3
 5       vs.                           ) AFTERNOON SESSION
                                       )
 6       Thomas Webster,               ) Washington, DC
                                       ) April 27, 2022
 7                       Defendant.    ) Time:  1:15 p.m.
         _____
 8
                            TRANSCRIPT OF JURY TRIAL
 9                              HELD BEFORE
                      THE HONORABLE JUDGE AMIT P. MEHTA
10                      UNITED STATES DISTRICT JUDGE
         _____
11
                           A P P E A R A N C E S
12
         For Plaintiff:      Hava Mirell
13                           U.S. Attorney's Office
                             312 N. Spring Street, Suite 1200
14                           Los Angeles, CA  90012
                             (213) 894-0717
15                           Email:  Hava.mirell@usdoj.gov

16                           Katherine Nielsen
                             DOJ-CRM, Fraud Section
17                           1400 New York Avenue, NW
                             Washington, DC  20530
18                           (202) 355-5736
                             Email:  Katherine.nielsen@usdoj.gov
19
                             Brian P. Kelly
20                           U.S. Attorney's Office
                             555 Fourth Street, NW, Suite 3816
21                           Washington, DC  20530
                             (202) 252-7503
22                           Email:  Brian.kelly3@usdoj.gov

23       For Defendant:      James E. Monroe
                             Dupee & Monroe, P.C.
24                           211 Main Street
                             Goshen, NY  10924
25                           (845) 294-8900
                             Email:  Marina@dupeemonroelaw.com
```

```
 1   Court Reporter:           Janice E. Dickman, RMR, CRR, CRC
                               Official Court Reporter
 2                             United States Courthouse, Room 6523
                               333 Constitution Avenue, NW
 3                             Washington, DC  20001
                               202-354-3267
 4                                   *   *   *

 5

 6                             INDEX

 7   WITNESSES:

 8    Patricia Norden
        Direct Examination By Ms. Nielsen.................... 3
 9      Cross-Examination By Mr. Monroe......................20

10    Virginia Donnelly
        Direct Examination By Ms. Mirell.....................22
11
      Edgar Tippett
12      Direct Examination By Mr. Kelly......................37

13    Riley Palmertree
        Direct Examination By Ms. Mirell.....................48
14

15   EXHIBITS ADMITTED:

16    100 through 114........................................ 7

17    300 through 316........................................27

18    208.2, 209.1, 211, 212, 213, 214, 215, 216, 217,
        217.1, 217.2, 217.3, 218, 219........................48
19
      402 - 404..............................................37
20
      407, 408, 613, 614, 705, 706, 707.....................48
21
      709....................................................26
22
      710....................................................48
23

24                             *   *   *

25
```

```
 1      *  *  *  *  *  *  *  *AFTERNOON SESSION*  *  *  *  *  *  *  *

 2              MS. NIELSEN:  Your Honor, as a matter of procedure we

 3      have physical items to be shown to the witness in this case.

 4      Is all right for our FBI officer to bring them up to her?

 5              THE COURT:  Of course.

 6              THE COURTROOM DEPUTY:  Jury panel.

 7              (Whereupon the jurors enter the courtroom.)

 8              THE COURT:  Okay.  Have a seat, everyone.  Welcome

 9      back, everybody.  I hope everybody had a nice lunch break.

10              So we're ready to resume with our afternoon session.

11      The government's next witness.

12              MS. NIELSEN:  Yes, Your Honor.  The government calls.

13                        PATRICIA NORDEN,

14      was called as a witness and, having been first duly sworn, was

15      examined and testified as follows:

16              THE COURT:  Good afternoon.  Have a seat.  If you

17      feel more comfortable with your mask off, you can remove it for

18      purposes of testimony.

19              THE WITNESS:  Thank you.

20                        DIRECT EXAMINATION

21      BY MS. NIELSEN:

22      Q.  Good afternoon.

23      A.  Good afternoon.

24              THE COURT:  Hang on one second, Counsel.

25              THE WITNESS:  Thank you.
```

```
 1              THE COURT:  Go ahead.
 2   BY MS. NIELSEN:
 3   Q.  Would you please state and spell your name for the record?
 4   A.  Patricia Norden.  First name P-A-T-R-I-C-I-A.  Last name in
 5   Norden N-O-R-D-E-N.
 6   Q.  And would you please tell the jury what your job is?
 7   A.  I'm a special agent with the Federal Bureau of
 8   Investigation.
 9   Q.  And how long have you been a special agent with the FBI?
10   A.  About fourteen years.
11   Q.  What office do you work at?
12   A.  I normally work in the New York field office, Hudson Valley
13   Resident Agency.
14   Q.  Are you working there at the present time?
15   A.  No.
16   Q.  Are you working at the moment?
17   A.  I am on a temporary assignment to FBI headquarters,
18   International Terrorism Operations section.
19   Q.  You said normally you work in New York, is that right?
20   A.  Yes.
21   Q.  Where did you work in February of 2021?
22   A.  New York field office, Hudson Valley Resident Agency.
23   Q.  And what were your duties at that time?
24   A.  I was a member of Squad CT-29, the counterterrorism squad
25   handling both IT and DT matters in New York.
```

1    Q.  Did you have any interaction with the January 6, 2021

2    Capitol breach investigations?

3    A.  Yes, I did.

4    Q.  What type of interaction?

5    A.  As leads were developed, they were handed out to the field

6    offices to attempt to identify and locate potential subjects

7    that were living in our area.

8    Q.  As part of your investigations of the Capitol breach cases,

9    did you investigate an individual named Thomas Webster?

10   A.  Yes.

11   Q.  At some point did you learn that an individual named Thomas

12   Webster would turn himself into the FBI in the Hudson Valley

13   office?

14   A.  Yes.

15   Q.  Why did he decide to do that?

16   A.  He had obtained an attorney and his attorney reached out to

17   my squad supervisor and arranged to turn himself in because he

18   realized that there was an FBI BOLO out for him.

19   Q.  Approximately what month was this?

20   A.  This was in February of 2021.

21   Q.  And at the same time that you were preparing for this

22   individual to turn himself into your office, did you also

23   receive some information about him from another FBI office?

24   A.  Yes, we did.

25   Q.  What office did you receive that information from?

1    A.   The Washington field office in Washington, D.C.

2    Q.   And why was the Washington field office also working on

3    this investigation at the same time your office was?

4    A.   Because the subject at the time that they were trying to

5    identify was a participant in January 6 events in Washington,

6    D.C., but they believed lived in our area up in New York.  So

7    they were, again, sending out a lead to identify and locate.

8    Q.   What agent at the Washington field office did you

9    collaborate with?

10   A.   Riley Palmertree.

11   Q.   And what, if any, information did you receive from Agent

12   Palmertree?

13   A.   Photos from the BOLO that had been put out, it was AFO-145.

14   Still shots from some videos, some other applications and

15   background information on Mr. Webster's employment history,

16   things like that, passport applications.

17   Q.   So you mentioned AFO-145.  What does "AFO" mean?

18   A.   Assaulting a federal officer.

19   Q.   And was AFO-145 a designation or an identification of this

20   individual?

21   A.   It was what they were being -- what they wanted us to look

22   out for, this person was identified as having assaulted a

23   federal officer on January 6.

24   Q.   And was he being called AFO-145 because --

25   A.   We had no name attached at the time.

1    Q.  Thank you.  Did you learn anything about Mr. Webster prior

2    to -- Mr. Webster's prior public service from the WFO agent?

3    A.  Yes.

4    Q.  What did you learn?

5    A.  That he was a former Marine and a retired NYPD officer.

6    Q.  And I believe you mentioned that you received some photos

7    and images from the Washington field office of AFO-145?

8    A.  Yes.

9    Q.  And did you review those images before Mr. Webster turned

10   himself in?

11   A.  Yes.

12   Q.  I'm going to show you -- sorry.

13          MS. NIELSEN:  At this point the government would like

14   to enter a number of exhibits that we'll use with this witness.

15   I've discussed them with defense counsel.  There are several

16   physical items, as well as some photo images.

17          We would like to move to admit Exhibit 100 through

18   Exhibit 114.

19          MR. MONROE:  No objection, Your Honor.

20          THE COURT:  100 through 114 are admitted.

21          MS. NIELSEN:  Thank you.

22   BY MS. NIELSEN:

23   Q.  I would like to bring up at this time Exhibit 106.  It's

24   previously been admitted.

25          THE COURTROOM DEPUTY:  Ms. Nielsen, can you please

```
 1    disconnect and reconnect?
 2              MS. NIELSEN:  Sure.
 3              THE COURTROOM DEPUTY:  Just give it a sec.
 4              All right, perfect.
 5              MS. NIELSEN:  Okay.  Going to publish that to the
 6    jury.
 7    BY MS. NIELSEN:
 8    Q.  So do you see the document in front of you?
 9    A.  Yes.
10    Q.  Do you know what this is?
11    A.  This is the seeking information, or BOLO, that the FBI had
12    put out, looking for information on AFO-145.
13    Q.  And I'm going to just blow this up a little bit so that we
14    can see the photo images.
15              Are these some of the images of AFO-145 that you
16    reviewed prior to Mr. Webster turning himself in?
17    A.  Yes.
18    Q.  And we can see -- what is the -- is there a distinctive
19    item of clothing that Mr. Webster -- or, AFO-145 is wearing?
20    A.  Yes.  A red, black, and white jacket.
21    Q.  Do you see any other items of clothing or things that are
22    identifying what this individual was wearing on January 6?
23    A.  Looks like there's potentially gloves on the inside of the
24    jacket.  There's jeans I can see in these photos.
25    Q.  Did the FBI request that -- well, let me, actually, bring
```

 1    up one additional exhibit.  If we can take this down.

 2            Bring up Exhibit 111.  Can you see the video on the

 3    screen -- I'm sorry, the image?

 4    A.  Yes.

 5    Q.  Is this one of the images that you viewed that you received

 6    from the Washington field office before Mr. Webster turned

 7    himself in?

 8    A.  Yes.

 9    Q.  Okay.  And does this appear to be the same outfit that you

10    had seen in the previous images?

11    A.  Yes.

12    Q.  Now, when the FBI requested -- did the FBI request that

13    Mr. Webster bring any items that he had had with him at the

14    Capitol in Washington, D.C., on January 6, 2021, to the FBI

15    with he turned himself in?

16    A.  Yes, we did.

17    Q.  What kind of things did you ask him to bring?

18    A.  His cell phone, jeans, work boots, jacket, ballistic

19    vest -- which in one of the other images you could see

20    underneath the jacket -- gloves.  Basically anything in those

21    photos.

22    Q.  Did you set a date for Mr. Webster to come and turn himself

23    in?

24    A.  Yes, we did.

25    Q.  And what was the date?

1   A.  February 22nd, 2021.

2   Q.  And did Mr. Webster in fact come in on February 22nd, 2021?

3   A.  Yes, he did.

4   Q.  And where did he come?

5   A.  He came to the Hudson Valley resident agency in

6   New Windsor, New York.

7   Q.  Is that the FBI office there?

8   A.  It is the FBI office.

9   Q.  Was this the first time that you'd met the individual?

10  A.  Yes.

11  Q.  Who, if anyone else, was with the individual when he came

12  in?

13  A.  His attorney, James Monroe.

14  Q.  And what did the subject do when he came in?

15  A.  He came in, he went through our security, our screening,

16  introduced himself, you know, to myself, the other agent, the

17  attorney.  We put him through our screening and then brought

18  him in to be interviewed.

19  Q.  Did Mr. Webster -- so when he identified himself, did he

20  himself give you his name?

21  A.  Yes.

22  Q.  And what name did he give you?

23  A.  Tom, Thomas Webster.

24  Q.  Did you verify his identity in any other way?

25  A.  Yes, we did.

1    Q.   And how do you do that?

2    A.   Driver's license and passport.

3    Q.   And did the individual who came into the FBI office to turn

4    himself in on February 22nd look like the person that we've

5    just reviewed in the BOLO and the photo from the internet?

6    A.   Yes.  Yes.

7    Q.   And did you spend a significant amount of time with

8    Mr. Webster on February 22nd of 2021?

9    A.   Yes, we did.

10   Q.   About how much time did you spend with him?

11   A.   Spent about 90 minutes on the interview with the attorney

12   and then probably an additional one to two hours with the

13   arrest processing; fingerprints, photos, getting him to --

14   transporting him to the New Windsor police department to stay

15   overnight.

16   Q.   Did you also spend time with Mr. Webster on February 23rd?

17   A.   Yes.

18   Q.   Why did you do that?

19   A.   In the morning we picked him up from the New Windsor police

20   department, had to transport him to Southern District of

21   New York, White Plains courthouse for his initial appearance.

22   So, we picked him up, drove him down south, 45 minutes to an

23   hour, depending on traffic, and then with COVID protocols,

24   marshals weren't taking anybody in, so we were actually sitting

25   physically with, all day, as he was getting moved around.

1    Q.  If I understand it correctly, you spent the whole day, the

2    whole next day with Mr. Webster?

3    A.  Yes.

4    Q.  So, do you see the man who came to your office and turned

5    himself in on February 22nd, 2021 in the courtroom today?

6    A.  Yes.

7    Q.  Can you indicate where he is and perhaps identify an

8    article of clothing he's wearing?

9    A.  He's sitting in the table straight ahead from me, that way,

10   in the center of the three gentlemen.  Well, they're all pretty

11   much dressed the same, but the bluish, grayish suit with the

12   blue tie.  Just put his face mask down and put it back down.

13          MS. NIELSEN:  Can the record reflect the witness has

14   identified the defendant at the defense table?

15          THE COURT:  Any objection, Mr. Monroe?  Mr. Monroe,

16   any objection to an in-court ID?

17          MR. MONROE:  No, not as stated by the witness.

18          THE COURT:  The record will reflect an in-court

19   identification of the defendant.

20   BY MS. NIELSEN:

21   Q.  So getting back to February 22nd, did Mr. Webster bring any

22   item with him that you'd asked him to bring, that he had had

23   with him at the Capitol on January 6, when he turned himself

24   in?

25   A.  Yes, he did.

1    Q.  What items did he bring with him?

2    A.  He brought jeans, the boots, the belt, the vest,

3    bulletproof vest.

4    Q.  All right.  So let's take these one at a time.

5            Let me ask Agent Palmertree if he would bring up

6    Exhibit 101, Government Exhibit 101, please.

7            Agent, do you recognize what Agent Palmertree just

8    put on your desk in front of you?

9    A.  Yes.

10   Q.  What are these, please?

11   A.  These are the work boots that Mr. Webster brought in on

12   February 22nd.

13   Q.  And Agent Palmertree, could you also bring up -- maybe we

14   could do this easier if you brought up 102 through 105.  And

15   that would be Government Exhibit 102 through 105.

16           And we'll start with what appears to be a belt there,

17   which is marked as Exhibit 102.  Do you recognize that?

18   A.  Yes.

19   Q.  And what is it?

20   A.  This is the belt that Mr. Webster brought in.

21   Q.  And there are two pairs of jeans there, which would be

22   Exhibits 103 and 104.  Do you recognize those?

23   A.  Yes.

24   Q.  What are they?

25   A.  The jeans that Mr. Webster brought in.

1   Q.  Now, there's two pairs of jeans.  Do you know why there are

2   two?

3   A.  He said he couldn't remember exactly what pair he wore that

4   day, so he just brought them both.

5   Q.  And there should also be a plate vest, which is Government

6   Exhibit 105.

7   A.  Yes.

8   Q.  Do you recognize the -- that vest?

9   A.  Yes.

10  Q.  Is that the one that Mr. Webster brought in with him?

11  A.  Yes, it is.

12  Q.  Now, do you see any writing on the inside of that vest?

13  A.  Yes, I do.

14  Q.  What do you see?  Can you describe the writing?

15  A.  It says WEB A plus, or A positive.

16  Q.  And what does A positive mean to you?

17  A.  To me it would seem to indicate that this is probably

18  Mr. Webster's blood type.  It's common in military and law

19  enforcement to have some article of clothing, some designation

20  of your blood type in case you get into an accident, get hurt,

21  need a transfusion.  It's easier to have it marked than for

22  them to have to type you.

23  Q.  And is there another tag inside of that vest, inside the

24  layer that has the WEB and the A plus on it?

25  A.  Yes.

 1    Q.  Can you open that up?

 2    A.  If I can get this open.  Yes, inside in here (indicating).

 3    Q.  Does that tag tell you anything about the ownership of the

 4    vest?

 5    A.  Yes.  It says Webster, Thomas, gives -- tax ID number,

 6    serial number, it's the -- manufactured, it looks like, in

 7    2006.

 8    Q.  Does it say anything else about, you know, where the vest

 9    might have come from?

10    A.  Serial number, it says NYPD 15169.

11    Q.  Okay.  Thank you.  I think that's enough of the everything

12    of the tag.  Thank you.

13            MS. NIELSEN:  Agent Palmertree, if you can retrieve

14    the items, that would being great.

15    BY MS. NIELSEN:

16    Q.  So I think you mentioned that you also asked Mr. Webster to

17    bring in his phone, if he had a phone with him on that day?

18    A.  Yes.

19    Q.  Did he bring a phone with him?

20    A.  No.

21    Q.  Did the FBI ultimately obtain a cell phone from

22    Mr. Webster?

23    A.  Yes, we did.

24    Q.  And how did you get that?

25    A.  We sent a couple of agents to the residence to pick it up

1    from his wife.

2    Q.  And was that with Mr. Webster's consent?

3    A.  Yes.

4    Q.  And so, do you have Exhibit 100 in front of you?

5    A.  Yes, I do.

6    Q.  Is that the phone that the FBI obtained in Mr. Webster on

7    February 22nd, of 2021?

8    A.  Yes, it is.

9    Q.  Did you process that phone or review anything that's on it?

10   A.  No, I did not.

11   Q.  Who did?

12   A.  Our computer analysis response team.  They do all of our

13   digital and forensic evidence processing.  We collect it, hand

14   it over to them, and they take care of running.

15   Q.  All right.  And so did Mr. Webster give you all consent to

16   search his phone?

17   A.  Yes, he did.

18   Q.  I'm going to pull you up now what's been previously

19   admitted as Government's Exhibit 112.  Do you see a document on

20   the screen in front of you?

21   A.  Yes.

22   Q.  Is that the consent form that Mr. Webster signed to allow

23   the FBI to search his phone?

24   A.  Yes, it is.

25   Q.  Okay.  And you see there's a date and signature on the

1  bottom, on the first line?

2  A.  Yes.

3  Q.  Did you know -- can you tell us the date and whose

4  signature that is, if you know?

5  A.  It's February 22nd, 2021, it's Mr. Webster's signature.

6  Q.  And I'm going down to the second page of the consent form.

7  Do you see your signature anywhere on this form?

8  A.  Yes, I do.

9  Q.  And where is it?

10  A.  The bottom, the last signature.

11  Q.  The signature here, the third?

12  A.  Yes.

13  Q.  All right.  We can take that down, please.

14          Now, we notice a distinctive outer layer, a

15  distinctive coat on the photos that we saw on the BOLO, is that

16  right?

17  A.  Yes.

18  Q.  What color was that coat?

19  A.  Red, black, and white.

20  Q.  Did Mr. Webster bring that coat in with him when he turned

21  himself into the FBI on February 22nd?

22  A.  No, he did not.

23  Q.  Did you later learn anything about the coat that

24  Mr. Webster had worn in Washington, D.C. on January 6?

25  A.  Yes.

1  Q.  And what did you learn?

2  A.  Mr. Webster had said that he lost the coat in Washington,

3  D.C. on January 6th.  He was walking back to his hotel a little

4  later on in the day and had gotten spun around, lost, and

5  started experiencing some anxiety with it; took the coat off to

6  try to focus a little more on his cell phone.  He was getting

7  overheated.  Put the coat down, started focusing on the phone,

8  and walked away from it.

9  Q.  So, basically he left the coat in Washington, D.C.?

10  A.  Yes.  And that was -- that was it.

11  Q.  And that's why he didn't bring it to you?

12  A.  Yes.

13  Q.  Did you arrest Mr. Webster on February 22nd?

14  A.  Yes.

15  Q.  And did the FBI take photos of the individual that was

16  arrested on February 22nd?

17  A.  Yes, we did.

18  Q.  I'm going to bring up Exhibit -- Government's Exhibit 113.

19        Agent Norden, is this a copy of the photos that were

20  taken of Mr. Webster when he turned himself in?

21  A.  Yes.

22  Q.  And can you tell us what the date of this form is up on the

23  top, right-hand corner?

24  A.  February 22nd, 2021.

25  Q.  Thank you.  We can take that down.

 1          Did the FBI collect any other identification

 2     materials when they processed Mr. Webster?

 3     A.  Yes, we did.

 4     Q.  What kind of identification materials?

 5     A.  We had a copy of his driver's license, passport, like an

 6     employee ID, I think, card.

 7     Q.  Let me pull up Government Exhibit 114.  It's already been

 8     admitted.

 9          All right.  Do you see this on the screen in front of

10     you?

11     A.  Yes.

12     Q.  Can you tell us what this is?

13     A.  This is Mr. Webster's passport.

14     Q.  Is this one of the documents that Mr. Webster brought in

15     with him on February 22nd, to the FBI?

16     A.  Yes.

17     Q.  You can take that down.  Thank you.

18          Did this information confirm to you, at the FBI, that

19     the individual that you had arrested was Thomas Webster?

20     A.  Yes.

21     Q.  And is that the same person that you identified here in

22     court today?

23     A.  Yes, it is.

24     Q.  And was that also the same individual that you viewed in

25     the photos of AFO-145?

```
 1    A.  Yes.
 2              MS. NIELSEN:  Thank you, Agent Norden.
 3              No further questions at this time.
 4              THE COURT:  All right.  Mr. Monroe, any
 5    cross-examination?
 6              MR. MONROE:  I'm sorry, Judge?
 7              THE COURT:  Any cross-examination?
 8              MR. MONROE:  Oh, yes, sir.  Thank you.
 9                        CROSS-EXAMINATION
10    BY MR. MONROE:
11    Q.  Good afternoon, agent.
12    A.  Good afternoon.
13    Q.  Nice seeing you.
14    A.  You, too.
15    Q.  Is it true that it was my office that initiated contact
16    with the FBI on behalf of Mr. Webster?
17    A.  Yes.
18    Q.  And it's also true that Mr. Webster voluntarily surrendered
19    himself to the FBI?
20    A.  Yes, he did.
21    Q.  And he, to the best of his ability, cooperated in his
22    surrender, correct?
23    A.  Aside from not having the phone, yes.
24    Q.  Okay.  And he sat down and gave your office a statement,
25    did he not?
```

```
 1    A.  Yes.
 2    Q.  And he gave your office a statement in the presence of his
 3    attorney, did he not?
 4    A.  Yes.
 5    Q.  And at that time, didn't he tell you and your fellow agents
 6    that the officer involved had punched him in the face and
 7    that's why this whole incident had transpired?
 8              THE COURT:  Any objection is sustained.  You know
 9    that's hearsay.  You can't ask that question.
10    BY MR. MONROE:
11    Q.  Were you one of the agents involved in formulating the
12    decision to arrest and charge Mr. Webster?
13    A.  As -- what do you mean?  As far as --
14    Q.  You were involved in the process of charging and arresting
15    Mr. Webster, were you not?
16    A.  We were, in conjunction with Washington field office,
17    involved with going over the evidence provided to the U.S.
18    attorneys.  As far as what was being charged came from the
19    Washington, D.C. area.  We were responsible for formulating the
20    plan to execute a safe arrest.
21    Q.  Okay.  Had anyone for -- from your agency had a chance to
22    review any videotape showing my client being punched by the
23    officer prior to there being any type of exchange between him
24    and the alleged victim in this case?
25    A.  I don't know about that.  I know I saw some stuff that was
```

1    open source, the body cam footage was not something that I was

2    able to play on the equipment that I had at the time.  So I

3    hadn't seen any of that prior to.  So, I can't speak for what

4    anybody else saw before, I just know what I saw.

5                    MR. MONROE:  Thank for speaking with me.

6                    THE COURT:  Okay.  Redirect?

7                    MS. NIELSEN:  No redirect, Your Honor.

8                    THE COURT:  Okay.  Agent Norden, thank you very much

9    for your time and testimony.  You are free to go.

10                   THE WITNESS:  Thank you.

11                   MS. NIELSEN:  The government calls Special Agent

12   Virginia Donnelly.

13                          VIRGINIA DONNELLY,

14   was called as a witness and, having been first duly sworn, was

15   examined and testified as follows:

16                   THE COURT:  Agent Donnelly, good afternoon.  Feel

17   free to take your mask off for purposes of testimony.

18                        DIRECT EXAMINATION

19   BY MS. MIRELL:

20   Q.  Good afternoon.

21   A.  Good afternoon.

22   Q.  Where do you work?

23   A.  I work at the FBI.

24   Q.  And what's your title?

25   A.  Special agent.

1    Q.  Can you -- sorry, can you spell your first and last name

2    for the record, please?

3    A.  Sure.  Virginia Donnelly.  V-I-R-G-I-N-I-A,

4    D-O-N-N-E-L-L-Y.

5    Q.  How long have you been a special agent?

6    A.  Approximately 14 years.

7    Q.  Do you have any other roles for the FBI?

8    A.  Yes.  I'm also a negotiator and a forensic examiner.

9    Q.  How long have you been a forensic examiner?

10   A.  Approximately four years.

11   Q.  What are your duties as a forensic examiner?

12   A.  In general, I collect, preserve, and analyze digital

13   evidence.

14   Q.  Have you received any training as a forensic examiner?

15   A.  I have received approximately 500 hours of training.

16   Q.  As a result of this training, do you have any particular

17   authorizations?

18   A.  I am certified by the FBI to extract or image and then

19   process digital evidence, to include computers, mobile devices,

20   and electronic storage media.

21   Q.  And what's the name of the team or the unit that you're a

22   digital examiner for?

23   A.  It's called CART, which stands for computer analysis

24   response team.

25   Q.  Special Agent Donnelly, how are you involved in this case?

```
 1    A.  I received a CART request to extract and examine a cell

 2    phone.

 3    Q.  And which FBI office made that request of you?

 4    A.  FBI New York.

 5    Q.  And do you -- did you know if any other offices were

 6    working on that case at the time?

 7    A.  Yes.

 8    Q.  Which office?

 9    A.  The Washington field office.

10    Q.  Do you know which -- any agents in the Washington field

11    office who were also working on that case?

12    A.  Yes.

13    Q.  Who?

14    A.  Agent Riley Palmertree.

15    Q.  Can you briefly describe to the jury, just in general

16    laymen's terms, how you conduct a forensic examination of the

17    phone?

18    A.  So, in general, when I receive a phone, I do a physical

19    examination, I look at what the phone looks like, I document

20    any identifying numbers, and I indicate whether there's any

21    media cards, such as a SIM card or an SD card that's in the

22    device.  Then I hook up the mobile device to a computer and I

23    use forensic software to extract that device, and then I

24    process that extraction, also with forensic software, so that

25    it becomes readable information.
```

1    Q.  What's the name of the software that you use that converts

2    the information from the cell phone into a readable format?

3    A.  I use Cellebrite.

4    Q.  Can you spell that for the record?

5    A.  Sure.  It's C-E-L-L-E-B-R-I-T-E.

6    Q.  And at this time I'm going to ask Special Agent Palmertree

7    to bring up what's already been admitted into evidence as

8    Exhibit 100.  And with the Court's permission, as well.

9          Special Agent Donnelly, can you open that bag in

10    front of you?  And can you tell the jury whether you recognize

11    what's in that bag?

12    A.  I to recognize this device.

13    Q.  Can you show it to the jury?

14    A.  (Indicating.)

15    Q.  And what is that?

16    A.  This is the cell phone that I received to examine in this

17    case.

18    Q.  And can you, again, just briefly describe the process that

19    you used to examine that particular cell phone?

20    A.  So, first, I take the cover off and I examine the device

21    itself.  Can I remove the cover --

22    Q.  Oh, yes.

23    A.  -- of the device?

24          And then I put stickers on it to make sure that I can

25    identify it at a later date.  So, I put these two stickers on

1  it.  And then I identify the identifying numbers that are

2  written on the bottom and then I connect it to a computer to

3  extract it and analyze it.

4  Q.  And so when you extracted the data from that phone and

5  analyzed it, did that process give you any information about

6  who owned the phone?

7  A.  It gave me the phone number that's associated with the

8  phone.

9  Q.  And did the phone, in your review of its contents, have the

10  ability to send and receive text messages?

11  A.  It did.

12  Q.  Did it have the ability to take and store photographs?

13  A.  It did.

14  Q.  And did it have internet accessibility?

15  A.  It did.

16  Q.  And the ability to conduct searches on the web?

17  A.  Yes.

18       MS. MIRELL:  At this time I would also like to read a

19  stipulation that has been entered by the parties into the

20  record.  And for the record, this is Exhibit 709.  The

21  government moves to admit the stipulation.

22       THE COURT:  709 will be admitted.

23       MS. MIRELL:  Okay.  And may I display this to the

24  jury?

25       THE COURT:  You may.

1          MS. MIRELL:  As part of this case the Federal Bureau

2     of Investigation, FBI, performed a digital forensic extraction

3     of Defendant Thomas Webster's cell phone.  The United States

4     and Defendant Thomas Webster agree and stipulate to the

5     following:

6          Thomas Webster's cell phone number was (845) 238-8000

7     from January 1st, 2020 through at least February 22nd, 2021.

8     On or about February 22nd, 2021 FBI lawfully obtained Thomas

9     Webster's cell phone and retained it as evidence in this case.

10    FBI maintained proper chain of custody for Thomas Webster's

11    cell phone throughout the pendency of this case.

12          FBI employed proper and reliable techniques to

13    extract the data from Thomas Webster's cell phone.

14          Government Exhibits 300 through 316 are accurate and

15    authentic copies of digital content extracted from Thomas

16    Webster's cell phone.

17          And the stipulation has been signed by counsel for

18    the defendant, as well as the United States.

19          And at this time the government also moves no admit

20    300 through 316.  And we can take that exhibit down.

21          THE COURT:  Okay.  So 300 through 316 will be

22    admitted.

23          MS. MIRELL:  Okay.

24    BY MS. MIRELL:

25    Q.  Now, Special Agent Donnelly, I just want to run through

 1    some of these exhibits with you.  So let's start with Exhibit

 2    300.  Let's publish that to the jury.

 3              Special Agent Donnelly, can you tell the jury what

 4    this is?

 5    A.  This is an extraction report that was created from the

 6    extraction of the cell phone.

 7    Q.  And scrolling down, because this exhibit has two pages,

 8    you've testified that the -- your extraction told you the phone

 9    number associated with this device.  Do you see that phone

10    number in this exhibit?

11    A.  Yes.

12    Q.  And can you point me where?

13    A.  It's the MSISDN.

14    Q.  And I think your computer actually has touch screen

15    function.  Do you mind just highlighting or underlining it in

16    the exhibit provided?

17    A.  (Indicating.)

18    Q.  If you're able to.  No?

19    A.  I did.

20    Q.  Okay.  Sorry.  I was looking at the wrong screen.  Thank

21    you.

22              And can you just read that number into the record,

23    please?

24    A.  Sure.  It's 8452388000.

25    Q.  And is that the same phone number that was just read by the

1    stipulation?

2    A.  Yes.

3    Q.  And do you know, based on this extraction report, what type

4    of phone that is in Exhibit 100?

5    A.  Yes.

6    Q.  Where does it tell you what type of phone it is?

7    A.  It tells you the detected model, which is right here

8    (indicating).

9    Q.  Okay.  And what kind of phone is that?  Do you recognize it?

10   A.  Yes it's a Samsung Galaxy S7.

11   Q.  Okay.  We can take down Exhibit 300.

12            So I want to direct your attention now to, and

13   admitted as, Exhibit 301.  I'm going to show that to the jury.

14            Special Agent Donnelly, what is this?

15   A.  This is an excerpt from the extraction report for this cell

16   phone.

17   Q.  And what is the excerpt -- what kind of content is it

18   showing us?

19   A.  It's showing text context.

20   Q.  And if we go through this exhibit, starting with the row

21   number 2, do you see a "From" column?

22   A.  Yes.

23   Q.  Is there any content in that column?

24   A.  There is not.

25   Q.  So how do you know who sent this text message?

1    A.  Under the "Content" column there is a heading that says

2    "Direction," and it says "Outgoing."

3    Q.  Can you underline that for the jury, please?

4    A.  Can I circle it instead?

5    Q.  You may.  Yes, of course.

6           Okay.  And the record reflects that she's circled

7    "Direction:  Outgoing" under the column labeled "Content."

8           So what does that tell you about who sent this text

9    message?

10   A.  It means that it came from the device that I examined.

11   Q.  So the owner or user of the device sent that text message?

12   A.  Correct.

13   Q.  Okay.  And moving on to the next column, the column labeled

14   "To."  Do you see where it says, "And Stacey Brian"?  What is

15   that?

16   A.  It means the device married up or connected the phone

17   number with how it was stored in the contacts of the device.

18   Q.  So the name listed under the "To" column is one of the

19   contacts from the phone?

20   A.  Correct.

21   Q.  Would it appear as "And Stacey Brian" if I were holding the

22   phone, if I were looking and scrolling through it?

23   A.  No.  It would show up as "Brian" and "Stacey," with Brian

24   being the first name and Stacey being the last name.

25   Q.  And last I want to direct your attention to the column

```
 1    labeled "All timestamps."  And do you see where it says the
 2    timestamp of 11-4-2020, 3:37:33 a.m., UTC-0?
 3    A.   Yes.
 4    Q.   Are you familiar with that time zone, "UTC-0"?
 5    A.   Yes.
 6    Q.   Is that time zone the same time zone that we're in, the
 7    Eastern Standard time?
 8    A.   No, it is not.
 9    Q.   What would one have to do to this time zone to convert it
10    to Eastern Standard time?
11    A.   You would have to subtract five hours.
12    Q.   So then what time was this message messaged "To" sent on
13    November -- well, what time was it sent?
14    A.   It was sent at 10:37 p.m. on November 3rd, 2020.
15    Q.   All right.  We can take that exhibit down.  Thank you.
16              And publish for the jury Exhibit 309.
17              Special Agent Donnelly, can you tell the jury what
18    this is?
19    A.   This is a photo from the device.
20    Q.   And did this photo also -- when you performed your
21    extraction and analysis, did it come with metadata associated
22    with that photo?
23    A.   It did.
24    Q.   Okay.  So I'm going to scroll down to the second page of
25    Exhibit 309.  And I'm going to zoom in here.
```

1          So, how do you -- do you know who took this photo?

2   A.   The device took this photo.

3   Q.   How do you know the device took the photo?

4   A.   Because under "Camera make and model" under metadata, which

5   is right here, it says the same make and model of the device

6   that I extracted.

7   Q.   And does this metadata tell you what time the photograph

8   was taken?

9   A.   It does.

10  Q.   And what time was that?

11  A.   It was at 3:43 p.m. on January 6, 2021.

12  Q.   And do you have to do anything to that time zone in order

13  to convert it into Eastern Standard time?

14  A.   You do not.

15  Q.   And the significance of the "Created date" up top, in that

16  column labeled "Additional file info," the same column we've

17  been discussing, what's the significant of that created date?

18  A.   That's the date that the photo was taken with the device.

19  Q.   Finally, I want to direct your attention to the column

20  labeled "Deleted."  Do you see where it say "Yes" in red?

21  A.   Yes.

22  Q.   What does that mean?

23  A.   It means the user of this device deleted this photo.

24  Q.   Lastly -- actually, going back to the "Additional file

25  info" column, do you see, at the very bottom, where it says

1    Lat/Lon, colon?

2    A.  Yes.

3    Q.  What's your understanding of that?

4    A.  That is the latitude and longitude of where the device was

5    when that photo was taken.

6    Q.  You can take that photo down.

7         And I'm going to show you what's been admitted as

8    Exhibit 310.

9         Do you see that exhibit, Special Agent Donnelly?

10   A.  Yes.

11   Q.  What is this?

12   A.  This is an excerpt of the web history that was extracted

13   from this device.

14   Q.  And looking at the column labeled "Title," what does it say

15   there?

16   A.  Stop the Steal rally at DuckDuckGo.

17   Q.  Is it your understanding the title is generated by the user

18   of the phone?

19   A.  No.

20   Q.  Who generates the title?  Or what generates it?

21   A.  It's automatically generated between the device and the

22   website that is visited.

23   Q.  So are you familiar with DuckDuckGo?

24   A.  Yes.

25   Q.  What is DuckDuckGo?

1    A.  It's a search engine that is considered a private browser.

2    Q.  And what makes it private?

3    A.  So, it prohibits tracking.

4    Q.  And what do you mean by -- for those of us who may not be

5    good at technology, what do you mean by prohibits tracking?

6    A.  It tries to stop tracking from other websites or other

7    applications on the device when you're using that search

8    engine.

9    Q.  So you said DuckDuckGo is like a search engine, like

10   similar to Google?

11   A.  Correct.

12   Q.  But it doesn't leave traces or doesn't leave information

13   about your user or your user profile for other types of

14   entities?  I must be butchering that.  But why don't you say it?

15   A.  It doesn't allow other applications or other websites to

16   track what you're searching on that search engine.

17   Q.  Okay.  And so, if we look at this column labeled "URL,"

18   what does this URL tell you about the web search?

19   A.  It tells me that the user went to DuckDuckGo first to start

20   the browser and then searched Stop the Steal rally within that

21   browser.

22   Q.  And if we move one column over, to the last visited column,

23   do you see where it says December 4th, 2020, at 11:15:06 a.m.?

24   A.  Yes.

25   Q.  And do you see where it says UTC-5?

1    A.  Yes.

2    Q.  Are you familiar with that time zone represented by UTC-5?

3    A.  Yes.

4    Q.  What time is that?

5    A.  That's Eastern Standard time.

6    Q.  So we wouldn't have to do anything, or the viewer would not

7    have to do anything in order to convert that timestamp, the

8    UTC-5, to Eastern Standard time?

9    A.  No.

10   Q.  I have one last exhibit for you -- we can take this exhibit

11   down -- Exhibit 314.

12            Again, Special Agent Donnelly, if we look at the

13   column labeled "Title," what does it say in "Title"?

14   A.  "Now facial recognition proves who stormed Capitol.

15   Populist Press 2021."

16   Q.  And if you direct your attention to the next column where

17   it says URL, what is that URL tell you about the search history

18   here?

19   A.  That the user went to the website Populist Press and looked

20   at something that was called "Breaking now, facial recognition

21   proves who stormed Capitol."

22   Q.  So is there any indication from this URL that it was

23   accessed by going through a search engine like DuckDuckGo or

24   Google?

25   A.  No.

 1    Q.  Okay.  And the same metadata that you described for Exhibit

 2    310 applies -- with respect to "Last visited" applies to this

 3    exhibit as well?

 4    A.  Yes.

 5              MS. MIRELL:  I have no further questions for this

 6    witness.

 7              THE COURT:  Cross-examination?

 8              MR. MONROE:  No cross for the witness, Judge.  Thank

 9    you.

10              THE COURT:  Okay.  All right.  Agent Donnelly, thank

11    you very much for your time and testimony.  You may step down.

12              THE WITNESS:  Thank you.  The evidence is still here.

13              THE COURT:  We'll take care of that.

14              Okay.  Government ready with its next witness?

15              MR. KELLY:  Yes, Your Honor.  Before the next witness

16    takes the stand, again, we had sent our expected exhibits --

17    there were just three of them for this witness -- to defense.

18    The government's understanding is --

19              THE COURT:  Let's have the witness just have a seat

20    real quick for a moment.

21              MR. KELLY:  They're Exhibits 402, 403 --

22              THE COURT:  Hang on one second.

23              MR. KELLY:  Yes.

24              THE COURT:  Have Mr. Douyon back here.

25              So what are they?

1          MR. KELLY:  Yes, 402, 403, and 404.

2          THE COURT:  Okay.

3          MR. KELLY:  So the government would just move to

4     admit those at this time, for efficiency sake.

5          THE COURT:  Okay, 401, 402, and 403 --

6          MR. KELLY:  I'm sorry, Your Honor.  I may have

7     misspoken.  402, 403, and 404.

8          THE COURT:  Okay.  So 402, 403, and 404, those will

9     be admitted.

10          MR. KELLY:  That was all the government had, Your

11     Honor.

12          THE COURT:  Okay.  Come on up.  Sir, you can come on

13     up.

14                         EDGAR TIPPETT,

15     was called as a witness and, having been first duly sworn, was

16     examined and testified as follows:

17          THE COURT:  All right.  Sir, welcome.  For purposes

18     of your testimony, feel free to remove your mask.

19          THE WITNESS:  Thank you.

20                    DIRECT EXAMINATION

21     BY MR. KELLY:

22     Q.  Good afternoon, sir.

23     A.  Afternoon.

24     Q.  Can you please begin by introducing yourself to the jury,

25     and spelling your first and last name for the record?

1    A.   Certainly.  My name is Edgar Charles Tippett.  E-D-G-A-R.

2    Last name Tippett, T-I-P-P-E-T-T.

3    Q.   Thank you.  Mr. Tippett, where do you work?

4    A.   I work for Safeway Stores, Incorporated; Albertsons.

5    Q.   And most people probably already know, but just for -- just

6    in case, could you please tell the jury what Safeway is?

7    A.   Safeway is a grocery store in the -- in this area.  We are

8    owned by Albertsons, LLC.  We operate throughout the entire

9    country, under various and different names, as a grocer.

10   Q.   Mr. Tippett, does Safeway have any stores located in the

11   District of Columbia?

12   A.   Yes, sir, we do.

13   Q.   Do you know how many stores are located in the District of

14   Columbia?

15   A.   I have five of the stores, Phil White has seven.  So 12 all

16   together.

17   Q.   Twelve all together.

18            And what is your position with Safeway?

19   A.   My position is district manager.  I oversee those five

20   stories, plus another 11 throughout the Maryland area.

21   Q.   How long have you been with Safeway?

22   A.   I've been with Safeway for 43 years, and I've been a

23   district manager for 23 of those years.

24   Q.   You already answered my next question.

25   A.   Oh, sorry.

1    Q.  No, it's fine.  You're making my job easy.  I appreciate it.

2           Mr. Tippett, now that we've gotten a little bit of

3    your background out of the way, I would like to direct your

4    attention to January 6 of last year, 2021.  Do you recall if

5    you were working that day?

6    A.  Yes, sir, I was.

7    Q.  Do you recall if, around 3:45 that afternoon, did you

8    receive an email concerning a citywide curfew being imposed in

9    the District?

10   A.  Yes, sir.  We had to clear out the stores by 4 p.m.

11   Q.  Was that email also sent to other individuals -- other

12   employees of Safeway?

13   A.  Yes.  To the entire city, yes.  And we also had a

14   conference call to review it quickly.

15   Q.  Do you recall, just generally, what the email said?

16   A.  It said:  For the safety of our employees -- and really did

17   focus on safety of the employees -- due to the incidents down

18   at the Capitol, that we would be shutting down our stores and

19   there would be no employees, guards, etcetera, in the stores at

20   all.  We would completely be unstaffed.

21   Q.  And I'm going to put up on the screen here what's been

22   admitted as Government's Exhibit 403.  Go ahead and publish

23   that.

24           Zoom on that a little bit.

25           Mr. Tippett, is this the email that was sent out to

1    Safeway employees on January 6, 2021?

2    A.  Yes, it was.

3    Q.  And other than, obviously, there are some blacked-out,

4    redacted portions, other than that, is this a complete copy of

5    that email, to your recollection?

6    A.  Yes, it is.

7    Q.  Could you just read to the jury what the subject line of

8    the email says?

9    A.  Subject line --

10   Q.  Where I'm pointing.

11   A.  Yes.  "Washington, D.C. curfew tonight, 1-6-21, 6 p.m. to

12   6 a.m.  Capitol lock down."

13   Q.  And I think you alluded to this already, but did -- what

14   was your understanding of why the -- of why the curfew was

15   being imposed?

16   A.  Due to the insurrection at the Capitol, we decided to, for

17   the safety of our employees -- plus, I think Metro was closing

18   down, as well as other areas, where -- most of our employees do

19   ride public transportation.  So we were trying to get everybody

20   out of our stores and home safely.

21   Q.  And this is the last part I'll have you read, I promise.

22   But if you could just read these first four lines here for the

23   jury (indicating)?

24   A.  Yeah.  "There is in place a 6 p.m. to 6 a.m. citywide

25   curfew throughout Washington, D.C. tonight, Wednesday, 1-6-21.

1    All D.C. stores will be closed at 4 p.m., with plans to reopen

2    at 6 a.m. or 7 a.m.  Night crews will not be in place."

3    Q.  Thank you.  Taking down Government's Exhibit 403.

4         Mr. Tippett, did Safeway in fact close all of its

5    D.C. stores at 4 o'clock p.m. that day?

6    A.  Yes, sir, we did.

7    Q.  Did Safeway also send home all of its employees at 4 o'clock

8    that day?

9    A.  Yes, we did.

10   Q.  What was the normal closing time for those stores in the

11   District of Columbia?

12   A.  My stores, midnight.  And then Georgetown, my one

13   Georgetown store is a 24-hour store, along with Georgia and

14   Randolph, was also a 24-hour store.  I believe some of Phil's

15   were 11 p.m.

16   Q.  So is it fair to say that the earliest that any of the

17   Safeway stores in the District would have normally closed on

18   that day would have been 11 p.m.?

19   A.  That's correct, yes.

20   Q.  And some would have stayed open?

21   A.  Open all night.

22   Q.  And then some --

23   A.  Until midnight.

24   Q.  Mr. Tippett, do Safeway stores in the District of Columbia

25   usually make sales between 4 o'clock p.m. and normal closing

1    time?

2    A.  Yes.  Historically, our business really goes into halves.

3    We do half of our business by 3 p.m. and then we do another

4    half from 3 p.m. to closing.  So we would have lost a

5    significant amount of income that day.

6    Q.  Mr. Tippett, did Safeway -- did Safeway ever prepare a

7    report that would have shown if it lost any revenue as a result

8    of the closures on January 6, 2021?

9    A.  Yeah, we get a sales report daily that we can look at.

10   And, of course, at the time we were still affected by the

11   pandemic, with greater sales than normal.  So most stores were

12   running probably 30 to 40 percent positive at the time.  And I

13   think, you'll see by the sales report, there are some negatives

14   on there.  So it did greatly affect our business, obviously.

15   Q.  So I'm actually going to put up what's Government's Exhibit

16   404, which has already been admitted.  You can publish that

17   please?  And I'll zoom in a bit.

18          And, actually, turning to the second page of

19   Government's Exhibit 404.  Mr. Tippett, is this the daily sales

20   report that you were alluding to a moment ago?

21   A.  Yes.  Yes, it is.

22   Q.  There's some terms on the report that I'm hoping you can

23   explain, and I'll take them just one-by-one with you.

24          Could you tell the jury, sort of, the middle column

25   there, what does "Projected ID percent" stand for?

1    A.  Projected ID is what the company -- quarterly we make a

2    sales plan.  This was coming, what we projected against COVID

3    from last year, which we thought we would probably start to

4    tail off a little bit; we had not.  I can honestly tell you

5    that because we were -- we continued to attract very high

6    sales.  So we were beating those sales plans by a large amount.

7    Q.  And, Mr. Tippett, what is actual ID?

8    A.  Actual is what we actually did for the day, compared to

9    last year.  So last year we were down -- we ran 13 percent down

10   from last year; expected us to be 14 percent up.  So the ID

11   versus projected, if you look at the Piney Branch store, shows

12   us 28 percent down.

13   Q.  So let's take the Piney Branch store as an example then.

14   So just to understand -- and correct me if any of this is

15   wrong -- so the actual ID for the Piney Branch store,

16   negative 13.81 percent, does that mean that in real terms, in

17   real dollars, that the store, Piney Branch, made almost

18   14 percent fewer sales on January 6, 2021 as compared to

19   January 6, 2020?

20   A.  Actually, ran 13 percent down versus actual.  But the

21   projected was 14 percent up, so it ran 28 percent down,

22   actually.

23   Q.  Okay.  So in layperson's terms, that ID versus projected

24   there in the last column, when it's negative, does that mean

25   that a particular store made fewer sales as a result of the

1    store closures?

2    A.  That's very bad.  Yes, when you see red in that column,

3    you're in -- yeah, you're in trouble.

4    Q.  So, for example, for the Piney Branch store, on January 6,

5    2021, that location made about 28 percent less in revenue

6    versus what had been expected?

7    A.  Correct.  Yes.

8    Q.  And that's true as you go down the column for each of the

9    stores?

10   A.  Yes, every store there.  And our city stores generally,

11   you're talking about January 6 when some of the

12   first-of-the-month money flows, we're usually well above a

13   normal week.  So it actually adds additional sales to us, which

14   we did not do that particular day.

15   Q.  So, taking the report as a whole then, does that mean that

16   each of the stores in D.C., from the low end to the high end,

17   made between, roughly, 18 percent on the low end and 47 percent

18   on the high end, fewer sales than what was projected?

19   A.  That's correct, yes.

20   Q.  In your many years with Safeway, was this an unusual

21   result?

22   A.  Absolutely, yes.

23   Q.  What was unusual about it?

24   A.  Being negative at all.  We generally write a plan that is

25   pretty fair and balanced because your plan is based on an

1    achievable bonus target.  So we don't set it so high that you

2    would never even be able to touch it.  If you saw numbers like

3    that from your projected, you would kind of give up on your

4    bonus, which you use that bonus to drive us, not to -- not to

5    just sit down.  So that would be -- yeah, very concerning for

6    any day or any -- you know, anytime.

7    Q.  Okay.  I'm going to take down the exhibit now.

8         I'm going to change subjects on you just a little bit

9    here, Mr. Tippett.  Where do the Safeway District of Columbia

10   stores receive -- from where do the Safeway District of

11   Columbia stores receive the goods that they sell?

12   A.  Our product comes out of Lancaster, Pennsylvania.

13   Q.  Are shipments received at the District of Columbia stores

14   from Lancaster, Pennsylvania on a daily basis?

15   A.  Yeah.  Some stores receive up to seven orders a day -- a

16   week, I'm sorry.  Some stores get four.  So either daily and/or

17   every other day.

18   Q.  And are those shipments typically made at different points

19   during the day for a particular store?

20   A.  Yes.  Yeah, your grocery, your hard, nonperishables come in

21   before 10 p.m.  That's when your stockers, night stockers come

22   in to restock the store after the day's business.  Perishable

23   flows from 2 a.m. to, normally, 6 a.m. into our stores.

24   Q.  So does that mean that for at least one category of goods,

25   those would typically have been received at the Safeway D.C.

1    stores after 4 o'clock p.m.?

2    A.  That would be correct, yes.

3    Q.  And is it also fair to say that those products would

4    typically be reshelved overnight?

5    A.  Correct.  Yes, night stockers work that entire load.  Yes.

6    Q.  Due to the store closures on January 6, 2021, were the

7    Safeway District of Columbia stores able to receive their

8    scheduled shipments from Pennsylvania?

9    A.  No, we could not receive our shipments, nor did we have

10   anybody in the stores to put them up.  So took us -- it put us

11   about a day and a half behind, roughly.  And also, when you

12   look at perishable, perishable, obviously, has, you know, a

13   shelf life that is, you know, measured within days.  And when

14   you lose a day's business and then you have product in the

15   pipeline coming, you're going to -- it's going to cause you to

16   increase your shrink percentage, lose product.  That is, what

17   normally would have sold just sitting on the shelf, plus you

18   have more product coming, sitting in trucks.

19            This kind of happened a little bit quickly, which, I

20   guess, caught everybody off guard.  Those trucks were loaded

21   and ready to come, so you couldn't cut off what you didn't

22   sell.  So you had to then -- I guess, later in the week -- it

23   probably took us three, four days to completely recover from a

24   day like that.  Sort of like a snowstorm for us.  When you

25   can't get anything in, it takes several days to recover.

 1    Q.  So I think, based on what you just said, is it fair to say

 2    that the lack of shipments after 4 o'clock p.m. on January 6th,

 3    2021 negatively impacted sales at the D.C. locations?

 4    A.  Extremely detrimental, yes.

 5              MR. KELLY:  I have no further questions.  Thank you.

 6              THE WITNESS:  Okay.

 7              THE COURT:  Okay.  Any cross-examination

 8    Mr. Webster -- I'm sorry, Mr. Monroe?

 9              MR. MONROE:  We have no cross-examination of this

10    witness.

11              THE COURT:  Okay.  Thank you very much, Mr. Tippett,

12    for your time and your testimony.  I think we all learned a

13    lot.

14              MS. MIRELL:  Your Honor, may I go put the poster

15    board up?

16              THE COURT:  Sure.

17                        (Pause.)

18     MS. MIRELL:  Your Honor, at this time the government calls

19        its final witness, Special Agent Riley Palmertree.

20                    RILEY PALMERTREE,

21    was called as a witness and, having been first duly sworn, was

22    examined and testified as follows:

23              THE COURT:  All right.  Agent Palmertree, welcome.

24              THE WITNESS:  Hello, Your Honor.

25              MS. MIRELL:  And before we start with Special Agent

 1    Palmertree, I would like to move to admit certain exhibits with

 2    this witness.  Those exhibit numbers are:  208.2, 209.1, 211,

 3    212, 213, 214, 215, 216, 217, 217.1, 217.2, 217.3, 218, 219,

 4    407, 408, 613, 614, 705, 706, 707, 710.

 5              THE COURT:  Okay.  Mr. Douyon, did you get all those?

 6              THE COURTROOM DEPUTY:  Yes.

 7              THE COURT:  All right.  Mr. Monroe, any objection

 8    to --

 9              MR. MONROE:  No objection.

10              THE COURT:  All right.  So those exhibits will all be

11    admitted.

12                         DIRECT EXAMINATION

13    BY MS. MIRELL:

14    Q.  Good afternoon.

15    A.  Good afternoon.

16    Q.  Can you please introduce yourself to the jury?

17    A.  My name is Special Agent Riley Palmertree.  First name is

18    R-I-L-E-Y, my last name is P-A-L-M-E-R-T-R-E-E.

19    Q.  Where do you work, Special Agent Palmertree?

20    A.  At the FBI Washington field office.

21    Q.  And how long have you been at the FBI Washington field

22    office?

23    A.  Since October 2017.

24    Q.  And what is your current assignment at the Washington field

25    office?

1    A.  I'm assigned to the FBI Washington D.C. Violent Crimes Task

2    Force.

3    Q.  Are you familiar with the investigation into Thomas

4    Webster?

5    A.  I am.

6    Q.  What's your role in that investigation?

7    A.  I am the case agent.

8    Q.  What does it mean to be the case agent?

9    A.  Essentially, I'm in charge of the investigation, it's

10   trajectory and -- of consolidating all the collaborative work

11   of other law enforcement agencies and colleagues and placing it

12   all into one case.

13   Q.  During your investigation into the defendant Thomas

14   Webster, did you work with agents from any other FBI offices?

15   A.  Yes.

16   Q.  Which offices?

17   A.  The FBI New York field office, its resident agency, the

18   Hudson Valley resident agency, which is a satellite office out

19   of the New York field office.

20   Q.  And do you have any other familiarity with the events that

21   occurred at the Capitol on January 6th?

22   A.  Yes.

23   Q.  How do you know -- or, what type of familiarity do you have

24   with those?

25   A.  My squad is tasked with -- my colleagues on the squad that

1    I work with, Violent Crimes Task Force is tasked with

2    investigating many of these cases, cases that resulted in

3    assaults on a federal officer.  I have about seven of these

4    cases.

5    Q.  So, in the days following January 6, how did the FBI go

6    about identifying participants in the January 6 riot?

7    A.  The first thing was we reviewed a lot of video, would be

8    the first step.

9    Q.  And based on that video, did you generate any type of

10   wanted poster, BOLO poster?

11   A.  Based on those videos, we tried to identify what looked to

12   be assaults on federal officers and we attempted to identify

13   both the victims in those cases and the individuals who had

14   appeared to assault federal officers on camera.  And those

15   individuals we -- who looked to have committed assaults against

16   federal officers, we tried to get as many photos of them as

17   possible in order to send out be-on-the-lookout notifications

18   to other field offices and in order to assemble

19   be-on-the-lookout posters that were eventually numbered onto

20   our website so that the public could submit tips to the FBI.

21   Q.  So, is that how you first came to learn about defendant

22   Thomas Webster?

23   A.  Yes.

24   Q.  And did defendant have a BOLO poster associated with him

25   that you've just described?

1    A.  Yes.

2    Q.  I'm showing you what's already been admitted into evidence

3    as Exhibit 106.  Publish for the jury.

4          Is this the BOLO poster that you're referring to?

5    A.  Yes.

6    Q.  Okay.  And during your investigation into -- did you --

7    well, what did you refer to him, based on this BOLO poster?

8    A.  To me he was FBI AFO BOLO 145.

9    Q.  So shorthand, BOLO 145?

10    A.  Yes.

11    Q.  During your investigation did you find any additional open

12    source photos of BOLO 145?

13    A.  Yes.

14    Q.  Can you describe for the jury what you mean by BOLO --

15    sorry, open source?

16    A.  Open source is just a technical term for publicly available

17    information, or information you could gather from Google or

18    things that are posted on social media accounts that you don't

19    have to log into, for instance, Twitter.

20    Q.  Okay.  And, sir, I'm going to show you what's been marked

21    or entered into evidence as Exhibit 111.  And you can publish

22    for the jury.

23          Is this one of the photos that you -- an open source

24    photo that you located?

25    A.  It is.

1    Q.  Do you remember where you found this photo?

2    A.  From social media.  I believe it was Twitter.

3    Q.  And aside from this open source photograph, did you receive

4    any other leads about BOLO 145's identity?

5    A.  Yes.

6    Q.  What types of leads?

7    A.  Primarily we received a lead from facial recognition search

8    through a repository from a partner agency.

9    Q.  Once you got that facial recognition hit, what did you do

10   with it?

11   A.  We compared that facial recognition hit to the records it

12   was associated with and got identifying information from those

13   records and further attempted to identify the individual in

14   other databases that we would use, that would give us the

15   person's name, location.

16   Q.  So what other databases did you search?

17   A.  Most likely a database called Accurint.

18   Q.  Did you also look at a DMV database?

19   A.  Yes.

20   Q.  I'm going to show you what's been admitted into --

21          First, I'm going to read what's been admitted as

22   Exhibit 707, which is a stipulation between the parties, which

23   also contains an accompanying report.

24          Okay.  The stipulation, reads as follows:  The

25   United States and Defendant Thomas Webster agree and stipulate

1    to the following:

2            On or about January 5th, 2021, a gray-colored 2004

3    Honda CR-V, New York state license plate number HV, as in

4    Victor, U 2139 was registered to defendant Webster.

5            A license plate reader is a camera that is pointed at

6    a roadway and it is specifically designed to read license plate

7    numbers.  Information from a license plate reader is collected,

8    including photographs of the license plate and car, date and

9    time information from when the picture was taken, and GPS

10   location information from when the picture was taken and

11   transmitted to servers owned by the District of Columbia

12   Metropolitan Police Department.  This information is

13   searchable, including by license plate number.

14           On February 17th, 2021, Deputy U.S. Marshal Gregory

15   Conner queried the license plate reader servers for license

16   place number HVU 2139.  He also queried the servers for other

17   license plate numbers similar to HVU 2139, include HVU 273.

18   According to the servers, on January 5th, 2021, at 4:32:30 a.m.

19   UTC-5, New York state license number HVU 2139 was photographed

20   entering the District of Columbia from Maryland while driving

21   southbound on Highway 295.

22           License plate reader information is maintained by the

23   Metropolitan Police Department in the regular course of

24   business and is regularly checked for accuracy.

25           The report appended to this stipulation is an

1    authentic, true and correct copy of a printout of the

2    above-described information for the New York state license

3    plate number HVU 2139.

4            Signed by the defense and the government.

5            And as we scroll down to the third page of this

6    exhibit, is this the license plate -- well, Special Agent

7    Palmertree, what is this?

8    A.  It's a license plate reader record.

9    Q.  Okay.  And I want to focus your attention to the middle

10   photograph, the top of the -- of this attachment.  What is the

11   license plate that you read there?

12   A.  HVU 2139.

13   Q.  Okay.  All right.  Take down that exhibit.

14           Based on your review of the DMV database, is that the

15   license plate registered to the defendant?

16   A.  Yes.

17   Q.  At the same time that you were conducting your

18   investigation into the identity of BOLO 145, did you learn of

19   any other FBI offices who were also investigating BOLO 145?

20   A.  Yes.

21   Q.  Which office?

22   A.  The New York field office, the Hudson Valley resident

23   agency.

24   Q.  And did you ultimately collaborate with the Hudson Valley

25   resident agency to identify and arrest the defendant?

1    A.  Yes.

2    Q.  Now, Special Agent Palmertree, I want to focus your

3    attention now on the defendant's time in Washington, D.C.

4            First, before I do that, as part of your

5    investigation into the events of January 6th, did you review

6    the contents of the defendant's cell phone?

7    A.  I did.

8    Q.  And can you explain to the jury what you did in order to

9    review the contents of the defendant's cell phone?

10   A.  I just went through text messages, web browser searches,

11   images, videos stored on the device, those types of things.

12   Q.  And were you provided with a Cellebrite report in order to

13   do that?

14   A.  Yes.

15   Q.  And who provided you with that report?

16   A.  The Hudson Valley resident agency.  Specifically, Special

17   Agent Virginia Donnelly.

18   Q.  And so you used that report to review the contents of the

19   phone?

20   A.  Yes.

21   Q.  Okay.  You may have mentioned some of this already but did

22   you review text messages on the phone?

23   A.  Yes.

24   Q.  And photos?

25   A.  Yes.

1    Q.  And web history?

2    A.  Yes.

3    Q.  So after reviewing the defendant's text messages, did you

4    form an opinion about why the defendant may have traveled to

5    Washington, D.C. on January 6th?

6    A.  Yes.

7    Q.  And what was your understanding?

8    A.  In short, to attend the Stop the Steal rally that was set

9    for January 6th.

10   Q.  And why -- did you have an understanding of why the

11   defendant would have wanted to attend that rally?

12   A.  To protest the results of the presidential election.

13   Q.  I'm showing you what's been admitted -- take this down, if

14   we haven't already.

15          Showing you what's been admitted as Exhibit 301.

16   Special Agent Palmertree, do you recognize this?

17   A.  Yes.

18   Q.  What is this?

19   A.  They're text messages sent from the mobile device.

20   Q.  From the defendant's mobile device?

21   A.  Yes.

22   Q.  So what did the defendant message the contact Brian Stacey

23   at 10:37 p.m. on November 3rd?

24   A.  "All the commies moved to NH, unfortunately, and bought the

25   blue with them."

1    Q.  And what did the defendant message the contact Maura at

2    3:15 p.m. on November 4th?

3    A.  "If it was done the fair way he wins, but the devil's party

4    is pulling out every trick in the book, so I really can't say

5    50-50.  Wisconsin finds 100K ballots overnight and 100 percent

6    of them are for Biden, not to mention they have more votes cast

7    than registered voters."

8    Q.  Special Agent Palmertree, do you know when the presidential

9    election was in 2020?

10   A.  Yes.

11   Q.  What day?

12   A.  November 3rd.

13   Q.  So around the time that these text messages were sent?

14   A.  Yes.

15   Q.  Okay.  I am going to take down this exhibit, show you

16   what's been admitted as Exhibit 302.

17         Special Agent Palmertree, what did the defendant

18   message the contact Brian and Stacey on November 5th, 2020, at

19   10:17 p.m.?

20   A.  "The same people burning our country down and attacking

21   cops are now in charge of counting ballots for the POTUS.  Do

22   they really think they're going to follow the law or subpoena

23   to allow supervision in counting ballots?"

24   Q.  And just for the record here, Special Agent Palmertree, you

25   were here while Special Agent Donnelly was testifying?

1    A.  Yes.

2    Q.  And you heard her talk about the UTC time zones?

3    A.  Yes.

4    Q.  So is it your understanding that 3:17:14 a.m. on November

5    6th would actually be 10:17 p.m. on November 5th, 2020?

6    A.  Yes, Eastern Standard time.

7    Q.  All right.  I'll take down that exhibit.

8          Show you what's been admitted as Exhibit 303.  What

9    did the defendant message Brian and Stacey on December 30th,

10   2020 at 5:29 p.m. as the converted time?

11   A.  "Guide to your Jan 6 trip --"

12          THE COURT:  Hang on for a second.  May I ask you to

13   magnify that?  I think folks are having a hard time.

14          MS. MIRELL:  Of course.  My apologies.  I'm too

15   familiar with this.

16   BY MS. MIRELL:

17   Q.  Okay.  Can you read again, Special Agent Palmertree?

18   A.  Yes.  "Guide to your Jan 6 trip includes D.C. gun laws,

19   self-defense options, citizen's arrest policy, drone policy,

20   common sense gear list, bonus prep info, and the Constitution

21   for obvious reasons.  Don't be a liability, be prepared for it

22   to get wild.  The Donald.  America first," with a URL.

23   Q.  Thank you.  I'll take down that exhibit.

24          Based on your review of the defendant's phone, did

25   you -- do you know if the defendant did any research before

1    going to the rally on January 6th?

2    A.  Yes.

3    Q.  Showing you what's been admitted as Exhibit 310.

4         Okay.  Zoom in on that.

5         So what is the title of the website that the

6    defendant visited on December 4th, 2020, at 11:15 a.m.?

7    A.  Stop the Steal rally at DuckDuckGo.

8    Q.  And do you know what the Stop the Steal rally was?

9    A.  Yes.

10   Q.  What was it?

11   A.  It's a rally to protest the presidential election.  It was

12   a rally that was slated and took place in Washington, D.C.,

13   near the ellipse, on January 6th, 2020 -- 2021.

14   Q.  Thank you.  Showing you what's been admitted as Exhibit

15   311.  What is the title of the website that the defendant

16   visited on December 10th, 2020, at 5:56 p.m.?  I'm sorry, at

17   10:56 p.m.

18   A.  Bullet safe, bulletproof vests.

19   Q.  And we can take down that exhibit.

20        Showing you what's been admitted as Exhibit 313, what

21   is the title of the website that the defendant visited on

22   December 29th, 2020, at 12:18 a.m.?

23   A.  Support Stop the Steal 2020.

24   Q.  And is it your understanding that that date is about one

25   week before the Stop the Steal rally?

1    A.  Yes.

2    Q.  Okay.  Take down that exhibit.

3         Show you what's been admitted as Exhibit 312.  Okay.

4    We can publish that.  What is the title of the website that the

5    defendant visited on December 30th, 2020, at 5:25 p.m., about a

6    week before January 6th?

7    A.  Guide to your Jan 6 trip.

8    Q.  Okay.  We don't have to read the rest.  Do you recognize

9    this text, Special Agent Palmertree?

10   A.  Yes.

11   Q.  Is it the same content as what we saw on the text message

12   in Exhibit 303 to Brian and Stacey?

13   A.  Yes.

14   Q.  Okay.  Just for good measure, we'll show that text again.

15   That's going to be Exhibit 303.

16        Does that appear to be the same text, Special Agent

17   Palmertree?

18   A.  It does.

19   Q.  You can take that exhibit down.

20        Okay.  So, Special Agent Palmertree, you testified

21   about how the defendant's car was photographed entering

22   Washington, D.C.  Do you know where in Washington, D.C. the

23   defendant stayed?

24   A.  Yes.

25   Q.  Where did he stay?

 1    A.   The Hotel Lombardy.

 2    Q.   How do you know that?

 3    A.   Because of images from the phone.

 4    Q.   Okay.  Showing you what's been admitted as Exhibit 305.

 5    Okay.  So, Special Agent Palmertree, I want to zoom into this

 6    photo and focus your attention on the ice bucket.  Can you read

 7    what it says on that ice bucket?

 8    A.   Hotel Lombardy.

 9    Q.   Do you recognize that gold insignia on top of the text?

10    A.   Yes.

11    Q.   What is that insignia?

12    A.   That's the Hotel Lombardy insignia.  It's in a lot of

13    places, including the welcome mat outside the doors of Hotel

14    Lombardy.

15    Q.   Okay.  And do you recognize this brown packaging on the

16    glass table in the photograph?

17    A.   I do.

18    Q.   What is that?

19    A.   That's what's commonly referred to as an MRE, or a meal

20    ready to eat.

21    Q.   What's a meal ready to eat?

22    A.   It's a military ration.

23    Q.   Are you familiar with meals ready to eat?

24    A.   Yes.

25    Q.   How are you familiar?

1    A.  From my time in the military.

2    Q.  What branch?

3    A.  I was in the Army.

4    Q.  When was the last time you ate a MRE?

5    A.  I can't remember the last time I ate a MRE.

6    Q.  Okay.  And if we scroll down to the metadata for this

7    photograph, do you see where it says "lat/lon" in the column

8    titled "Additional File Info" under the header "Metadata"?

9    A.  I do.

10   Q.  Special Agent Palmertree, have a had an opportunity to look

11   up that latitude and longitude?

12   A.  Yes.

13   Q.  And where does it trace to?

14   A.  Hotel Lombardy.

15   Q.  Did you find any other photographs the defendant took

16   inside the Hotel Lombardy on January 5th?

17   A.  Yes.

18   Q.  Okay.  You can take down this exhibit.

19        I'm going no show you what's been admitted as Exhibit

20   306.  Okay.  Special Agent Palmertree, do you see a backpack in

21   this photo?

22   A.  Yes.

23   Q.  Would you describe this as a normal backpack?

24   A.  No.

25   Q.  What would -- how would you describe it?

1    A.  I would describe it as a rucksack.

2    Q.  What is a rucksack?

3    A.  A rucksack is issued to folks in the military, it's a

4    backpack.

5    Q.  What's different about the rucksack?  What's different

6    about its structure?

7    A.  The metal frame that you're looking at goes against your

8    back and it's designed to support a lot of weight when you're

9    carrying it.  Hence, the metal frame is taking the brunt of the

10   weight and distributing it across your back.

11   Q.  Special Agent Palmertree, do you see any gloves in this

12   photograph?

13   A.  Yes.

14   Q.  Can you circle for us the gloves you see?

15   A.  (Indicating.)

16   Q.  Okay.  Based on your investigation, did you recognize the

17   defendant to be carrying any of those pairs of gloves on

18   January 6?

19   A.  Yes, I recognize the gloves at the top of the rucksack to

20   be consistent with those carried by the individual as seen in

21   other photos.

22          MS. MIRELL:  Let the record reflect that the

23   defendant has -- I'm sorry, that Special Agent Palmertree has

24   circled the tan leather work gloves on top of the backpack in

25   the middle of the photograph, as well as a pair of black

 1   gloves, also near the backpack in the middle of the photograph.

 2           Okay.  You can take that exhibit down.

 3           During your investigation did you find any

 4   photographs on the phone that showed the defendant on January

 5   6th, 2021?

 6   A.  Yes.

 7   Q.  So, based on those photographs, where is the first place

 8   you saw the defendant?  Based on those photographs.

 9   A.  Near the Washington Monument.

10   Q.  Show you what's been admitted as Exhibit 307.

11           THE COURT:  Ms. Mirell, before you continue, do you

12   have a sense how long your direct will be?

13           MS. MIRELL:  I expect it will probably be another 45

14   minutes to an hour.

15           THE COURT:  Okay.  Let's talk our break.  It's a

16   quarter of three.  Why don't we plan to restart just about 3

17   o'clock, and then we'll go just as close to 4 as we can to

18   finish off our day.

19           Thank you all very much.

20           (Whereupon the jurors leave the courtroom.)

21           THE COURT:  Okay.  Agent Palmertree, I'll just ask

22   you to not to discuss your testimony with anyone during the

23   break.  Thank you.

24           See everybody in 15.

25           (Recess.)

```
 1                  (Whereupon the jurors enter the courtroom.)

 2                  THE COURT:  Okay, folks.

 3       BY MS. MIRELL:

 4       Q.  I believe we left off with Exhibit 307.  Can we publish

 5       that to the jury, please?

 6                  Special Agent Palmertree, can you identify the

 7       Washington Monument in this photo?

 8       A.  Yes.

 9       Q.  Where is it?

10       A.  It's in the back left portion of the video.

11       Q.  The tall monument in the back left?

12       A.  The tall monument in the back.

13       Q.  About how far away was the Washington Monument from the

14       rally that you described that was being held the ellipse?

15       A.  Several blocks.

16       Q.  Under a mile, fair to say?

17       A.  That's fair to say.

18       Q.  Okay.  And can you identify for the jury and for the

19       record, do you see the defendant in this photograph?

20       A.  Yes.

21       Q.  What's the defendant wearing?

22       A.  Blue jeans, brown boots, a black watch cap, a red, black,

23       and white jacket.

24       Q.  What's he holding in his hands?

25       A.  What appears to be a Marine Corps flag.
```

1    Q.  Okay.  Let me just zoom in.  That's the defendant, right?

2    A.  Yes.

3    Q.  Okay.  And I'm going to scroll down to the metadata for

4    this photograph, and zoom in.

5            What's your understanding of when this photo was

6    taken?

7    A.  At the captured time, January 6, 2021, at 10:46 a.m.

8    Q.  Was this photo deleted?

9    A.  An attempt to delete the photo from the device was made,

10   yes.

11   Q.  And what -- based on your investigation, what's your

12   understanding of where the defendant went after this photograph

13   was taken?

14           And we can take it down.

15   A.  Based on my investigation, the defendant proceeded to the

16   Capitol.

17   Q.  And what side of the Capitol?

18   A.  The western side.

19   Q.  And to get from the Washington Monument to the western side

20   of the Capitol, what do you walk down?

21   A.  Constitution.

22   Q.  Is the mall in between?

23   A.  Yeah.  Sure.

24   Q.  And based on your investigation, what was happening at the

25   west front of the U.S. Capitol between about 12:55 and 3:00

1    o'clock p.m. on January 6th, 2021?

2    A.   Protest that developed into a riot.

3    Q.   At this time I'm going to read into the record what's been

4    admitted as Exhibit 705.  I'll put it up on the screen for the

5    jury to follow along.

6         Okay.  Reads, "United States and defendant Thomas

7    Webster agree and stipulate to the following:

8         "On January 6th, 2021, officers from the

9    United States Capitol Police, USCP, on the U.S. Capitol grounds

10   and in the U.S. Capitol building were engaged in their official

11   duties as officers or employees of the United States or of any

12   agency in any branch of the United States government as those

13   terms are used in Counts 1 and 2.

14        "On January 6, 2021, officers from the Washington

15   D.C. Metropolitan Police Department, MPD, on the U.S. Capitol

16   grounds and in the U.S. Capitol building, were assisting

17   officers from the USCP who were engaged in their official

18   duties as officers or employees of the United States or of any

19   agency in any branch of the United States government as those

20   terms are used in Counts 1 and 2."

21        And it's signed by counsel for the defendant and by

22   the government.

23        Have you had an opportunity to review surveillance

24   footage showing people and rioters gathering on the west front

25   of the Capitol on January 6, 2021?

1    A.   I have.

2    Q.   Okay.   I'm going to show you what's already been admitted

3    in evidence as Exhibit 212.

4         There's no sound for this video.   I'm just going to

5    ensure that my sound is connected.

6         And at this time I also have, unfortunately, a

7    lengthy stipulation to read into the record.   So, let me

8    actually take this exhibit down and read Exhibit 710 into the

9    record.

10        "United States and defendant Thomas Webster agree and

11   stipulate to the following:   The events depicted in the video

12   footage for the following government exhibits and defense

13   exhibits are a fair and accurate depiction of the events at the

14   U.S. Capitol on January 6, 2021.   The timestamps on the

15   recordings are accurate and the video footage was not altered

16   or edited in any way with the following exceptions:

17        "The modifications to the video footage did not in

18   any way alter the substance of what is depicted or render the

19   footage inaccurate.   The video footage is authentic in that it

20   is what it purports to be.

21        "No. 1.   Government Exhibit 211.   This exhibit was

22   created using Government Exhibit 204.   The only modifications

23   were, 1), slowing down the video from normal speed.   And, 2),

24   removing the audio.

25        "2.   Government Exhibit 212.   This exhibit was

1    created using Government Exhibit 201.  The only modifications

2    were, 1), clipping Exhibit 201 to timestamps of approximately

3    12:55:14 to 14:59:59.  2), speeding up the video from normal

4    speed.  And, 3), adding a time counter to the bottom right

5    corner of the screen which matches the counter in the top left

6    of Exhibit 201.

7         "3.  Government Exhibit 213.  This exhibit was

8    created using Government Exhibit 214.  The only modification

9    was slowing down the video from normal speed.

10        "4.  Government Exhibit 214.  This exhibit was

11   created using Government Exhibit 207.  The only modifications

12   were, 1), converting a portion of the video to black and white.

13   And, 2), adding colorized circles to focus on certain portions

14   of the video.  The yellow circle identifies defendant Thomas

15   Webster and the green circle represents defendant Tom Webster

16   and MPD Officer Noah Rathbun together.

17        "5.  Government Exhibit 215.  This exhibit was

18   created using Government Exhibit 216.  The only modification

19   was slowing down the video from normal speed.

20        "No. 6.  Government Exhibit 216.  This exhibit was

21   created using Government Exhibits 204 and 214.  The only

22   modifications were, 1), placing the two videos side by side.

23   2), synchronizing the videos to play together.  And, 3),

24   removing the audio from Exhibit 214.

25        "No. 7.  Government Exhibit 217.  This exhibit was

1    created using Government Exhibit 205.  The only modifications

2    were, 1), speeding up approximately the first two minutes of

3    the video from normal speed.  2), adding a time counter to the

4    bottom right corner of the screen which matches the counter in

5    the top left of Exhibit 205.  3), converting a portion of the

6    video to black and white.  And, 4), adding colorized circles to

7    identify relevant portions of the video.  The yellow circle

8    identifies defendant Thomas Webster, the blue circle identifies

9    MPD Officer Noah Rathbun, and the green circle represents both

10   of them together.

11           "No. 8.  Government Exhibit 218.  This exhibit was

12   created using Government Exhibit 206.  The only modifications

13   were, 1), removing color from a portion of the video.  And, 2),

14   adding colored circles to identify relevant portions of the

15   video.  The yellow circle identifies defendant Thomas Webster

16   and MPD officer Noah Rathbun together.

17           "No. 9.  Defense Exhibit 43.  This exhibit was

18   created using Defense Exhibit 17.  The only modifications were,

19   1), clipping Exhibit 17 to a particular timeframe.  2), slowing

20   down the video from normal speed.  3), removing the audio.

21   And, 4), adding colorized circles to identify certain portions

22   of the video.  The red circle identifies MPD Officer Noah

23   Rathbun's hand.

24           And, finally, "No. 10.  Defense Exhibit 44.  This

25   exhibit was created using Defense Exhibit 17.  The only

1   modifications were, 1), clipping Exhibit 17 to a particular

2   timeframe.  2), slowing down a portion of the video from normal

3   speed.  3), removing the audio.  And, 4), aiding colorized

4   circles to identify certain portions of the video.  The red

5   circle identifies Defendant Thomas Webster and MPD Officer Noah

6   Rathbun together."

7          And it's signed by both defense counsel and the

8   government.

9          Okay.  Going back, now -- maybe my colleague can help

10  me.  One moment.

11          (Pause.)

12          All right.  Special Agent Palmertree, I'm back.  So,

13  I'm going to start this -- you had testified that you reviewed

14  surveillance footage showing people gathering on the west front

15  between -- starting at 12:55 p.m., is that right?

16  A.  Yes.

17  Q.  I'll start this exhibit.  Before I do -- sorry again -- can

18  you identify for me which way we're looking at in the

19  surveillance footage, which direction?

20  A.  We're facing west.

21  Q.  We're facing the west lawn, is that right?

22  A.  Yes.

23  Q.  Can you identify in this exhibit the inaugural stage?

24  A.  Yes.

25  Q.  Where is it?

1    A.   It's in the white portion at the very bottom of the frame.

2    Q.   And can you identify a media tower in this exhibit?

3    A.   Yes.

4    Q.   Where is it?

5    A.   It's in the very center of the frame, the tall

6    scaffolding-type building.

7    Q.   How many fences do you see in this screen shot?

8    A.   At least three.

9    Q.   Can you identify each of those fences?

10   A.   Yes.

11   Q.   Let's start with the first fence that you see.

12   A.   Do you want me to draw or just describe?  I can describe.

13   Q.   Let's describe first -- well, we can do it simultaneously.

14   Why don't you draw and describe?

15   A.   At the very top of the frame there is a long temporary

16   fence separated in segments, with white signposts -- or, white

17   signs posted across the temporary fence.

18   Q.   Can you draw that on the exhibit?

19   A.   (Indicating.)

20   Q.   Great.  And do you know what those signposts said, based on

21   your investigation?

22   A.   Yes.

23   Q.   What did they say?

24   A.   "Area Closed."

25   Q.   Okay.  Let the record reflect the witness has identified

 1    the snow fence at the top of the exhibit -- or, at the top of

 2    timestamp 00 in this exhibit, Exhibit 212.

 3            All right.  Moving down, do you see any other fences?

 4    A.  Yes.

 5    Q.  What's the next fence you see?

 6    A.  I'm going to trace the very top of the next temporary fence

 7    (indicating), which is the same fence as that I just

 8    underlined, it's the same material.

 9    Q.  What's behind the fence?

10    A.  Behind that fence is a rock wall, or a brick wall,

11    whatever -- it's made of rocks.

12    Q.  During the course of your investigation, have you had an

13    opportunity to walk the grounds of the U.S. Capitol?

14    A.  Yes.

15    Q.  Have you walked near this wall?

16    A.  Yes.

17    Q.  Can you stand up for the jury and show about where the wall

18    hits on you?

19    A.  Right here (indicating).

20    Q.  So, would you be able to just step over the wall --

21            Let the record reflect the defendant is about how

22    tall?

23    A.  5' 11".

24    Q.  I'm sorry, not the defendant.  The witness.

25    A.  I'm 5-11.

1    Q.   And it goes up to where?

2    A.   Just below my belt line.

3    Q.   Are you able to step over that wall?

4    A.   No, it's too wide.  It's a very wide wall.

5    Q.   Is it fair to say you would have to hoist yourself over

6    that wall?

7    A.   That's fair to say.

8    Q.   And can you identify for me, and for the record, the

9    defendant identified in timestamp 00 of this -- or, the

10   beginning of this exhibit, Exhibit 212, he identified a middle

11   fence and a wall, kind of at the center of the exhibit, midway

12   through the media tower.

13              All right.  What's the last fence you see?

14   A.   The last I see is a temporary barrier here (indicating).

15   Q.   Okay.  And when you walked the U.S. Capitol grounds, did

16   that barrier exist while you were walking them?

17   A.   No.

18   Q.   What's your understanding of what this barrier is?

19   A.   My understanding was that it was an ornamental, temporary

20   ornamental type fence that ran (indicating).

21   Q.   Let the record reflect that the defendant -- I'm sorry,

22   that the witness has -- that the witness has identified the

23   fence, kind of in the center of the screen, and it's black

24   metal.

25              And are there any stairs behind that fence?

```
1    A.  Yes.

2    Q.  Are you familiar with -- are you aware if there were any

3    other fences on the Capitol grounds that day?

4    A.  Yes.

5    Q.  Where would that fence have been?

6    A.  If we were to walk further west from here, in this

7    direction, you would walk into another one of these fences that

8    is marked with similar signage.

9    Q.  Okay.  And I think we saw that as Exhibit 601.2.

10              Okay.  We can publish that exhibit to the jury.  Is

11   this the fourth fence that you've been describing, Special

12   Agent Palmertree?

13   A.  Yes.

14   Q.  And can you describe for the record where it is in this

15   photograph?

16   A.  Near First.  At the very edge of the grass of the western

17   lawn of the Capitol.

18   Q.  Very forefront of this photograph, though, that snow

19   fencing down there, is that what you're describing?

20   A.  Yes.

21   Q.  And what angle are we facing, what direction are we facing

22   in this photograph?

23   A.  We're facing east, towards the Capitol.

24   Q.  Now I'm finally going to play Exhibit 212.

25              (Video played.)
```

```
 1              All right.  I've stopped the exhibit at the timestamp
 2       at the bottom right of the exhibit, 13:25:24:24.  Do you see
 3       any officers in this still shot?
 4       A.  Yes.
 5       Q.  Can you describe for the record where you see the officers?
 6       A.  Can I just draw a line, maybe?
 7       Q.  Sure.
 8       A.  (Indicating.)
 9       Q.  Let the record reflect that the witness has identified
10       officers -- kind of in a wave shape through the middle of the
11       exhibit.
12              Do you see the officers carrying anything in their
13       hands?  If we --
14       A.  Yes.
15       Q.  And can you show the jury what you see?
16       A.  Right there, for instance, I see officers carrying segments
17       of bike racks.
18       Q.  For the record, the witness has circled officers clad in
19       black carrying bike racks in the center of this still shot.
20              What's your understanding of the purpose of bike
21       racks in this situation?
22       A.  In this situation to establish a hasty or quick temporary
23       perimeter.
24       Q.  We'll continue playing the exhibit, another 12 seconds.
25              (Video played.)
```

1           I've stopped at the count time 13:33:48:24, the

2    bottom right, the still shot.

3           Do you see any gas in this still shot?

4    A.  Yes, I see what looks to be gas.

5    Q.  And can you circle the patches of gas that you see?

6    A.  (Indicating.)

7    Q.  Let the record reflect that the witness circled a patch of

8    gas to the left of the media tower and a patch of gas on the

9    right-hand side of the still shot.

10          What's your understanding of what this gas was?

11   A.  CS, or what's commonly referred to as teargas, which is a

12   crowd-control type gas.

13   Q.  And is it used to disburse the crowds then?

14   A.  It can be used for that, yes.

15   Q.  Okay.  I'm going to play the exhibit for another 40 seconds

16   or so.

17          (Video played.)

18          I'm going to stop the exhibit at the bottom right

19   counter 14:01:03:14.

20          Based on your law enforcement experience would you

21   say the police have established a perimeter at this point?

22   A.  Yes, I would say that law enforcement has established

23   somewhat of a perimeter.

24   Q.  Okay.  Continue playing for about another 50 seconds.

25          (Video playing.)

1              All right.  I've stopped at 14:28:46:04 at the bottom

2      right-hand corner.

3              Special Agent Palmertree, what's happened at this

4      point in the surveillance footage?

5      A.  The perimeter appears to be breaking and --

6      Q.  Who is breaking the perimeter?

7      A.  Rioters.

8      Q.  And just for the record, I've been marking timestamps with

9      14:28.  Do you recognize that time?

10     A.  Yes.

11     Q.  What kind of time is that?

12     A.  That's military time.

13     Q.  So what time is that in Eastern Standard time?

14     A.  2:28 p.m.

15     Q.  All right.  Continue playing another 20 seconds.

16              (Video played.)

17              All right.  I've stopped, bottom right-hand timestamp

18     of 14:42:03:14.

19              Special Agent Palmertree, I would like to direct your

20     attention to what you've previously identified as the

21     inauguration stage.  Do you see any rioters on that stage?

22     A.  Yes.

23     Q.  Had you seen rioters before on that stage?

24     A.  Prior to this point?

25     Q.  Yes.

```
 1    A.   No.

 2    Q.   I'll continue playing the exhibit until the end.

 3              (Video played.)

 4              Let me just get to that last screen shot.  And I've

 5    stopped a 14:56:16:24, in the bottom right-hand corner.

 6              Special Agent Palmertree, do you see any law

 7    enforcement officers in this still shot?

 8    A.   None that I can make out.

 9    Q.   All right.  We can take down this exhibit -- if I know how.

10              All right.  Using the same surveillance footage, were

11    you also able to trace the defendant's path through the crowd

12    on January 6th, 2021?

13    A.   Yes.

14    Q.   How were you able to do that?

15    A.   By matching the incident that I can see through the Capitol

16    police surveillance to the corresponding incident on the

17    victim's body-worn camera.  From that, using the Capitol

18    surveillance footage to trace the flag that I knew the subject

19    to be holding, backwards.

20    Q.   So just to break that down.  You knew what time the

21    incident happened based on the timestamp of the body-worn

22    camera?

23    A.   Yes.

24    Q.   And then you were able to look at the surveillance footage,

25    to then trace it backwards to where the defendant -- how the
```

1    defendant got to that point?

2    A.   Correct.  I could also see the matching incidents, as well.

3    Q.   Okay.  And did you have anything, any identifying object or

4    piece of clothing to use as a guidepost?

5    A.   Yes.

6    Q.   What did you use?

7    A.   The flag.

8    Q.   I'm going to show you what's been admitted as Exhibit 217.

9         All right.  Start this exhibit from the beginning.

10        (Video played.)

11        Okay.  Special Agent Palmertree, what do we see in

12   the yellow circle at the top of the screen?

13   A.   A Marine Corps flag believed to be held by Thomas Webster.

14   Q.   And what time is this?

15   A.   2:21 p.m.

16   Q.   Is this when you were first able to identify the defendant

17   on the surveillance footage?

18   A.   Yes.

19   Q.   Okay.  It will play for another 30 seconds or so.

20        (Video played.)

21        I've stopped at 14:23:06:13 in the counter there.

22        Special Agent Palmertree, do you see a, kind of, a

23   dark line running across the middle of the crowd in this still

24   shot?

25   A.   Yes.

 1   Q.  Do you have an understanding of what that dark line would

 2   have been?

 3   A.  That line indicates that there's a wall there that we

 4   discussed earlier, that runs to just below my belt line.

 5   Q.  Okay.  And I want to pull up for you what's been admitted

 6   as Exhibit 219.  So zooming in and publishing for the jury.

 7              Seeing these side by side, it's your testimony that

 8   that dark line that we see in the middle of Exhibit 217

 9   corresponds to kind of the wall that we see on the exhibit on

10   the left?

11   A.  That's my understanding, yes.

12   Q.  Okay.  Take down that exhibit and go back to video.

13              I'm resuming from 14:23:06:13.

14              (Video played.)

15              Okay.  And I've stopped the exhibit at the counter of

16   14:24:31:10 in the bottom right of the video.

17              Special Agent Palmertree, do you see that red flag in

18   this still shot?

19   A.  Yes.

20   Q.  So you still see that red flag?

21   A.  Can you run it back a couple of seconds?

22   Q.  Sure.

23              (Video played.)

24              Did that help?

25   A.  No.  You have to run it back a few more.

```
 1                      (Video played.)
 2   Q.  Still see it at 14:24:25:20?
 3   A.  No, it appears to have been lowered.
 4   Q.  What's your understanding of why it may have been lowered
 5   at this point?
 6   A.  It may have been lowered because there's a wall there that
 7   needs to be traversed.  But other than that, I couldn't really
 8   speculate as to exactly why it was lowered.
 9   Q.  And was there also another barrier around that area?
10   A.  There was.
11   Q.  Okay.  Is that the wall that you would be referring to, or
12   is the wall the one behind it?
13   A.  The wall is behind it, but there's also potentially fencing
14   to traverse.
15   Q.  Okay.  And I'll pull up Exhibit, again, 219 again.
16              So, Special Agent Palmertree, is it your
17   understanding that it could have been this second gate -- if we
18   looked to the left, the exhibit on the left, the second gate,
19   the black metal gate running through the middle?
20   A.  Possibly, I just can't tell.
21   Q.  Okay.  All right.  Going back to the exhibit.  Starting to
22   run it.
23              (Video played.)
24              Okay.  Stopping the exhibit at the bottom right
25   timestamp of 14:27:55:26.  Do you see a blue circle?
```

```
 1   A.  Yes.

 2   Q.  Who do you understand to be in that blue circle?

 3   A.  Officer Noah Rathbun.

 4   Q.  I'll run the exhibit until the end.

 5              (Video played.)

 6              One stop, 14:28:30:23 at the bottom right.  Who do

 7   you understand to be in that green circle?

 8   A.  Thomas Webster and Noah Rathbun.

 9              (Video played.)

10   Q.  So what's your understanding of who is in the yellow

11   circle.  I've stopped the exhibit at 14:29:15:24 in the bottom

12   right corner?

13   A.  Thomas Webster.

14   Q.  And is it your understanding that Officer Rathbun is also

15   in the yellow circle, or just Webster?

16   A.  It's my understanding that Officer Rathbun is still inside

17   the yellow circle.

18              (Video played.)

19   Q.  That concludes the exhibit.

20              During your investigation, were you able to find any

21   open source video showing the defendant's path while on the

22   Capitol?

23   A.  Yes.

24   Q.  Showing you what's already been admitted as Exhibit 214.  I

25   believe this one is supposed to have audio.  Starting from the
```

```
1    beginning.
2                   (Video played.)
3                   Let me turn that down, so as not to deafen everyone.
4                   Special Agent Palmertree, who is in this green circle
5    that we see at the top of the screen?  And we've stopped at the
6    16-second time bar stamp.
7    A.   That's Officer Noah Rathbun on the left and Thomas Webster
8    on the right.
9                   (Video played.)
10   Q.   Okay.  Let me go back and stop.
11                  (Video played.)
12                  Okay.  We've stopped at the 44-second timestamp.
13   Directing your attention, Special Agent Palmertree, to that
14   green circle.  Do you see the defendant there?
15   A.   Yes.
16   Q.   How can you see the defendant?  Can you identify him?
17   A.   Yes, by his red jacket.
18   Q.   Do you see Officer Rathbun there?
19   A.   Yes.
20   Q.   Where is Officer Rathbun?
21   A.   He looks to be on the ground.  Here's the yellow that marks
22   his jacket (indicating).
23   Q.   And the record identify -- let the reflect that the witness
24   has identified a small patch of yellow in the center of the
25   circle to be Officer Rathbun.
```

```
 1                    (Video played.)

 2                    All right.  I've stopped the exhibit at the 1:22

 3      timestamp on the bottom of the time-scroller.

 4                    Special Agent Palmertree, did you find any other open

 5      source videos showing the defendant's path on the Capitol

 6      grounds?

 7      A.   Yes.

 8      Q.   Okay.  Showing you what's been admitted as Exhibit 218.

 9                    (Video played.)

10                    Did we also see the defendant in the yellow circle in

11      the bottom of this video?

12      A.   Yes.

13      Q.   Okay.

14                    (Video played.)

15                    I've stopped the exhibit at the 43-second timestamp

16      at the time bar.

17                    Special Agent Palmertree, do you recognize the

18      individuals, or who those individuals are in the middle of the

19      screen right there?  Not personally, but do you recognize what

20      types of officers they are?

21      A.   Yes.

22      Q.   What kind of officers are those?

23      A.   Those are -- look to be Capitol police officers.

24      Q.   And what do they appear to be -- or, guarding or holding,

25      protecting?
```

```
 1    A.  What looks to be the inaugural stage.

 2    Q.  Did you find any other -- well, let me continue playing.

 3              (Video played.)

 4              That's all I needed to show of that exhibit.

 5              Did you find any other open source videos showing the

 6    defendant's path on the lower west terrace?

 7    A.  Yes.

 8    Q.  Okay.  So, I'm showing you what's been marked for

 9    identification as Exhibit 209.  And in this video I'm actually

10    going to start it from the 16:52 time marker on the bottom.

11              (Video played.)

12              Okay.  Special Agent Palmertree, directing your

13    attention towards the right side of this still shot at the

14    16:59 timestamp, do you see the defendant there?

15    A.  Yes.

16    Q.  Can you circle him for the jury?

17    A.  (Indicating.)

18    Q.  And do you see Officer Rathbun there?

19    A.  Yes.

20    Q.  And can you circle Officer Rathbun for the jury?

21    A.  (Indicating.)

22    Q.  And do you see the position of Officer Rathbun's foot?

23    A.  Yes.

24    Q.  What's your understanding of Officer Rathbun's body

25    position at that moment, based on that foot?
```

1    A.  He appears to be kneeling.

2    Q.  Okay.  And the defendant, does he appear to be kneeling or

3    on the ground?

4    A.  The defendant appears to be over Officer Rathbun.

5    Q.  Okay.  Let the record reflect the witness has identified

6    the defendant in the red jacket and Officer Rathbun as the

7    individual with a foot out and a yellow jacket on the right

8    side of this still shot at 16:59.

9             Continue playing.

10            (Video played.)

11            And I know it's hard to follow in, kind of, this

12   Where's Waldo, but do you see the defendant in this still shot

13   at the 17:38 timestamp?

14   A.  Yes.

15   Q.  Can you identify the defendant for the members of the jury?

16   A.  Thomas Webster, right here, on the lower right portion of

17   the frame.

18   Q.  May the record reflect that the witness has circled an

19   individual wearing a black, red, and white jacket in the bottom

20   right corner.

21            (Video played.)

22            Okay.  I've stopped the exhibit at 17:45, bottom time

23   scroll.

24            Special Agent Palmertree, do you see the defendant in

25   this still shot?

```
 1    A.  Yes.

 2    Q.  Can you circle him for the jury?

 3    A.  Yes (indicating).

 4    Q.  And what is he doing with his finger?

 5    A.  He appears to be pointing in the direction of a cluster of

 6    Capitol police officers and MPD officers.

 7    Q.  Are you familiar with the body-worn camera footage of

 8    Officer Rathbun?

 9    A.  Yes.

10    Q.  Are you aware if the defendant also pointed at Officer

11    Rathbun in that footage?

12    A.  I can't tell who he's pointing at.

13    Q.  When the defendant approached Officer Rathbun, was he

14    pointing a finger, in the body-worn camera footage of Officer

15    Rathbun?

16    A.  Just now?

17    Q.  Well, I haven't shown you that footage, but we can --

18    A.  Yes.

19    Q.  Okay.  All right.  We'll continue playing the exhibit.

20              (Video played.)

21              Okay.  Special Agent Palmertree, do you see the

22    defendant here in this still shot at the 18:03 timestamp?

23    A.  Yes.

24    Q.  And can you circle the defendant for the members of the

25    jury?
```

```
1    A.   (Indicating.)

2    Q.   And let the record reflect that the witness has identified

3    an individual wearing a red, white, and black jacket towards

4    the right side of this still shot.

5              Special Agent Palmertree, what does the defendant

6    appear doing with his hands at that point?

7    A.   The defendant is standing up and he appears to be holding

8    his arms outstretched, and like this (indicating).

9    Q.   Okay.  And who are the individuals wearing black, and

10   yellow and black around the defendant?

11   A.   Those appear to be officers.

12             (Video played.)

13   Q.   Okay I'll stop the exhibit at the 18:14 timestamp.

14             During your investigation, did you find any open

15   source videos where you could hear the defendant's voice?

16   A.   Yes.

17             MS. MIRELL:  At this time, Your Honor, I would ask

18   that you give an instruction about transcripts.

19             THE COURT:  Do we have transcripts?

20             MS. MIRELL:  There will be a transcript displayed at

21   the bottom of this video.

22             THE COURT:  Okay.  Ladies and gentlemen, from what I

23   understand from the government, they're about to play a video

24   that has transcribed the sound, the audio on the video.  The

25   transcripts, or the words you see on that video, those are only
```

1    being furnished for your convenience and guidance as you listen

2    to the audio, to clarify portions of the audio which may be

3    difficult to hear, and to help you identify the speakers.

4           The recording itself, however, is the evidence in the

5    case.  The transcript -- that is, the written portion on the

6    screen -- is not.  If you notice any difference between the

7    transcript and the recording, you must rely only on the

8    recording and not the transcript.

9           In addition, if you cannot determine from the

10   recording that particular words were spoken, you must disregard

11   the transcript as far as those words are concerned.

12          MS. MIRELL:  Thank you.

13   BY MS. MIRELL:

14   Q.  So I am going to play for you, Special Agent Palmertree,

15   what's been marked as Exhibit 208.2, based off of Exhibit 208.

16          (Video played.)

17          All right.  Let me take you back one second.  Okay.

18   I've stopped at the 11-second time mark.

19          Did you see the defendant in this still shot?

20   A.  Yes.

21   Q.  Can you identify him for the record, what he's wearing?

22   A.  He's on the right side of the frame, wearing a red, white,

23   and black jacket with --

24   Q.  Is he -- oh --

25   A.  -- what appears to be a ballistic vest under the jacket.

1    Q.  At this time I'm going to ask Special Agent Hankinson to

2    bring up what's already been admitted as Exhibit 105.

3              Pass that to the witness.  Thank you.

4              Does that appear to be the same bulletproof vest that

5    you see in this still shot?

6    A.  It's the same ballistic vest, yes.  Appears to be the same

7    ballistic vest.

8    Q.  Okay.  And I'm going to show you what's been admitted as

9    Exhibit 614.

10             All right.  We can display that to the jury.  Special

11   Agent Palmertree, do you recognize this?

12   A.  Yes.

13   Q.  What is it?

14   A.  It's a label commonly found on the soft plates that are

15   inside these vests.  I recognize this one in the picture from

16   this actual vest.

17   Q.  And can you show the jury in that vest where they would

18   find that actual label?

19             Let the record reflect that the witness is unzipping

20   the bottom.

21   A.  You would unzip the bottom portion, and it's usually -- the

22   part that goes against your body, there's usually a label here

23   of some sort.

24   Q.  And can you read the name on that label, based on Exhibit

25   614?

1    A.  Webster, Thomas.

2    Q.  Do you see, at the bottom right, where it says, "Serial

3    Number"?

4    A.  Yes.

5    Q.  What's the serial number?

6    A.  NYPD-15169.

7    Q.  And you recognize NYPD to be the New York City Police

8    Department?

9    A.  Yes.

10   Q.  All right.  I'll go back to the video now.

11             (Video played.)

12             Special Agent Palmertree, what did you hear the

13   defendant to say at about the 33-second timestamp?

14   A.  "Send more patriots.  We need some help."

15   Q.  Okay.  We can take down the exhibit now.

16             Did the defendant take any pictures on his phone from

17   around this area that we just saw in Exhibit 208. -- or, 208?

18   A.  Yes.

19   Q.  Okay.  Showing you Exhibit 308 -- I'll zoom in -- can you

20   describe this photo for the jury?

21   A.  Yes.  The photo was taken as if the individual who took the

22   photo was standing to the direct left of the inaugural stage.

23   So this -- in this frame you are facing what I believe to be is

24   north.

25   Q.  Okay.  And scrolling down the metadata for this photograph,

1    when was this photo taken?

2    A.  At the capture time of January 6, 2021, at 3:01 p.m.

3    Q.  Was this photo deleted?

4    A.  An attempt to delete this photo from the device was made by

5    the user, yes.

6    Q.  Do you know if the defendant went anywhere else besides the

7    lower west terrace on January 6?

8    A.  Yes.

9    Q.  Where did he go?

10   A.  Just outside the -- a tunnel leading into the Capitol.

11   This tunnel is on the lower west.

12   Q.  Okay.  So at this time I'm actually going to ask you -- may

13   I approach the witness?

14          I've handed the witness a black Sharpie.

15          So we've just reviewed quite a few videos, Special

16   Agent Palmertree.  Do you mind standing up and marking on

17   Exhibit 603.1 where we see the defendant based on your review

18   of all those videos.  You can just mark with an X the most

19   significant points.

20   A.  (Indicating.)

21   Q.  Can you do it a little bigger on that exhibit?  Because I

22   can't even see.

23          And can you narrate as you're doing it where you're

24   marking?

25   A.  This is a stone wall that I talked about earlier.  Imagine

1      this is all grass.  This is a stone wall.  This is the first

2      concrete or rock-type level of the lower west terrace.  These

3      are the stairs leading up to the lower west terrace.

4              This is approximately where the officers holding the

5      bike racks were.  This is the area where I described the

6      defendant as having been walking around, holding his arms

7      upright.  This is where we described the photo as being taken,

8      pointed in this direction.  (Indicating.)

9              And there -- go further?

10     Q.  Okay.  And can you circle about where the attack of Officer

11     Rathbun occurred?

12     A.  Approximately there (indicating).

13     Q.  Sure.  And we can --

14     A.  There's further places, I can keep going.

15     Q.  That's fine.  You can sit back down for now.

16             MS. MIRELL:  This may be an appropriate place to

17     break, Your Honor.

18             THE COURT:  Okay.  Great.  Terrific.

19             All right.  Ladies and gentlemen, we're going to wrap

20     up for the day.  Tomorrow, because I again have to stop at 4

21     o'clock for another matter, let's go ahead and try and start

22     again -- steal another half hour and start as close to 9 a.m.

23     as we can.  If everybody would be here no later than 8:50 so we

24     can try to get started around 9 o'clock, that would be much

25     appreciated.

```
 1              Same reminders as always.  You probably know them by
 2    heart now.  Thank you very much.  Have a good evening.  We look
 3    forward to see everybody tomorrow.
 4              (Whereupon the jurors leave the courtroom.)
 5              THE COURT:  Okay.  Agent, you can step down again.
 6    Just a reminder, since you're on the stand, not to discuss your
 7    testimony with anyone overnight.  Okay?
 8              THE WITNESS:  Yes, Your Honor.
 9              THE COURT:  All right.  Anything we need to --
10    everybody can have a seat.  Anything we need to take up before
11    we adjourn this afternoon?
12              I guess the question is, Ms. Mirell, how much longer
13    do you think you'll have?
14              MS. MIRELL:  Oh, I think I have probably another 15
15    minutes with this witness.
16              THE COURT:  Okay.  And cross?  Any sense?
17              MR. MONROE:  Half-hour, 45 minutes, Judge.
18              THE COURT:  Okay.  Do you think -- your defense
19    witnesses will be here tomorrow?
20              MR. MONROE:  I have Mr. Webster.  I intend to call
21    him as a witness, and --
22              THE COURT:  Hang on.  I'm going to need you to turn
23    the mic toward you, Counsel, and just repeat what you said.
24              MR. MONROE:  Yes.  So, I intend to call Mr. Webster
25    first, and then I -- because of how I thought the evidence was
```

1    going, I rearranged to have my three character witnesses in

2    town Friday morning.

3              THE COURT:  Okay.  All right.  Let's see where we are

4    tomorrow in terms of whether we close on Friday or not.  We

5    still need to pull these jury instructions together, and maybe

6    we have time tomorrow afternoon to go through them.

7              You know, I think the thing we all need to be

8    thinking about is -- the government may have a motion on

9    this -- but, what this self-defense instruction is -- if it's

10   given, is going to look like.  I have to tell you, I wasn't

11   satisfied with what I received before.  And, unfortunately,

12   the, sort of, Redbook standard instructions aren't terribly

13   well-suited for this situation.

14             So, you know, we may have to sort of craft something

15   and all come to some agreement upon what's proper for these

16   circumstances.  Okay?  So just be thinking about that

17   overnight.

18             Yes, Ms. Mirell?

19             MS. MIRELL:  Your Honor, with regard to the charging

20   conference, if the parties have proposed revisions, would you

21   like us to send those by email, or do you already have a

22   working draft that you would like us --

23             THE COURT:  We have a working draft, which we hope to

24   circulate to you this evening, with the exception of, perhaps,

25   the self-defense, which we're still noodling over.  So we'll

1    email that out this evening and get that circulated and then we

2    can talk about it -- probably tomorrow, maybe tomorrow, we'll

3    see.

4              MR. MONROE:  As I mentioned yesterday, I did offer

5    some proposed instructions that I believe address the First

6    Amendment issues I think are involved.

7              THE COURT:  Let's talk about it tomorrow.  I'm not --

8    we could talk about it at the charge conference.  I don't need

9    to convey my views on it right now.  We can talk about it then.

10             Okay.  Thanks, everybody.  Have a good evening.

11    We'll see you tomorrow.

12                            *   *   *

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                    CERTIFICATE OF OFFICIAL COURT REPORTER

3

4        I, JANICE DICKMAN, do hereby certify that the above and

5    foregoing constitutes a true and accurate transcript of my

6    stenographic notes and is a full, true and complete transcript

7    of the proceedings to the best of my ability.

8                         Dated this 28th day of April, 2022

9

10

11                    _____

12                         Janice E. Dickman, CRR, CMR, CCR
                           Official Court Reporter
13                         Room 6523
                           333 Constitution Avenue, N.W.
14                         Washington, D.C.  20001

15

16

17

18

19

20

21

22

23

24

25