```
1                IN THE UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF COLUMBIA
2

3    United States of America,     ) Criminal Action
                                   ) No. 21-cr-208
4                    Plaintiff,    )
                                   ) JURY TRIAL - DAY 5
5    vs.                           ) AFTERNOON SESSION
                                   )
6    Thomas Webster,               ) Washington, DC
                                   ) April 29, 2022
7                    Defendant.    ) Time:  1:15 p.m.
     _____
8
                     TRANSCRIPT OF JURY TRIAL
9                        HELD BEFORE
               THE HONORABLE JUDGE AMIT P. MEHTA
10                UNITED STATES DISTRICT JUDGE

11   _____

                      A P P E A R A N C E S
12
     For Plaintiff:      Hava Mirell
13                       U.S. Attorney's Office
                         312 N. Spring Street, Suite 1200
14                       Los Angeles, CA  90012
                         (213) 894-0717
15                       Email:  Hava.mirell@usdoj.gov

16                       Katherine Nielsen
                         DOJ-CRM, Fraud Section
17                       1400 New York Avenue, NW
                         Washington, DC  20530
18                       (202) 355-5736
                         Email:  Katherine.nielsen@usdoj.gov
19
                         Brian P. Kelly
20                       U.S. Attorney's Office
                         555 Fourth Street, NW, Suite 3816
21                       Washington, DC  20530
                         (202) 252-7503
22                       Email:  Brian.kelly3@usdoj.gov

23   For Defendant:      James E. Monroe
                         Dupee & Monroe, P.C.
24                       211 Main Street
                         Goshen, NY  10924
25                       (845) 294-8900
                         Email:  Marina@dupeemonroelaw.com
```

```
 1      Court Reporter:           Janice E. Dickman, RMR, CRR, CRC
                                  Official Court Reporter
 2                                United States Courthouse, Room 6523
                                  333 Constitution Avenue, NW
 3                                Washington, DC  20001
                                  202-354-3267
 4                                    *   *   *

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1      THE COURTROOM DEPUTY:  Good afternoon, Your Honor.

2  This is criminal case No. 21-208, *United States of America*

3  *versus Thomas Webster*, Brian Kelly, Hava Mirell and Katherine

4  Nielsen for the government.  James Monroe and Walter Machnicki

5  for the defense.  Mr. Webster is appearing in person for these

6  proceedings.

7      THE COURT:  Everybody, good afternoon, again.  All

8  right, just a couple things before we get moving.  We

9  circulated the jury instructions, the final.  Hopefully

10  everybody has taken a look at them.  Just two changes from what

11  was circulated.  One, the government had made a request with

12  respect to Count Two.  We made that addition -- or, made that

13  correction.

14      And then defense had submitted a revised -- what I

15  sort of call a defense position instruction.  Is there any

16  objection to delivering the instruction as the defense has

17  presented it?

18      MS. MIRELL:  Yes, Your Honor.  I only have it on my

19  phone, I apologize.  Government would request that the Court

20  strike the first clause of the second paragraph.  And it would

21  just read -- with the second clause with respect to the

22  sentence the "reasonably believing," strike that, first of all,

23  and then just say, "the defendant used an amount."

24      THE COURT:  I'm sorry.  You would like it to just

25  say, the second paragraph, "Officer Rathbun struck defendant in

1     his face and then defendant used the amount of force he

2     reasonably believed necessary to protect himself by bringing

3     Officer Rathbun to the ground"?

4               MS. MIRELL:  Yes.

5               THE COURT:  Okay.  Any objection to those changes?

6               MR. MONROE:  No objection.

7               THE COURT:  All right.  So we'll take those two

8     clauses out.  We'll make those corrections before the jury

9     instructions go back during deliberations.

10              Okay.  With that, is there anything we need to

11    discuss about instructions?

12              All right.  I also -- Ms. Mirell, anything else about

13    instructions?

14              MS. MIRELL:  Not instructions.

15              THE COURT:  Then there's the verdict form that we've

16    put together.  Anybody have any comments about the verdict

17    form?

18              MR. MONROE:  Can I see it real quick, Judge?

19              THE COURT:  Yeah.

20              MR. MONROE:  Thank you.

21              THE COURT:  Does government counsel have any comments

22    to the jury?

23              MS. MIRELL:  I apologize, Your Honor.  I have a

24    family obligation that requires me to fly out of DCA tonight at

25    5 p.m.  I don't want to be rude to the Court.  I may have to

 1    duck out at 3:30, depending where we are in this case.

 2              THE COURT:  Not a problem.  Thanks for the notice.

 3              Anything on the verdict form from either side?

 4              MR. MONROE:  Nothing on behalf of the defense, Judge.

 5              THE COURT:  All right.  Let's let our jurors in and

 6    we'll get started.

 7              It's going to take a minute to line them up.

 8    Everybody can have a seat.

 9              Just while we're waiting, a couple things.  Both

10    sides, you've got your final exhibit lists to the jury, that

11    both sides have approved.

12              MS. NIELSON:  We will work on that.

13              THE COURT:  That's one thing we'll need to deal with,

14    and then ensuring that all the exhibits that have been admitted

15    are the ones that actually go back, which we can take care of

16    afterwards.  And depending on the time of day, we'll sort of

17    see where we are in terms of whether we just have them come

18    back Monday or start this afternoon.

19              And I think, Government Counsel -- and I guess this

20    is for both -- talk to Mr. Douyon, but you should probably

21    present exhibits to him on a memory stick of some kind, if

22    that's not already happening.

23              MS. NIELSEN:  I'm sorry.  For the defense?

24              THE COURT:  No, no, for Mr. Douyon, to send back to

25    the jury.

 1          MS. NIELSEN:  Yes.  We have a memory stick and it's

 2     loaded on to the laptop.

 3          THE COURT:  On what?

 4          MS. NIELSEN:  Loaded on the laptop that's going back

 5     to the jury.

 6          THE COURT:  Okay.

 7          MR. MONROE:  We did provide the videos on a memory

 8     stick, but there was a couple more documents that we didn't add

 9     to that thumb drive, we can do that.

10          THE COURT:  As long as the video is on there and any

11     hard-copy documents --

12          MR. MONROE:  Yeah, I have the hard copies here,

13     Judge.

14          THE COURT:  That's fine.

15          MR. MONROE:  Try to get used to this revolution we're

16     dealing with.

17          THE COURT:  It's tricky, technology.

18          All right.  I think we're ready to go.

19          THE COURTROOM DEPUTY:  Jury panel.

20          (Whereupon the jurors enter the courtroom.)

21          THE COURT:  All right.  Have a seat, everybody.

22          Ladies and gentlemen, welcome back.  Thank you for

23     your patience with us.  It allowed us to get done what we

24     needed to get done.  So we are ready to go now this afternoon.

25     The way things are going forward is as follows:  You will hear

1    from me with the final instructions in this case, they will

2    consist both of sort of general principles of law, as well as

3    some substantive instructions.  We will then hear closing

4    statements from the government and closing statements from the

5    defense.  The government will have an opportunity, at the end,

6    to do a rebuttal.

7         You will then get some final instructions from me,

8    very brief instructions, that are largely administrative in

9    nature.  And then we'll sort of see where we are at the end of

10   the day in terms of whether to send you back to start

11   deliberating or we just, you know, start fresh on Monday

12   morning.  Okay?  All right.

13        So, ladies and gentlemen, the time has now come when

14   all the evidence is in.  It is now up to me to instruct you on

15   the law.  Before we talk about the specific charges alleged

16   here and some of the specific issues in this case, I want to

17   take a few moments to talk about some general rules of law.

18   Some of these will repeat what I told you in my preliminary

19   instructions.

20        Now, I'm going to read all of these to you.  You do

21   not need to write everything down word for word because you

22   will have copies of these instructions with you when you are

23   deliberating.

24        All right.  So, my function and has been to conduct

25   this trial in an orderly, fair, and efficient manner, to rule

1    on questions of law and to instruct you on the law that applies

2    in this case.  It is your duty to accept the law as I instruct

3    you.  You should consider all the instructions as a whole.  You

4    may not ignore or refuse to follow any of them.

5           Your function as the jury is to determine what the

6    facts are in this case.  You are the sole judges of the facts.

7    While it is my responsibility to decide what is admitted as

8    evidence during the trial, you alone decide the weight, if any,

9    to give to that evidence.  You alone decide the credibility or

10   believability of the witnesses.

11          You should determine the facts without prejudice,

12   fear, sympathy, or favoritism.  You should not be improperly

13   influenced by anyone's race, ethnic origin, or gender.  Decide

14   the case solely from a fair consideration of the evidence.

15          You may not take anything I may have said or done as

16   indicating how I think you should decide this case.  If you

17   believe that I have expressed or indicated any such opinion,

18   you should ignore it.  The verdict in this case is your sole

19   and exclusive responsibility.

20          If any reference by the Court or the attorneys to the

21   evidence does not coincide with your own recollection of the

22   evidence, it is your recollection that should control your

23   deliberations.

24          During trial I permitted those jurors who wanted to

25   do so, to take notes.  You may take your notebooks with you to

1    the jury room and use them during your deliberations if you

2    wish.  As I told you at the beginning of trial, your notes are

3    only to be an aid to your memory.  They are not evidence in the

4    case and they should not replace your own memory of the

5    evidence.  Those jurors who have not taken notes should rely on

6    their own memory of the evidence.  The notes are intended to be

7    for the notetaker's own personal use.

8            Every defendant in a criminal case is presumed to be

9    innocent.  This presumption of innocence remains with the

10   defendant throughout the trial, unless and until the government

11   has proven he is guilty beyond a reasonable doubt.  This burden

12   never shifts throughout the trial.  The law does not require

13   the defendant to prove his innocence or to produce any evidence

14   at all.  If you find that the government has proven beyond a

15   reasonable doubt every element of a particular offense with

16   which the defendant is charged, it is your duty to find him

17   guilty of that offense.  On the other hand, if you find the

18   government has failed to prove any element of a particular

19   offense beyond a reasonable doubt, you must find the defendant

20   not guilty of that offense.

21           The government has the burden of proving the

22   defendant guilty beyond a reasonable doubt.  Now, in civil

23   cases it is only necessary to prove that a fact is more likely

24   true than not, or, in some cases, that its truth is highly

25   probable.  In criminal cases such as this one, the government's

1      proof must be more powerful than that.  It must be beyond a

2      reasonable doubt.  Reasonable doubt, as the name implies, is a

3      doubt based on a reason -- a doubt for which you have a reason

4      based upon the evidence or lack of evidence in the case.  If,

5      after careful, honest, and impartial consideration of all the

6      evidence, you cannot say that you are firmly convinced of the

7      defendant's guilt, then have you a reasonable doubt.

8             Reasonable doubt is the kind of doubt that would

9      cause a reasonable person, after careful and thoughtful

10     reflection, to hesitate to act in the graver or more important

11     matters in life.  However, it is not an imaginary doubt, nor a

12     doubt based on speculation or guesswork; it is a doubt based on

13     reason.  The government is not required to prove guilt beyond

14     all doubt, or to a mathematical or scientific certainty.  Its

15     burden is to prove guilt beyond a reasonable doubt.

16            One of the questions you were asked when we were

17     selecting this jury was whether the nature of the charges would

18     affect your ability to render a fair and impartial verdict.

19     There was a reason for that question.  You must not allow the

20     nature of the charges themselves to affect your verdict.  You

21     must only consider the evidence that has been presented in this

22     case in rendering a fair and impartial verdict.

23            The weight of the evidence is not necessarily

24     determined by the number of witnesses testifying on each side.

25     Rather, you should consider all the facts and circumstances in

1    evidence to determine which of the witnesses you believe.  You

2    might find that the testimony of a smaller number of witnesses

3    on one side is more believable than the testimony of a greater

4    number of witnesses on the other side or you might find the

5    opposite.

6              During your deliberations you may consider only the

7    evidence properly admitted in this case.  The evidence in this

8    case was the sworn testimony of the witnesses, the exhibits

9    that were admitted into evidence, and the facts stipulated to

10   by the parties.

11             During the trial you were told that the parties had

12   stipulated -- that is, agreed -- to certain facts.  You should

13   consider any stipulation of fact to be undisputed evidence.

14   Whether you consider the evidence, you are permitted to draw,

15   from the facts that you find have been proven such reasonable

16   inferences as you feel are justified in light of your

17   experience.  You should give any evidence such weight as in

18   your judgment it is fairly entitled to receive.

19             Statements and arguments of the lawyers are not

20   evidence.  They are only intended to assist you in

21   understanding the evidence.  Similarly, the questions of the

22   lawyers are not evidence.

23             The indictment, which we've talked about, is merely a

24   formal way of accusing a person of a crime.  You must not

25   consider the indictment as evidence of any kind.  You may not

1    consider as any evidence of the defendant's guilt or draw any

2    inference of guilt from it.

3          There are two types of evidence for which you may

4    determine what the facts are in this case; direct evidence and

5    circumstantial evidence.  When a witness, such as an

6    eyewitness, asserts actual knowledge of a fact, that witness's

7    testimony is called direct evidence.  On the other hand,

8    evidence of facts and circumstances from which a reasonable

9    inference may be drawn is called circumstantial evidence.

10          Let me give you an example.  Assume a person has

11    looked out a window and saw that snow was falling.  If he later

12    testified in court about what he had seen, his testimony would

13    be direct evidence that snow was falling at the time he saw it

14    happen.  Assume, however, that he looked out a window and saw

15    no snow on the ground and then went to sleep and saw snow on

16    the ground after he woke up.  His testimony about what he had

17    seen would be circumstantial evidence that it had snowed while

18    he was asleep.

19          The law says that both direct and circumstantial

20    evidence are acceptable as a means of proving a fact.  The law

21    does not favor one form of evidence over another.  It is for

22    you to decide how much weight to give to any particular

23    evidence, whether it is direct or circumstantial.  You are

24    permitted to give equal weight to both.  Circumstantial

25    evidence does not require a greater degree of certainty than

1    direct evidence.  In reaching a verdict in this case, you

2    should consider all of the evidence presented, both direct and

3    circumstantial.

4            Now the lawyers in this case sometimes objected when

5    the other side asked a question, made an argument or offered

6    evidence that the objecting lawyer believed was not proper.

7    You must not hold such objections against the lawyer who made

8    them or the party that he or she represents.  It is the

9    lawyer's responsibility to object to evidence that they believe

10   is not admissible.

11           If, during the course of the trial, I sustained an

12   objection to a lawyer's question, you should ignore the

13   question, and you must not speculate as to what the answer

14   would have been.  If, after a witness answered a question, I

15   ruled that the answer should be stricken, you should both

16   ignore the question and the answer and they should play no part

17   in your deliberations.  Likewise, exhibits as to which I have

18   sustained an objection or that I ordered stricken are not

19   evidence, and you must not consider them in your deliberations.

20           In determining whether the government has proved its

21   case, you must consider and weigh the testimony of all the

22   witnesses who have appeared before you.  You are the sole judge

23   of the credibility of the witnesses.  In other words, you alone

24   are to determine whether to believe any witness and the extent

25   to which any witness should be believed.

1          In reaching a conclusion as to the credibility of any

2     witness, you may consider any matter that may have a bearing on

3     the subject.  You may consider the demeanor and the behavior of

4     the witness on the stand, the witness's manner of testifying,

5     whether the witness impresses you as a truthful person, whether

6     the witness impresses you as having an accurate memory and

7     recollection, whether the witness has any motive for not

8     telling the truth, whether the witness had a full opportunity

9     to observe the matter about which he or she has testified,

10    whether the witness has any interest in the outcome of this

11    case, or friendship or hostility toward other people concerned

12    with the case.

13          Inconsistencies or discrepancies in the testimony of

14    a witness or between the testimony of different witnesses may

15    or may not cause you to discredit such testimony.  Two or more

16    persons witnessing an incident or transaction may see or hear

17    it differently.  An innocent mis-recollection, like a failure

18    of recollection, is not an uncommon experience.  In weighing

19    the effect of the inconsistency or discrepancy always, consider

20    whether it pertains to a matter of important or unimportant

21    detail, and whether the inconsistencies or discrepancy results

22    from innocent error or intentional falsehood.

23          You may consider the reasonableness or

24    unreasonableness, the probability or improbability of a the

25    testimony of a witness in determining whether to accept it as

1      true and accurate.  You may consider whether the witness has

2      been contradicted or supported by other credible evidence.

3                If you believe that any witness has shown himself or

4      herself to be biased or prejudiced, for or against either side

5      in this trial, you may consider and determine whether such bias

6      and prejudice has colored the testimony of the witness so as to

7      affect the desire and capability of that witness to tell the

8      truth.  You should give the testimony of each witness such

9      weight as in your judgment it is fairly entitled to receive.

10               Now, you've heard evidence that Officer Noah Rathbun

11     and Mr. Webster made a statement on an earlier occasion and

12     that this statement may be inconsistent with his testimony here

13     at trial.  It is for you to decide whether the witness made

14     such a statement and whether in fact it was inconsistent with

15     the witness's testimony here.  If you find such an

16     inconsistency, you may consider the earlier statement in

17     judging the credibility of the witness, but you may not

18     consider it as evidence that what was said in the earlier

19     statement was true.

20               You have heard testimony about witnesses meeting with

21     attorneys and/or investigators before they testified.  You were

22     instructed that it is perfectly proper for a lawyer or

23     investigator to interview a witness in preparation for trial.

24               A police officer's or law enforcement agent's

25     testimony should be considered by you just as any other

1    evidence in the case.  And evaluating the officer's or agent's

2    credibility you should use the same guidelines that you apply

3    to the testimony of any witness.  In no event should you give

4    greater or lesser weight to the testimony of any witness merely

5    because he or she is a police officer or law enforcement agent.

6           A defendant has a right to become a witness in his

7    own behalf.  His testimony should not be disbelieved merely

8    because he is the defendant.  In evaluating his testimony,

9    however, you may consider the fact that the defendant has a

10   vital interest in the outcome of this trial.  As with the

11   testimony of any other witness, you should give the defendant's

12   testimony as much weight as in your judgment it deserves.

13          Now, you have heard evidence that Mr. Webster made

14   statements to law enforcement about the crimes charged.  You

15   must decide how much weight to give the statement.  For

16   example, you may consider whether he made the statement

17   voluntarily and understood what he was saying.  You may

18   consider whether he was forced, threatened, or pressured,

19   either physically or psychologically, and whether he was

20   promised any reward or benefit for making the statement.  You

21   may consider all the conversations between him and law

22   enforcement.  You may consider whether law enforcement warned

23   him of his rights.  You may consider where and when the

24   statement was given, the duration of any questioning, who was

25   present during some or all of the questioning of the defendant,

1    and whether law enforcement recorded some or all of the

2    conversations.  You may consider the age, education,

3    experience, intelligence and the physical and mental condition

4    of the defendant.

5         Mr. Webster, has introduced testimony that in the

6    opinion of Laura Moritz, Brian Gallo, and Frank Sialiano,

7    Mr. Webster is a peaceful and/or law-abiding person.  Such

8    evidence may indicate to you that it is unlikely that a

9    peaceful and/or law-abiding person would commit the crime

10   charged or it may not.  You may consider this evidence along

11   with other evidence in the case, including evidence that

12   contradicts Mr. Webster's character evidence, and give it as

13   much weight as you think it deserves.

14        Notwithstanding the evidence of character, if, after

15   weighing all the evidence, you are convinced beyond a

16   reasonable doubt that Mr. Webster's guilty of crimes charged,

17   it is your duty to find him guilty.  On the other hand,

18   evidence of good character alone may create a reasonable doubt

19   as to a defendant's guilt, although without it the other

20   evidence would be convincing.

21        A transcript of a video recording was furnished for

22   your convenience and guidance as you listened to the video to

23   clarify portions of the video which are difficult to hear and

24   to help you identify speakers.  The video, however, is the

25   evidence in the case; the transcript is not.  If you notice any

1    difference between the transcript and the video, you must rely

2    only on the video and not the transcript.  In addition, if you

3    cannot determine from the video that particular words were

4    spoken, you must disregard the transcript as far as those words

5    are concerned.

6            During the course of this trial a number of exhibits

7    were admitted in evidence.  Sometimes only those parts of an

8    exhibit that are relevant to your deliberations were admitted.

9    When this has occurred the irrelevant parts of the exhibit were

10   blacked out or otherwise removed, or a video played without

11   audio.  There are a variety of reasons why only a portion of an

12   exhibit is admitted, including that the other portions are

13   inadmissible or implicate an individual's privacy.  As you

14   examine the exhibits and you see where there appear to be

15   omissions, you should consider only the portions that were

16   admitted.  You should not guess as to what has been taken out

17   and you should not hold it against either party.  You are to

18   decide the facts only from the evidence that is before you.

19           Someone's intent or knowledge ordinarily cannot be

20   proved directly because there is no way of knowing what a

21   person is actually thinking, but you may infer someone's intent

22   or knowledge from the surrounding circumstances.  You may

23   consider any statements made or acts done or omitted in this

24   case by Mr. Webster, and all other facts and circumstances

25   received in evidence which indicate his intent or knowledge.

1        It is entirely up to you, however, to decide what

2   facts to find from the evidence received during this trial.

3   You should consider all the circumstances in evidence that you

4   think are relevant in determining whether the government has

5   proved beyond a reasonable doubt that the defendant acted with

6   the necessary state of mind.

7        Okay.  Now, ladies and gentlemen, we're going to

8   switch gears a little bit and now I'm going to talk to you

9   about the specific offenses that are charged in this case.

10       Now, Mr. Webster asserts that he acted in

11  self-defense and therefore is not guilty of any of the charges.

12  After I have instructed each of you on the counts with which he

13  is charged, I will instruct you on the defense of self-defense

14  that applies to each of the counts.

15       Each count of the indictment charges a separate

16  offense.  You should consider each offense, and the evidence

17  which applies to it, separately, and you should return separate

18  verdicts as to each count unless I instruct you to do

19  otherwise.  The fact that you may find the defendant guilty or

20  not guilty on any one count of the indictment should not

21  influence your verdict with respect to any other count of the

22  indictment.

23       Count One of the indictment charges the defendant

24  with forcibly assaulting, resisting, opposing, impeding,

25  intimidating, or interfering with any person assisting officers

1    of the United States who are engaged in the performance of

2    their official duties, while using a deadly or dangerous

3    weapon, and while making physical contact with the person or

4    acting with the intent to commit another felony, which is a

5    violation of federal law.

6          Now, I'm going to instruct you on this charge and

7    also on the lesser included offense of assaulted, resisting,

8    imposing, impeding, intimidating, or interfering with any

9    person assisting officers of the United States who are engaged

10   in the performance of their official duties, and while making

11   physical contact with the person or acting with the intent to

12   commit another felony.

13         Just to put it in layman's terms, you'll notice that

14   a number of the counts include using a dangerous weapon.  The

15   lesser included offense for each of those will drop the "using

16   a dangerous weapon."  Okay?  So that's how these instructions

17   will, as a general matter, work.

18         After I give you the elements of these crimes -- that

19   is, both the greater offense and lesser offense -- I will tell

20   you in what order you should consider them.

21         Okay.  In order to find the defendant guilty of Count

22   One, that is, forcibly assaulting, resisting, opposing,

23   impeding, intimidating, or interfering with a person assisting

24   officers of the United States when engaged in the performance

25   of their duties, while using a deadly or dangerous weapon, and

1   while making physical contact with the person or acting with

2   the intent to commit another felony, you must find the

3   following elements beyond a reasonable doubt:

4        First, the defendant assaulted, resisted, opposed

5   impeded, intimidated, or interfered with Officer Noah Rathbun,

6   an officer from the Metropolitan Police Department.

7        Second, the defendant did such acts forcibly.

8        Third, the defendant did such acts voluntarily and

9   intentionally.

10       Fourth, the person assaulted, resisted, opposed,

11  impeded, intimidated, or interfered with assisting officers of

12  the United States who were then engaged in the performance of

13  their official duties.

14       Fifth, that the defendant made physical contact with

15  a person who was assisting officers of the United States who

16  were then engaged in the performance of their official duties,

17  or acted with the intent to commit another felony.  For

18  purposes of this element, "another felony" refers to the

19  offense charged in Count Two.  And I'll instruct you as to that

20  count in a moment.

21       And the sixth element, in doing the foregoing acts,

22  the defendant used a deadly or dangerous weapon.

23       Now, the elements of the lesser included offense will

24  sound very familiar, minus the sixth element.  But I'm going to

25  read them back to you anyway.

1     In order to find the defendant guilty of assaulting,

2  resisting, opposing, impeding, intimidating, or interfering

3  with any person assisting officers of the United States who are

4  engaged in the performance of their official duties, and while

5  making physical contact with the person or acting with the

6  intent to commit another felony, you must find the following

7  elements beyond a reasonable doubt:

8     First, the defendant assaulted, resisted, opposed,

9  impeded, intimidated, or interfered with Officer Noah Rathbun,

10 an officer of the Metropolitan Police Department.

11    Second, the defendant did such acts forcibly.

12    Third, the defendant did such acts voluntarily and

13 intentionally.

14    Fourth, the person assaulted, resisted, opposed,

15 impeded, intimidated, or interfered with a person assisting

16 officers of the United States who were then engaged in the

17 performance of their official duties.

18    And, fifth, the defendant made physical contact with

19 a person assisting officers of the United States who were then

20 engaged in the performance of their official duties, or acted

21 with the intent to commit another felony.  And, again, for

22 purposes of this element, "another felony" refers to the

23 offense charged in Count Two.

24    Now I'm going to instruct you on the order in which

25 you should consider the above offenses.  And this will be true

1    for all of the other counts as well where there's a greater

2    offense and a lesser offense.

3            You should first consider whether Mr. Webster is

4    guilty of assaulting, resisting, opposing, intimidating or

5    interfering with any person assisting officers of the

6    United States who are engaged in the performance of their

7    official duties, while using a deadly or dangerous weapon, and

8    while making physical contact with the person or acting with

9    the intent to commit another felony.

10           If you find Mr. Webster guilty, do not go on to the

11   other charge -- that is, the lesser charge.  If you find

12   Mr. Webster not guilty, go on to consider assaulting,

13   resisting, opposing, impeding, intimidating, or interfering

14   with another person assisting officers of the United States who

15   are engaged in the performance of their duties, while making

16   physical contact with the person or acting with the intent of

17   committing another felony.

18           And, if after making all reasonable efforts to reach

19   a verdict on the charge that includes using a dangerous --

20   excuse me, using or carrying a deadly or dangerous weapon, you

21   are not able to do so, you are allowed to consider the other,

22   that is, the lesser assault charge.

23           The order will be reflected on the verdict form that

24   I will be giving you.

25           Now, here are a few definitions associated with Count

1    One.  The defendant acted forcibly if he used force, attempted

2    to use force, or threatened to use force against the officer.

3    A threat to use force at some unspecified time in the future is

4    not sufficient to establish that the defendant act forcibly.

5           The term "assault" means any intentional attempt or

6    threat to inflict injury upon someone else, when coupled with

7    an apparent present ability to do so.  A finding that one used

8    force, or attempted or threatened to use it, isn't the same as

9    a finding that he attempted or threatened to inflict injury.

10   In order to find that the defendant committed an assault, you

11   must find beyond a reasonable doubt that the defendant acted

12   forcibly and the defendant intended to inflict or intended to

13   threaten injury.

14          The terms "resist," "oppose," "impede," "intimidate,"

15   and "interfere with" carry their everyday, ordinary means.

16          You are instructed that Officer Noah Rathbun is an

17   officer of the Metropolitan Police Department and that it was

18   part of the official duty of such officer to assist federal

19   officers in protecting the U.S. Capitol complex on January 6,

20   2021, detaining individuals who lacked authorization to enter

21   the restricted area around the complex.  It is not necessary to

22   show that the defendant knew the person being forcibly

23   assaulted, resisted, opposed, impeded, intimidated, or

24   interfered with was, at that time, assisting federal officers

25   in carrying out an official duty so long as it is established

1    beyond a reasonable doubt that the victim was, in fact,

2    assisting a federal officer acting in the course of his duty

3    and that the defendant intentionally forcibly assaulted,

4    resisted, opposed, impeded, intimidated, or interfered with

5    that officer.

6          An object is a deadly or dangerous weapon if it is

7    capable of causing serious bodily injury or death to another

8    person and the defendant used it in that manner.   In

9    determining whether the object is a deadly or dangerous weapon

10   you may consider both physical capabilities of the object used

11   and the manner in which the object is used.

12         All right.   That's Count One.   Count Two and the rest

13   of them will be a little easier.

14         Count Two of the indictment charges the defendant

15   with committing or attempting to commit an act to obstruct,

16   impede, or interfere with Officer Noah Rathbun while Officer

17   Rathbun was lawfully carrying out his official duties incident

18   to a civil disorder, which is a violation of federal law.

19         You may find Mr. Webster guilty of Count Two if you

20   determine that Mr. Webster either committed or attempted to

21   commit the acts described in the above paragraph.   You need not

22   conclude that he both committed and attempted to commit the

23   acts described in the above paragraph.   I will instruct you as

24   to both the commission of the offense and the attempted

25   commission on the offense below.   You may consider these two

1     alternatives in any order you wish.

2               In order to find the defendant guilty of this

3     offense, you must find the following elements beyond a

4     reasonable doubt:

5               First, the defendant knowingly committed an act with

6     the intended purpose of obstructing, impeding, or interfering

7     with Officer Noah Rathbun.

8               Second, at the time of the defendant's actual act,

9     Officer Noah Rathbun was engaged in the lawful performance of

10    his official duties incident to and during a civil disorder.

11              Third, the civil disorder in any way or degree

12    obstructed, delayed, or adversely affected either commerce or

13    the movement of any article or commodity in commerce or the

14    conduct or performance of any federally protected function.

15              All right.  Here's some definitions.  And the person

16    acts "knowingly" if he realizes what he is doing and he is

17    aware of the nature of his conduct, and he does not act through

18    ignorance, mistake, or accident.  In deciding whether the

19    defendant acted knowingly, you must consider all of the

20    evidence, including what the defendant did or said.

21              The term "civil disorder" means any public

22    disturbance involving acts of violence by groups of three or

23    more persons, which A) causes an immediate danger or injury to

24    another individual; B) causes an immediate danger of damage to

25    another individual's property; C) results in injury to another

1   individual, or; D) results in damage to another individual's

2   property.

3        The term "commerce" means commerce or travel between

4   one state, including the District of Columbia, and any other

5   state, including the District of Columbia.  It also means

6   commerce wholly within the District of Columbia.

7        The term "federally protected function" means any

8   function, operation, or action carried out, under the laws of

9   the United States, by any department, agency, or

10   instrumentality of the United States or by an officer or

11   employee thereof.

12        The term "department" includes executive departments.

13   The Department of Homeland Security, which includes the

14   United States Secret Service, is an executive department.

15        The term "agency" includes any department,

16   independent establishment, commission, administration,

17   authority, board, or bureau of the United States.

18        The term "law enforcement officer" means any officer

19   or employee of the United States or the District of Columbia

20   while engaged in the enforcement or prosecution of any criminal

21   laws of the United States or the District of Columbia.

22        For the U.S. Capitol Police and Metropolitan Police

23   Department, on January 6 of 2021, the term "official duties"

24   means policing the U.S. Capitol building and grounds, and

25   enforcing federal law and D.C. law in those areas.

1          All right.  Now, in Count Two the defendant is also

2     charged with an attempt to commit the crime of obstructing

3     Officer Noah Rathbun during a civil disorder.  An attempt to

4     instruct officers during a civil disorder is a federal crime

5     even if the defendant did not actually complete the crime of

6     obstructing officers during a civil disorder.

7          In order to find the defendant guilty of attempting

8     to commit the crime of obstructing Officer Noah Rathbun during

9     a civil disorder, you must find that the government proved

10    beyond a reasonable doubt each of the following elements:

11         First, that the defendant intended to commit the

12    crime of obstructing Officer Noah Rathbun during a civil

13    disorder, as I have defined that offense above.

14         Second, that the defendant took a substantial step

15    toward committing obstruction of Officer Noah Rathbun during a

16    civil disorder, which strongly corroborates or confirms that

17    the defendant intended to commit that crime.

18         Now, with respect to the first element of attempt,

19    you may not find the defendant guilty of attempting to commit

20    obstruction of Officer Noah Rathbun during a civil disorder

21    merely because he thought about it.  You must find that the

22    evidence proved beyond a reasonable doubt that the defendant's

23    mental state passed beyond the stage of merely thinking about

24    the crime to actually intending to commit it.

25         With respect to the substantial step element, you may

1    not find the defendant guilty of attempt to commit obstruction

2    of Officer Noah Rathbun during the civil disorder merely

3    because he made some plans to or some preparation for

4    committing that crime.  Instead, you must find that the

5    defendant took some firm, clear, undeniable action to

6    accomplish his intent to commit obstruction of Dr. -- excuse

7    me, Officer Noah Rathbun during a civil disorder.  However, the

8    substantial step element does not require the government to

9    prove that the defendant did everything except the last act

10   necessary to complete the crime.

11        All right.  Let's move on to Count Three.  Count

12   three of the indictment charges the defendant with entering or

13   remaining in a restricted building or grounds while using or

14   carrying a dangerous -- excuse me, while carrying a deadly or

15   dangerous weapon, which is a violation of federal law.

16        I'm going to instruct you on this charge and also on

17   the lesser included offense of entering or remaining in a

18   restricted building or grounds.  After I give you the elements

19   of these crimes, I will tell you in what order you should

20   consider them.

21        In order to find the defendant guilty of entering or

22   remaining in a restricted building or grounds while using or

23   carrying a deadly or dangerous weapon, you must find that the

24   government proved each of the following elements beyond a

25   reasonable doubt.

1          First, that the defendant entered or remained in a

2     restricted building or grounds without lawful authority to do

3     so.

4          Second, that the defendant did so knowingly.

5          Third, that the defendant used or carried a deadly or

6     dangerous weapon during and in relation to the offense.

7          In order to find the defendant guilty of entering or

8     remaining in a restricted building or grounds, you must find

9     the government proved beyond a reasonable doubt elements one

10    and two of the greater offense, listed immediately above.

11         As with Count One, you should consider, first,

12    whether Mr. Webster is guilty of the greater offense.  If you

13    find him not guilty of the greater offense, or if you cannot

14    reach a verdict through reasonable efforts on the greater

15    offense, you may go onto consider the lesser offense.

16         This order of consideration of the charges will be

17    reflected in the verdict form that I will be giving you.

18         A few definitions.  The term "restricted building or

19    grounds" means any posted, cordoned off, or otherwise

20    restricted area of a building or grounds where a person

21    protected by the Secret Service is or will be temporarily

22    visiting.

23         The term "person protected by the Secret Service"

24    includes the Vice President and the immediate family of the

25    Vice President.  The term "knowingly" has the same meaning

 1    described in the instructions for Count Two.  The term "deadly

 2    or dangerous weapon" has the same meaning described in the

 3    instructions for Count One.

 4         The term "deadly or dangerous weapon" -- sorry, I'm

 5    repeating myself.

 6         Count four of the indictment charges the defendant

 7    with disorderly and/or disruptive conduct in a restricted

 8    building or grounds while using or carrying a deadly or

 9    dangerous weapon, which is a violation of federal law.  I'm

10    going to instruct you on this charge and also on the lesser

11    included offense of disorderly or disruptive conduct in a

12    restricted building or grounds.  After I give you the elements

13    of these crimes, I will tell you in what order you should

14    consider them.

15         In order to find the defendant guilty of disorderly

16    or disruptive conduct in a restricted building or grounds while

17    using a deadly or dangerous weapon, you must find that the

18    government proved each of the following elements beyond a

19    reasonable doubt:

20         First, that the defendant engaged in disorderly or

21    disruptive conduct in, or in proximity to, any restricted

22    building or grounds.

23         Second, that the defendant did so knowingly, and with

24    the intent to impede or disrupt the orderly conduct of

25    government business or official functions.

1    Third, that the defendant's conduct occurred when, or

2    so that, his conduct in fact impeded or disrupted the orderly

3    conduct of government business or official functions.

4    And, fourth, that the defendant used or carried a

5    deadly or dangerous weapon during and in relation to the

6    offense.

7    Now, in order to find the defendant guilty of the

8    lesser included offense of disorderly or disruptive conduct in

9    a restricted building or grounds, you must find that the

10   government proved beyond a reasonable doubt elements one

11   through three of the greater offense, which is listed

12   immediately above.

13   As with Counts One and Three, you should consider,

14   first, whether Mr. Webster is guilty of the greater offense.

15   If you find him not guilty of that offense or if you cannot

16   reach a verdict through reasonable efforts on that greater

17   offense, you may go on to consider the lesser offense.

18   The order will be reflected in the verdict form that

19   I'll be giving you.

20   A few more definitions as to this count.  "Disorderly

21   conduct" occurs when a person is unreasonably loud and

22   disruptive under the circumstances, or interferes with another

23   person by jostling against or unnecessarily crowding that

24   person.  "Disruptive conduct" is a disturbance that interrupts

25   an event, activity, or the normal course of a process.

1          The term "restricted building or grounds,"

2    "knowingly," and "deadly or dangerous weapon" have the same

3    meanings described in the instructions above.

4          Now, with respect to this count, you may find

5    Mr. Webster guilty of the crime charged in Count Four without

6    finding that he personally committed each of the acts that

7    actually make up the crime.  Any person who in some way

8    intentionally participates in the commission of a crime can be

9    found guilty either as an aider and abettor or as a principal

10   offender.  It makes no difference which label you attach.  The

11   person is as guilty of a crime as he would be if he had

12   personally committed each of the acts that make up the crime.

13         To find that a defendant aided and abetted in

14   committing a crime, you must find that the defendant knowingly

15   associated himself with the commission of the crime, that he

16   participated in the crime as something he wished to bring

17   about, and that he intended by his actions to make it succeed.

18         Some affirmative conduct by the defendant in planning

19   or carrying out the crime is necessary.  Mere physical presence

20   by Mr. Webster at the place and time that the crime is

21   committed is not by itself sufficient to establish his guilt.

22   However, mere physical presence is enough if it is intended to

23   help in the commission of the crime.

24         The government is not required to prove that anyone

25   discussed or agreed upon a specific time or method of

1    committing the crime.

2         It is not necessary that all the people who committed

3    the crime be caught or identified.  It is sufficient if you

4    find beyond a reasonable doubt that the crime was committed by

5    someone and the defendant knowingly and intentionally aided and

6    abetted in committing the crime.

7         Now, the above instruction on aiding and abetting

8    applies only to Count Four and to no other count.

9         Count Five -- getting close to the end, I promise.

10   Count Five of the indictment charges the defendant with

11   knowingly engaging in any act of physical violence against a

12   person or property in a restricted building or grounds while

13   using or carrying a deadly or dangerous weapon, which is a

14   violation of federal law.

15        I'm going to instruct you on this charge and also on

16   the lesser included offense of knowingly engaging in any act of

17   physical violence against a person or property in a restricted

18   building or grounds.  After I give you the elements of these

19   crimes, I will tell you in what order you should consider them.

20        In order to find the defendant guilty of knowingly

21   engaging in any act of physical violence against a person or

22   property in a restricted building or grounds, you must find

23   that the government proved each of the following elements

24   beyond a reasonable doubt:

25        First, that the defendant engaged in an act of

1    physical violence against a person or property end in, or in

2    proximity to, a restricted building or grounds.

3              Second, that the defendant did so knowingly.

4              Third, that the defendant used or carried a deadly or

5    dangerous weapon during and in relation to the offense.

6              In order to find the defendant guilty of knowingly

7    engaging in any act of physical violence against a person or

8    property in a restricted building or grounds -- this is the

9    lesser included offense -- you must find that the government

10   provided -- excuse me, proved beyond a reasonable doubt

11   elements one and two of the greater offense, which are listed

12   immediately above.

13             Now, as with Counts One, Three, and Four, you should

14   consider, first, whether Mr. Webster is guilty of the greater

15   offense.  If you find him not guilty of the greater offense, or

16   if you cannot reach a verdict through reasonable efforts on the

17   greater offense, you may go on to consider the lesser offense.

18             This order of consideration will be reflected in the

19   verdict form that I give you.

20             Couple more definitions.  The term "act of physical

21   violence" means any act involving an assault or other

22   infliction of death or bodily harm on an individual, or damage

23   to, or discretion of, real or personal property.

24             The terms "restricted building and grounds,"

25   "knowingly," and "deadly or dangerous" have the same meanings

1    described in the instructions above.

2          Count Six of the indictment charges the defendant

3    with engaging in an act of physical violence in the

4    United States Capitol grounds or any of the Capitol buildings,

5    which is a violation of federal law.

6          In order to find the defendant guilty of this

7    offense, you must find that the government proved each of the

8    following elements beyond a reasonable doubt:

9          First, that the defendant engaged in an act of

10   physical violence in the United States Capitol grounds or in

11   any of the Capitol buildings.

12         Second, that the defendant acted willfully and

13   knowingly.

14         The term "act of physical violence" means any act

15   involving assaults or other infliction or threat of infliction

16   of death or bodily harm on an individual.

17         The term "United States Capitol grounds" includes all

18   squares, reservations, streets, roadways, walks, and other

19   areas as defined on a map entitled, quote, Map showing areas

20   comprising United States Capitol grounds, end quote, dated June

21   25th, 1946, approved by the Architect of the Capitol, and

22   recorded in the Office of the Surveyor of the District of

23   Columbia in Book 127, page 8.  This is what the statute says.

24   You are instructed that the West Front of the United States

25   Capitol, including the West Lower Terrace, is part of the

1    United States Capitol grounds for purposes of this count.

2         The terms "willfully" and "knowingly" have the same

3    meanings described in the instructions above.

4         Okay.  Those are the instructions on the substantive

5    elements of each of the counts.  I'm now going to turn to

6    self-defense, as I discussed at the start.

7         Now, every person has the right to use a reasonable

8    amount of force in self-defense if:

9         One, he has a reasonable belief that the use of force

10   was necessary to defend himself or another against the

11   immediate use of excessive force.

12        And, two, uses no more force than was reasonably

13   necessary in the circumstances.  A person who was the initial

14   aggressor does not act in self-defense.

15        If you find that Mr. Webster actually and reasonably

16   believed that he was in imminent danger of serious bodily harm

17   and that Mr. Webster had reasonable grounds for that belief,

18   then Mr. Webster has a right to self-defense even if

19   Mr. Webster also had other possible motives, such as feelings

20   of anger toward Officer Rathbun or a desire for revenge.  The

21   defendant's other possible motives do not defeat an otherwise

22   valid claim of self-defense, but can be considered in

23   evaluating whether the Mr. -- excuse me, evaluating whether

24   Mr. Webster actually and reasonably believed he was in imminent

25   danger of serious bodily harm.

1          Self-defense is a defense to the charges in Counts,

2   One, Two, Three, Four, Five, and Six.  Mr. Webster is not

3   required to prove that he acted in self-defense.  Where

4   evidence of self-defense is present, the government must prove

5   beyond a reasonable doubt that Mr. Webster did not act in

6   self-defense.  If the government has failed to do so, you must

7   find Mr. Webster not guilty on these counts.

8          Self-defense is not, however, a defense to the lesser

9   included offenses in Counts Three and Four.  If you reach the

10  lesser included offenses in Counts Three and Four, the

11  government need not prove beyond a reasonable doubt that

12  Mr. Webster did not act in self-defense.

13         Now, a person may use a reasonable amount of force in

14  self-defense.  A person may use an amount of force which, at

15  the time of the incident, he actually and reasonably believes

16  is necessary to protect himself from imminent bodily harm.

17         Even if the other person is the aggressor and

18  Mr. Webster is justified in using force in self-defense, he may

19  not use any greater force than he actually and reasonably

20  believes to be necessary under the circumstances to prevent the

21  harm he reasonably believes is intended to avoid serious bodily

22  harm.

23         In deciding whether Mr. Webster used excessive force

24  in defending himself, you may consider all the circumstances

25  under which he acted.  A person acting in the heat of passion

1    caused by an assault does not necessarily lose his claim of

2    self-defense by using greater force than would seem necessary

3    to a calm mind.  In the heat of passion, a person may actually

4    and reasonably believe something that seems unreasonable to a

5    calm mind.

6            If Mr. Webster actually and reasonably believes it is

7    necessary to use force to prevent imminent bodily harm to

8    himself, he may use a reasonable amount of force even though

9    afterwards it turns out the appearances were false.

10           If you find that Mr. Webster was the aggressor, he

11   cannot rely upon the right of self-defense to justify his use

12   of force.  Mere words without more by Mr. Webster, however, do

13   not constitute aggression.

14           All right.  Now, this is the defendant's position in

15   the case:  Officer Rathbun raised his hand and gestured toward

16   the defendant, inviting him to engage in a fight.  Mr. Webster

17   responded to Officer's Rathbun provocation by pushing on the

18   police barrier.  Officer Rathbun struck defendant in his face.

19   Defendant used the amount of force he reasonably believed

20   necessary to protect himself by bringing Officer Rathbun to the

21   ground.

22           Okay.  That is the end of the instructions, the

23   substantive instructions I am going to deliver to you.  As I

24   said, at the close of the instructions I'll have a few more

25   administrative instructions to provide you.  But we are now

```
 1    ready to proceed with the government's closing arguments.
 2              MR. KELLY:  Thank you, Your Honor.  I just need to
 3    get myself mic'd up here.
 4              THE COURTROOM DEPUTY:  Mr. Kelly, are you plugged in?
 5              MR. KELLY:  I am.  I am at the table, though.  I'm
 6    plugged in at the table.  Oh, I'm sorry it's a slide.  It's
 7    just a black screen.  Okay.
 8              Okay.  Testing.  Is this okay?  It's picking me up?
 9              Hostile.  Chaotic.  Violent.  Those are just a few of
10    the words that the officers who testified before you this week
11    used to describe what happened at the U.S. Capitol on January
12    6, 2021.  And it was all of those things.  Thousands of angry
13    rioters decided on the District of Columbia that day to stop
14    members of Congress from certifying the results of the 2020
15    presidential election.
16              One of those angry rioters was the defendant, Thomas
17    Webster.  And there was another word that describes what
18    happened at the Capitol that day.
19              Why is it -- is it showing up as two?
20              THE COURTROOM DEPUTY:  Could you unplug it and replug
21    it in, please?
22              MR. KELLY:  Apologies.
23              (Pause.)
24              MR. KELLY:  Trying this again.
25              There is another word that describes what happened at
```

1    the Capitol that day, and that word is rage.  This case is

2    about rage, plain and simple.  This case is about Thomas

3    Webster's rage and how he made Officer Noah Rathbun the victim

4    of that rage on January 6th.

5             But you don't have to take my word for it.  You saw

6    it with your own eyes and you heard it with your own ears.  You

7    saw it in the videos that we showed you.  And you heard Officer

8    Rathbun testify, for three hours, in front of you about what

9    happened that day.

10            You heard Officer Rathbun describe how the defendant

11   aggressively approached him at the front police line perimeter

12   in the Lower West Terrace on January 6th.  You heard him

13   describe how the defendant came out of the crowd from nowhere,

14   shoving other members of the crowd out of the way, to come

15   face-to-face, directly next to the bike racks where Officer

16   Rathbun was standing.  You heard him explain that the defendant

17   was an obvious threat from the first moment that he

18   aggressively approached Officer Rathbun and the other officers

19   at that police line.

20            You also heard that he was a threat because he was

21   carrying in his hands, which Officer Rathbun noticed right

22   away, a metal flagpole.  You heard him describe what the

23   defendant yelled at him.  A lot of profanities, yes, but also,

24   "Take your shit off.  Take your shit off."  Officer Rathbun

25   told you that's what people say when they want to fight a cop.

1    Officer Rathbun knew those were fighting words.  The defendant

2    knew they were fighting words, too; he told you as much

3    yesterday.

4          You also heard Officer Rathbun heard describe how,

5    after saying those fighting words, the defendant didn't just

6    stop with mere words.  He shoved that bike rack into Officer

7    Rathbun and the other officers, not once, but twice.  Officer

8    Rathbun told you at that point he tried to push back with an

9    open hand; an obvious threat not only to Officer Rathbun, but

10   to every other officer on that line and to the people who were

11   inside Congress trying to certify the 2020 Electoral vote.

12         You heard Officer Rathbun tell you that after he

13   tried to push back an obvious threat, who was already becoming

14   physical and trying to take down an already vulnerable police

15   line, with thousands of other rioters behind him, that the

16   defendant responded by violently swinging a flagpole, a metal

17   flagpole, like a club; not once, not twice, but three times at

18   Officer Rathbun.

19         He told you that Officer Rathbun, that he was able to

20   somehow get that club, that metal club away from the defendant

21   at that point, and then he started to retreat.  The line had

22   collapsed.  Officer Rathbun and the other officers on that line

23   had no choice but to retreat; they were being overrun.

24         But that wasn't the end of it.  Officer Rathbun told

25   you that he could still see the defendant.  And as Officer

1    Rathbun retreated, the defendant squared up on him and charged

2    at him with his hands raised, tackling Officer Rathbun to the

3    ground.  Officer Rathbun told you that after he was on the

4    ground, the defendant grabbed onto his helmet and dragged him

5    across the ground, choking him by his own chip strap, to the

6    point where he couldn't breathe, before the defendant shoved

7    him to the ground the second time as Officer Rathbun was

8    desperately trying to get back onto his feet.

9           And once the defendant had Officer Rathbun pinned

10   onto the ground, on his back, surrounded by hundreds or

11   thousands of other rioters who were streaming across the line

12   that that man helped take down, he started ripping Officer

13   Rathbun's gas mask off of his face, gas flooding in, flooding

14   in, the gas in the air making it even harder for Officer

15   Rathbun to breath, until the mask then snapped back onto his

16   face, trapping the gas there.

17          Officer Rathbun, thankfully, was able to get back on

18   his feet.  But before that happened, he also told you that he

19   was being kicked, while he was helpless on the ground

20   underneath the defendant, by other rioters.  And you saw the

21   bruises and you saw the scrapes and the abrasions that happened

22   as he was being violently kicked while helpless under the

23   defendant.

24          You saw the defendant assault Officer Rathbun with

25   your own eyes.  And you heard it described with your own ears.

1    And yet Mr. Monroe and the defendant have told you time and

2    time again, since the very first day of this trial in opening

3    statements, that this all started because of a punch and

4    because of a wave, or a hand gesture.

5          According to them, Officer Rathbun is to blame.

6    They've said that again and again.  You heard the defendant say

7    it again and again.  And he said that because he needs it to be

8    true.  But it isn't true.  The defendant is not the victim

9    here.  What is true is that you can see with your own eyes and

10   hear with your own ears.  So let's look at the evidence and

11   let's see what the evidence proves.

12         Now, the first charge is that the defendant, as you

13   heard Judge Mehta say a number of times, assaulted, resisted

14   opposed, impeded, intimidated, or interfered with Officer

15   Rathbun with a dangerous weapon.  And the evidence proves the

16   defendant is guilty.

17         Now, this is important.  Judge Mehta just gave you

18   some instructions.  Those instructions as to how you consider

19   the evidence and the elements that the government has to prove

20   beyond a reasonable doubt, those control.  And your own

21   recollection and your own interpretation of the facts and the

22   evidence controls.  That said, I'm going to do my best now to

23   walk you through the elements and how the government has met

24   its burden of proof as to each one.

25         So looking at the slide there, as I said, the videos,

1    members of the jury, speak for themselves.  You have Officer

2    Rathbun's body-worn camera video giving you a firsthand look,

3    from the perspective of his chest, what happened to him that

4    day.  You have U.S. Capitol Police surveillance footage.

5    That's the big, far back, sort of Where's Waldo video, giving

6    you a bird's eye view of the entire scene, where you can see

7    the assault.

8         You have Exhibits 206 and 207, which are some of

9    those open source videos that we told you about, showing the

10   assault just from another angle, off to the side.  And then

11   some things you'll get back with you, and I think you saw at

12   least a couple of them with Special Agent Palmertree, were some

13   of the enhanced videos where, because things happened fast,

14   there's a lot of chaos, a lot of things going on, those are the

15   black-and-white ones, those sorts of things.

16        So let's take a look -- you've seen it before -- at

17   Officer Rathbun's body-worn camera.  But before I show you that

18   short clip, I want you to remember something.  Remember what it

19   was like the very first time you saw that video, when my

20   colleague Ms. Mirell showed it to you on Tuesday during opening

21   statements.  What was your reaction to what you saw in the

22   video the first time that you saw it?

23        Members of the jury, the parties, both sides, have

24   been pausing and zooming and replaying and going in slow

25   motion, even going frame-by-frame, trying to parse exactly what

1    it is that happened that day.  And that's good, we want you to

2    know exactly what happened that day.  But let's not lose sight

3    of the fact of what the video really shows, when you just see

4    it and you just think about it for what it is.

5              (Video played.)

6              You can see it with your own eyes.  But you also

7    heard it with your own ears, and you heard it from the

8    perspective of Officer Rathbun and from the defendant.

9              Now, very quickly, the slide that's up here, just to

10   set it aside.  You did hear from some character witnesses

11   today.  But they didn't give you an account of what happened on

12   January 6th.  They weren't there.  They know nothing about what

13   you know of what the defendant did that day, what he did to

14   Officer Rathbun.  So let's focus on the actual evidence in this

15   case and what the defendant actually did, because that's what

16   matters.

17             Judge Mehta told you a couple of times, you're the

18   jury and you have the sole responsibility to determine the

19   credibility of the witnesses that have testified before you.

20   And that includes Officer Rathbun.

21             So let's talk about Officer Rathbun for a moment.

22   You saw him.  He sat right there for three hours the other day.

23   How did he seem to you?  Did he seem defensive?  Did he seem

24   like he was trying to make up lies?  Did he seem like he had

25   anything to hide?  Did he seem like the type of officer who is

1    a, quote, unquote, rogue cop, who would instigate a fight with

2    the defendant in that situation on January 6th?  That's how the

3    defendant described him several times yesterday, as a rogue

4    cop.  Did Officer Rathbun strike you as a rogue cop who would

5    have instigated this?

6              Now, you also heard the defendant testify -- and

7    again, you get to determine his credibility.  You get to decide

8    if you believe what he's telling you, especially when viewed in

9    light of the evidence that you've seen with your own eyes and

10   that you heard with your own ears from Officer Rathbun and the

11   other government witnesses this week.

12             So what did the defendant tell you about what

13   happened that day?  Well, first he told you he was angry as he

14   approached the police line that day.  And, frankly, that is

15   believable, because you can see it.

16             He was angry as he approached the line, but he wasn't

17   aggressive.  When my colleague Ms. Nielsen pressed him

18   yesterday about whether or not his actions were aggressive, he

19   said, "Well, I wouldn't call it that.  It's hard to describe."

20   If that's not aggression, members of the jury, I don't know

21   what is.  From the very first moment that he approaches Officer

22   Rathbun on that line he is angry, he is aggressive, he is

23   enraged.

24             But also told you he wanted to give the officers the

25   benefit of the doubt.  He had some other members of the crowd,

1   some other protesters with blood, children crying.  And I'm

2   sure it was a very chaotic scene.  There were those things

3   happening that day, I'm certain of it.  He wanted to give the

4   officers the benefit of the doubt.  That's what he told you was

5   in his mind as he first approached Officer Rathbun on the

6   police line.  He was also thinking to himself, don't say

7   anything threatening.

8           He's angry, but he's going to give the officers the

9   benefit of the doubt and not say anything threatening.  Okay.

10  He also told you he targeted Officer Rathbun.  And one of the

11  reasons he targeted Officer Rathbun and singled him out is

12  because, as the defendant told you, he was the only officer

13  standing on the line there who wasn't in full riot gear.  He

14  was wearing the bright yellow sleeves.  All he had was a helmet

15  and a gas mask; not like the officers to his left and his

16  right.

17          So not aggressive, benefit of the doubt, nothing

18  threatening.  Members of the jury, you just saw the video, you

19  heard what the defendant said to Officer Rathbun from the very

20  second he enters the frame.  Does this look to you like a man

21  who is not trying to say anything threatening, who is not

22  acting aggressively?  You decide if you believe the defendant

23  when he characterizes what it was he was doing that day.

24          What else did he say?  Okay, after the initial

25  approach to the line he told you that he became angry and

1    frustrated by Officer Rathbun.  I suppose because Officer

2    Rathbun had looked at his Marine Corps flag and had, I don't

3    know, not embraced him and said, "I'm a fellow" -- "I'm a

4    fellow vet, we're in this together."  And that angered the

5    defendant, he got frustrated.

6           But he told you, in his words, he stayed away from

7    the gate.  He stayed on his side of the line.  That is, until

8    he slammed the bike rack into Officer Rathbun, which he said,

9    in his own words, he did yesterday, he told you, yes, he

10   agrees, he slammed the bike rack into Officer Rathbun.  Is this

11   a man who is staying on his side of the gate?  Is this a man

12   who is giving distance to Officer Rathbun and the other

13   officers on the police line?

14          Maybe this is (indicating).  This is the second time

15   after he shoved the bike rack into Officer Rathbun; he grabbed

16   it and started shoving it into him again.  And Officer Rathbun

17   told he knew at that point the defendant is trying to pull that

18   line down, and it wouldn't have taken much.

19          So what did Officer Rathbun do?  Well, Officer

20   Rathbun told you he tried to push back what was an obvious

21   threat, who was already engaging in assaultive conduct towards

22   Officer Rathbun.  He used an open hand, he tried to push the

23   defendant back, away from the line, as he was trying to rip the

24   barricade down.

25          How did the defendant describe it?  Well, he said he

1    got hit.  It was a freight train, I think is what he said.

2    Freight train.  It was like getting hit with a hammer.  One of

3    the hardest hits he's ever had in his entire life.  So hard in

4    fact, that he was stunned, that he thought he suffered a

5    concussion.

6            Okay.  This, members of the jury, what's on the

7    screen there, this single frame, literally a single frame from

8    Officer Rathbun's body-worn camera shows you the freight train,

9    as the defendant would call it.  Yes, Officer Rathbun admitted,

10   and you can see it, there's no denying it, his hand made

11   contact with the defendant's face after the defendant said,

12   "Take your shit off.  Take your shit off," and then shoved the

13   metal bike rack, not once, but twice, into Officer Rathbun.

14   Yes, Officer Rathbun, his open hand did make contact with the

15   defendant's face.

16           This is the moment that the defendant thinks

17   justifies everything that came after.  All of the defendant's

18   actions were the result of this.  And it was okay because

19   Officer Rathbun had hit him with a hammer.  Well, where are the

20   injuries?  I mean, if he got -- first off, you can see it's an

21   open hand to the face.  Ms. Nielsen asked the defendant

22   yesterday to point out where his injuries were.  This is a

23   still shot from a video taken probably just minutes after the

24   freight train.  And he pointed out nothing on the right side of

25   his face, which is actually where Officer Rathbun's open hand

1    pushed him away.  He pointed out something in the corner of his

2    lip on the left side.

3              Now, members of the jury, I don't know if you can or

4    cannot see an injury there, you're the judges of that.  But it

5    doesn't matter because even if there is an injury there, we

6    have no idea where it came from.  We know where it didn't come

7    from.  It didn't come from Officer Rathbun's open hand pushing

8    the defendant's face away on the right side.  Certainly didn't

9    come from that, and there's nothing there.

10             There's another video, as well, that shows the

11   defendant after he assaulted Officer Rathbun.  There he is

12   (indicating).  No injuries, certainly nothing on the right side

13   of his face where he got hit with a freight train.

14             So what else did the defendant tell you?  Well, he

15   told you he was afraid.  He was afraid of Officer Rathbun.  A

16   6-foot, 240-pound, former 20-year NYPD officer, former Marine,

17   was afraid because Officer Rathbun had hit him with a freight

18   train and he was in recovery mode.

19             But, he told you he wasn't going to hit that officer

20   with the pole because that would have been wrong.  It would

21   have been wrong to hit the officer with a pole, so he wasn't

22   going to.  He told you he meant to discourage Officer Rathbun

23   from punching him again.  He wasn't using it as a weapon.

24   That's what he told you.  You what did your eyes tell you?

25             Is this him not trying to hit the officer?  Is this

1    him just using it to discourage?  Or is it him swinging as hard

2    as he can, with two hands, directly at Officer Rathbun, a metal

3    pole, like a club, so hard that the pole breaks in half and the

4    Marine Corps flag goes flying off into the wind.  (Indicating.)

5              But it wasn't just one, there's a second two-handed

6    swing at Officer Rathbun.  And then, when you watch the

7    body-worn camera, there's a little bit of a pause until the

8    defendant decides, well, maybe one more for good measure.  I'm

9    going to swing this metal pole like a club as hard as I can at

10   Officer Rathbun, but not as a weapon and not to hit him.  Is

11   that believable to you, members of the jury?

12             So after he swung the metal flagpole three times at

13   Officer Rathbun, he told you he was still afraid.  He was still

14   afraid of Officer Rathbun at this point.  This, mind you, was

15   after Officer Rathbun managed to disarm the defendant with the

16   metal club that he had just used to assault the officer and

17   Officer Rathbun was retreating.  You can see it as plain as day

18   from any of the video angles.  He and the other officers are

19   frantically retreating away from that broken police line, backing

20   up, backing up.

21             What did the defendant tell you, though?  He was

22   afraid, but he was going to do something that he knew wouldn't

23   hurt the officer.  Because, again, hurting him would have been

24   wrong.  He also told you that he was somehow being pushed

25   forward by the crowd, maybe he had no choice.  But to bull rush

1    Officer Rathbun, like a linebacker?

2            He also told you they kind of ran into each other.

3    That's how he described what happened.  They kind of just ran

4    into each other somehow and Officer Rathbun, he kind of fell

5    down.

6            There's the defendant.  Is he being pushed forward by

7    the crowd?  What about here?  Is he being forced forward?  Does

8    he look afraid to you?  Is he afraid of Officer Rathbun there,

9    as he charges at him like a linebacker?  What about here.  Is

10   that fear?  Is Officer Rathbun a threat?  (Indicating.)

11           Do you believe the defendant's version of what

12   happened that day?

13           After he violently tackled Officer Rathbun to the

14   ground, he told you he was still afraid of Officer Rathbun.

15   Even though he had the whole crowd behind his back, thousands

16   of other rioters, he was still afraid.  So, he wanted Officer

17   Rathbun to see his hands, so that Officer Rathbun would know

18   the defendant wasn't a threat.  It's like when you get pulled

19   over and you put your hands on the steering wheel.  Do you

20   remember the defendant showing you that yesterday?  That,

21   apparently, is what he was doing here.

22           According to the defendant, this is him showing

23   Officer Rathbun his hands so that the officer knows the

24   defendant isn't a threat.  Does that make any amount of sense

25   to any of you?

1      Finally, what else did he say?  Well, he told you,

2   and I quote, he had -- when he sat down with the FBI, he had a

3   clear conscience about what happened between him and Officer

4   Rathbun.  A clear conscience, based on everything that you've

5   seen just now.

6      And Mr. Monroe told you in his opening statement

7   that, if anything, his client exercised restraint.  Apparently

8   this is restraint, members of the jury.  This is what restraint

9   looks like, according to the defendant.  (Indicating.)

10      Okay.  So, having established that Thomas Webster

11   assaulted Officer Rathbun, something else for you to consider

12   is did he use a deadly or dangerous weapon to do so?  Now, this

13   is what Judge Mehta was telling you is the greater and lesser

14   included aspect of a bunch of the charges.

15      So even if you decided he didn't use a deadly or

16   dangerous weapon, you could still decide that he assaulted

17   Officer Rathbun.  But you won't even have to get to that lesser

18   included offense because the defendant clearly assaulted

19   Officer Rathbun with a deadly or dangerous weapon.  Officer

20   Rathbun told you a metal pole in the hands of a hostile person

21   is a weapon.  That's just as true for a police officer as it is

22   for anyone else.  And here the defendant used it as a weapon.

23   It was no longer a flagpole, it was a metal club.

24      Officer Burger, if you remember her testifying, the

25   U.S. Capitol police officer, she was there that day.  She

1    actually was standing right near where Officer Rathbun was on

2    the police line in the Lower West Terrace.  She told you

3    rioters were using everything as weapons.  Whatever they could

4    get their hands on, they were using as weapons.  A metal pole,

5    when used the way that the defendant used it toward Officer

6    Rathbun, is a deadly or dangerous weapon.

7            The defendant knew it, too.  He told you that when he

8    first approached the police line, he knew that the flagpole

9    would be viewed as a potential danger, as a potential weapon,

10   because he spent 20 years with NYPD and he knows all sorts of

11   things can be used as weapons.  Certainly a metal pole can.  He

12   knew Officer Rathbun would be concerned about the flagpole.

13   But it wasn't a weapon, according to the defendant, when it was

14   in his hands, even when he was violently swinging it at Officer

15   Rathbun multiple times.  According to the defendant, it doesn't

16   become a weapon until Officer Rathbun had it.

17           I don't know if you'll remember what he told you

18   yesterday, one of the reasons he was still scared of Officer

19   Rathbun and had to bull rush him like a linebacker and tackle

20   him to the ground is because by then Officer Rathbun had the

21   very pole that the defendant had just swung at him three times,

22   and according to the defendant, that was concerning to him.  It

23   was concerning to him that Officer Rathbun had the metal pole.

24   So he certainly thought it could be used as a weapon, didn't

25   he?  Just not when it was in his hands.

1          Moving on, and other elements.  Officer Rathbun was

2     assisting U.S. Capitol police officers who were engaged in the

3     performance of their official duties.  While Captain Mendoza,

4     Officer Burger, Officer Rathbun, they all told you, U.S.

5     Capitol Police, one of their officials duties is to protect the

6     Capitol and protect the members of Congress who were meeting

7     that day to certify the results of the 2020 presidential

8     election.  And you also know, and it's been stipulated to, that

9     MPD officers, such as Officer Rathbun, were there to reinforce

10    and assist the U. S. Capitol police officers in fulfilling

11    their official duties.

12         Still on Count One.  Thomas Webster made physical

13    contact with Officer Rathbun, or acted with intent to commit

14    another felony.  So let's take those one at a time.

15         Physical contact with the pole.  Well, we certainly

16    saw him swing the pole at Officer Rathbun a bunch of times.  We

17    certainly saw him trying to hit Officer Rathbun with the pole.

18    It all happens very fast.  We certainly know that there was

19    more physical contact after Officer Rathbun disarmed the

20    defendant and was retreating away from the broken police line

21    and thousands of rioters who were charging at him and the other

22    officers -- or, the hundreds of rioters, at least, there.

23         He was tackled, he was pinned to the ground, dragged

24    by his helmet, choked, gas mask ripped off of his face.

25    Physical contact, to say the least.

1          But even putting that one aside, there's also intent

2     to commit another felony.  And I'm about to start talking with

3     you about that.  As Judge Mehta told you, that's the second

4     count, obstructed or interfered with Officer Rathbun who was

5     carrying out his duties during a civil disorder.

6          Thomas Webster is guilty.  He's guilty of Count one.

7     He's guilty of assaulting Officer Rathbun with a deadly or

8     dangerous weapon.

9          Moving on to the second charge.  The second charge is

10    that the defendant interfered with Officer Rathbun during a

11    civil disorder.  And again, the evidence proves that he is

12    guilty.

13         So here's Count Two.  One of the elements of Count

14    Two is that Thomas Webster committed or attempted to commit an

15    act intending to obstruct or interfere with Officer Rathbun.

16    Well, let's talk about intent, because we've already been

17    talking about his acts for most of this week and for the last

18    few minutes.

19         Well, we know why the defendant was there that day.

20    He told you.  And we saw it in his text messages and his web

21    searches.  He was upset about the 2020 presidential election.

22    He thought the election had been stolen from then President

23    Donald Trump.  He came to the District of Columbia to attend

24    the Stop the Steal rally.  And he did, he went and he attended

25    the rally and he listened to Donald Trump's speech.

1          He listened to Donald Trump's speech, and like

2     hundreds or thousands of others, got riled up, got angry, and

3     marched on the Capitol.  Now, he described it as petitioning

4     the government to take another look at the election results.

5     But let's be real, members of the jury, we know what that

6     means.  He wanted to stop the count, Stop the Steal.  That's

7     why he was going there that day.  And he was going to

8     accomplish his goal, come hell or high water.

9          Here's some of his text messages.  And these will

10    come back with you.  The screen is a little bit blurry.  But

11    here's one that he sent on November 4th of 2020.  "All the

12    commies moved to NH, unfortunately, and bought the blue with

13    them."  That same day, out going, "If it was done the fair way,

14    he wins.  But the devil's party is pulling out every trick in

15    the book, so I really can't say, 50-50.  Wisconsin finds

16    100,000 ballots overnight and 100 percent of them are for

17    Biden, not to mention they have more votes cast than registered

18    voters."

19         He was angry about the election.  He thought it was

20    stolen.  He thought there was fraud.  That's why he came to the

21    District of Columbia, that's why he went to the Capitol on

22    January 6 after listening to then President Donald Trump's

23    speech.

24         Here's another text message outgoing from November

25    6th.  "The same people burning our country down and attacking

1   cops are now in charge of counting ballots for the POTUS.  Do

2   they really think they are going to follow the law or a

3   subpoena to allow supervision in counting ballots?"

4          I'm not going to read this entire one, but it's

5   Exhibit 303, you've seen it.  He sent this text, he got it off

6   a website guide.  "Guide to your Jan 6 trip includes D.C. gun

7   laws, self-defense options, citizen's arrest policy, drone

8   policy, common sense gear list, bonus prep info, and the

9   Constitution for obvious reasons.  Don't be a liability.  Be

10  prepared for it to get wild."  And here he is on December 4th

11  of 2020, through DuckDuckGo, researching the Stop the Steal

12  rally.  There's no real question about why he was here.  He

13  told you why he was here.

14         Why else -- how else do we know what his intent was

15  that day, what he intended to do?  Well, he came prepared for

16  battle.  He loaded up.  He loaded up his military rations, his

17  MREs.  Getting into the right mindset, I suppose.  He wore his

18  military rucksack to the Capitol.  He wore his NYPD-issued

19  bulletproof vest, with his blood typewritten on the inside of

20  it.  He loaded up.  He came prepared for battle because he

21  needed to help Stop the Steal.

22         Okay.  How else do we know what he meant to do?

23  Well, he told you he knew it was the officers' job to protect

24  the U.S. Capitol on January 6.  He knew that that's what they

25  were there for.  Despite knowing that, he assaulted Officer

1    Rathbun, and he breached the police line.  Officer Rathbun told

2    you in no uncertain terms -- and you can see it in the

3    videos -- that the defendant not only assaulted Officer

4    Rathbun, but his actions were a direct contributing reason for

5    that section of the police line to collapse.  Right then and

6    there.

7           The defendant felt like the whole crowd was behind

8    him.  Not only did he help open the floodgates by taking the

9    barricades down, he literally led the charge, with the crowd

10   behind him.  He was one of the first people there that you can

11   see charging Officer Rathbun, with people running in from

12   behind.  And again, the videos speak for themselves.

13          Let's see what his assault of Officer Rathbun did and

14   how that affected what was happening at the Capitol there in

15   the Lower West Terrace.

16          Just to remind you, that's the defendant in the

17   yellow and Officer Rathbun in the blue.  Take a look at them,

18   see what's happening.  But also take a look at the police line

19   right around where Officer Rathbun is and what happens to it

20   right at the time of the assault.

21          (Video played.)

22          Again, the videos and images speak for themselves.

23   Looking at the picture on the left, there is the police line,

24   at least right where Officer Rathbun is, still intact.  There's

25   the defendant with his flag, the red flag just above.  And just

1    a few seconds later, after the defendant helped rip down that

2    barricade, that bike rack, started charging at the retreating

3    officers, the line was gone.

4            The defendant committed an act that obstructed

5    Officer Rathbun.

6            Officer Rathbun was engaged in the lawful performance

7    of his officials duties incident to and during a civil

8    disorder, while officials duties include protecting the Capitol

9    and members of Congress and assisting the U.S. police.  And

10   civil disorder, members of the jury, Judge Mehta just defined

11   that for you, it's up here in a paraphrased version.  If what

12   happened on U.S. cap top January 6, 2021, doesn't count as a

13   civil disorder, then I don't know what does.

14           The civil disorder obstructed, delayed, or adversely

15   affected commerce or any federally protected function.  That's

16   another element of Count Two.

17           Federally protected function.  Well, Captain Mendoza,

18   Officer Burger, Officer Rathbun, others told you protecting the

19   Capitol building and members of Congress.  And U.S. Secret

20   Service Agent Wade told you they were there to protect

21   Vice President Pence.  Vice President Pence and his family

22   never left the Capitol grounds before, during, or after the

23   riot.  There are videos and images showing then Vice President

24   Pence and his family around the Capitol around the time that

25   Thomas Webster and other rioters were breaching the police line

1    outside of the Capitol building.  And U.S. Secret Service Agent

2    Wade told you he was with then Vice President Pence, who never

3    left the building.  That is a federally protected function.

4            But again, putting that aside, adverse affected

5    commerce.  Now, you may have been wondering why we had district

6    manager of Safeway Ed Tippett come and testify for you the

7    other day.  Well, this was why, because as part of this

8    element, one of the things the civil disorder adversely

9    affected was commerce.  And that included the commerce and

10   Safeway not being able to get the shipments of their supplies

11   from their warehouses in Lancaster, Pennsylvania.  And it

12   affected their actual in-store sales on January 6, as well.

13           They lost a lot of money, Mr. Tippett told you that.

14   And you can see it on this -- somewhat hard to read here, but,

15   again, you'll have all of the exhibits back with you as you're

16   deliberating -- there's a lot of red there in the right-hand

17   column.  I would say the commerce was adversely affected when

18   the mayor was forced to shut the city down as a result of the

19   defendant and other rioters' actions at the Capitol that day,

20   and Safeway was forced to close its doors.

21           Now, moving on to the third, fourth, and fifth

22   charges, they all have some things in common with one another

23   and they all have some things that are a little bit different.

24   They all concern things that the defendant did while he was on

25   restricted Capitol grounds on January 6th.

1    Count Three says that while he was there he was armed

2    with or used a dangerous weapon.  Count Four says that while he

3    was there he engaged in conduct that impeded and disrupted the

4    certification of the election.  And Count Five says that while

5    he was there he engaged in physical violence.

6         Again, members of the jury, the evidence proves that

7    he is guilty of all three counts.

8         So let's start with Count Three.  This is the

9    unlawful presence charge.  So, the defendant entered or

10   remained in a restricted building or grounds is one of the

11   elements of Count Three.  I don't think there's really any

12   dispute here that the Capitol was restricted that day.  The

13   Capitol grounds were restricted that day.

14        Captain Mendoza told you it was off limits; the

15   building, the grounds the West Front, the Lower West Terrace,

16   the Lower West tunnel, the inaugural stage, all closed to the

17   public that day because of the certification of the vote and

18   then Vice President Pence visiting the Capitol under the

19   protection of the U.S. Secret Service, which is what Agent Wade

20   told you.

21        Again this isn't in dispute.  There's a stipulation

22   to that effect, 706.  And there are exhibits.  Here's the

23   old-timey map that shows the shaded portions.  There's really

24   no question that where all of this happened, where the

25   defendant was with Officer Rathbun, is in that shaded portion.

1    And there's really no question, as Captain Mendoza explained,

2    this red line on Exhibit 601.1 shows the restricted portions of

3    the Capitol grounds.

4         So, I guess what's in dispute is did the defendant

5    know he wasn't supposed to be there that day?

6         Well, Captain Mendoza told you, at least, why he

7    should have known.  She didn't say that, but she said there was

8    snow fencing, there were bike racks, there were signs.  There

9    were multiple layers of fencing and bike racks and signs

10   leading all across the grass, up to the Lower West Terrace, up

11   to the Capitol.  Here is some of it here.  I am not going to do

12   as good of a job as Captain Mendoza did in pointing out what's

13   here, but you can see the fencing, multiple layers, you can see

14   the signs.  Here is some of the bike rack fencing from further

15   out.  Here's an "Area Closed" sign "By order of the

16   United States Capitol Police Board."  (Indicating.)

17        Now, the defendant testified that he didn't see any

18   of that.  And to be fair, other rioters had already torn down

19   some of that fencing, some of those bike racks and some of

20   those signs.  One thing they didn't tear down, because they

21   couldn't, was the wall that Special Agent Palmertree told you

22   about that came up pretty high on your body, that you wouldn't

23   be able to casually step over, certainly not while carrying a

24   large metal flagpole with a Marine Corps flag on top of it.

25        And here we can see the defending doing just that.

1    The image on the left, if you match it up with the media tower

2    there and your understanding of perspective, it's pretty clear

3    he's climbing over the wall there.  So there was a physical

4    barricade, even if you believe that he didn't see a single

5    sign, or a single gate, or any snow fencing.

6            But that doesn't even really matter either, members

7    of the jury, because even if all of the signs were down, even

8    if the wall wasn't obvious enough, there were flash bangs going

9    off, there were teargas canisters going off, there was teargas

10   in the air.

11           The defendant kind of equivocated a little bit when

12   he was asked about this yesterday, but he acknowledged, he was

13   20 years with NYPD.  He knows, of all people, when police are

14   using flash bangs and teargas, they mean business.  They're

15   trying to disburse a crowd from somewhere it's not supposed to

16   be.  Do you believe the defendant when he tells you he didn't

17   know that he wasn't supposed to be there?

18           Okay.  Well, putting aside the flash bangs and the

19   teargas, what about the police line of MPD and U.S. Capitol

20   police officers, standing shoulder to shoulder behind metal

21   bike racks, with thousands of rioters on one side and the U.S.

22   Capitol building behind them?  We know that the defendant saw

23   that because we can see it on the video, so he couldn't deny

24   it, and so he admitted it.  Officer Rathbun knew why the line

25   was there.  Special Agent Palmertree knew why the line was

1    there.  And the defendant knew why the line was there.  He told

2    you.  He told you that as soon as he saw that bike rack line

3    with those officers lined up, he knew it was an established

4    police line, that it was there to hold the perimeter, protect

5    the people behind the perimeter.  And as he said, police stay

6    on one side, protestors on the other.

7           There, again, you can see, on the right-hand portion

8    of the screen, the red Marine Corps flag.  That's the

9    defendant.  That's the defendant as he's approaching Officer

10   Rathbun.  There's the police line, as plain as day.  Protestors

11   on one side, officers on the other.  Do not cross.  Thomas

12   Webster knew that.  Here, again, there's the police line.  This

13   is 2:27 p.m.  This is just about a minute before the defendant

14   assaulted Officer Rathbun and helped breach that police line.

15   As plain as day.  Do not cross.  (Indicating.)

16          But he did cross.  Go back a slide.  There's the

17   police line.  Just keep an eye on where the police line is.

18   He's past the police line.  Now, the defendant told you the

19   police line wasn't there anymore, so I guess he thought he was

20   allowed to just go wherever he wanted because the police line

21   just disappeared.

22          You're the people who decide if you believe the

23   witnesses.  You decide credibility.  You decide if what they're

24   telling you is believable.

25          THE COURT:  Mr. Kelly, you're about 45 minutes.

1          MR. KELLY:  Understood.

2          He also did so knowingly, because he moved further

3    into a restricted area.  And he stayed, he admitted today, that

4    he stayed at least for an hour.  There's video evidence showing

5    that he stayed for at least two hours after assaulting Officer

6    Rathbun, moving closer and closer into the restricted Capitol

7    area.

8          Here's Government's Exhibit 603.  And I will be

9    brief, and I won't do as good of a job as Special Agent

10   Palmertree, 603.1.  But this X right here, number one, that's

11   the wall that the defendant climbed over.

12         Number two, those are the stairs with the ornamental

13   fencing at the top that he had to climb and cross.

14         Number three, that's where he assaulted Officer

15   Rathbun.

16         Number four, that's where he, on the video you saw,

17   kept approaching the retreating officers and pointed his finger

18   at them, even after assaulting Officer Rathbun, as they

19   retreated to this back wall.

20         And, number five, that's when he went to another

21   police line and put his arms like that (indicating).

22         Number six, that's the "Send more patriots" video.

23   That's where he took a picture of himself, there at the base of

24   the inaugural stage.

25         Number seven, that's the video of the officer being

1    dragged down the steps at the Lower West Tunnel, with a mob of

2    angry rioters.  He took a picture there as well.

3           And number eight, that's him still on the inaugural

4    stage, after 4 o'clock, in that screenshot that I'll show you

5    from the surveillance with the little red circle, showing him

6    almost two hours after assaulting Officer Rathbun, still in

7    restricted Capitol grounds.

8           (Video played.)

9           There he is in the middle.  This is right after

10   assaulting Officer Rathbun.  He is continuing on and pointing

11   at the officers.  Here's the "Send more patriots" video.

12          (Video played.)

13          There's the picture that he took.  I'm not going to

14   show this video, in the interest of time.  You all remember it.

15   It shows the officer being dragged down the steps by the mob.

16   You can watch the video, if you would like, back as you're

17   deliberating.  And ask yourselves, would any reasonable,

18   logical person possibly think they were supposed to be there?

19   Possibly think that they were allowed to be where they were?

20          There's the picture that he took.  And here he is

21   still on the inaugural stage, hours after assaulting Officer

22   Rathbun in restricted grounds.

23          There was also consciousness of guilt.  He knew that

24   he wasn't supposed to be there because just later that night he

25   started searching "Facial recognition proves who stormed the

1    Capitol."  Someone texted him, "Hey, I hope you're all right

2    down there.  Do you need me to come down with bail money?"  He

3    responded, "All is well.  In my room.  Never forget this date."

4              While he was in those restricted grounds he used or

5    carried a deadly or dangerous weapon.  Same meaning as Count

6    One.  This is a deadly or dangerous weapon, members of the

7    jury, in the way it is being used by the defendant.  This is a

8    deadly and dangerous weapon, if you look in the upper

9    right-hand portion of your screen, as he's swinging it at

10   Officer Rathbun.

11             Count Four.  This has the same restricted grounds

12   element, the same deadly or dangerous weapon element, and

13   Thomas Webster engaged in disorderly or disruptive conduct.

14   The assault and the breach, members of the jury, that's

15   disorderly or disruptive conduct.

16             He was also aiding and abetting other rioters in

17   stopping the count inside the Capitol building.  "Send more

18   patriots."  He helped take down the line, that allowed people

19   to stream in and help stop the vote.  And he intended to and

20   did impede or disrupt the orderly conduct of government

21   business or official functions; that's the certification of the

22   vote.

23             Intent is part of this, members of the jury.  I'm not

24   going to go over it again.  For all of the reasons that I

25   showed you when we were discussing intent in Count Two, the

1    same intent applies here.  And we know from Officer Gazelle

2    that the orderly conduct of government was in fact disrupted.

3    They had to recess the joint session in the Senate at 2:13,

4    couldn't resume for another six hours because of what was

5    happening outside and inside the building.  The House recessed

6    at 2:29, they couldn't resume for seven hours.

7            Count Five.  Again, the same restricted grounds, same

8    deadly or dangerous weapon.  And the defendant engaged in an

9    act of physical violence against a person or property.  See

10   Count One.

11           Finally, the sixth charge, the defendant engaged in

12   an act of physical violence while on the Capitol grounds.

13   Members of the jury, this is basically the same as Count Five,

14   with a couple changes.  Here there's no need to prove the

15   ground were restricted, even though they were.  And there's no

16   need to prove that the defendant knew they were restricted,

17   even though he did.  And there's no need to prove that he had a

18   deadly or dangerous weapon, even though that's exactly what he

19   had with him.

20           At the beginning of this trial, members of the jury,

21   Ms. Mirell, my colleague, told you that the government would

22   prove beyond a reasonable doubt that the defendant Thomas

23   Webster was guilty of all six crimes charged in this case.  And

24   that's exactly what the evidence has proved.  Yet despite

25   everything you've seen and heard, the defendant doesn't want

1    you to focus on his rage or his actions that day.  He wants to

2    blame Officer Rathbun.  Thomas Webster and Officer Rathbun both

3    swore oaths to protect and serve at some point in their lives.

4    But only one of them actually fulfilled that oath on January

5    6th at the U.S. Capitol, and that was Officer Rathbun.

6          You are the jurors and you are the deciders of fact.

7    And one of the greatest tools that you have at your disposal is

8    your own common sense.  So when you go back and you deliberate,

9    you start discussing this case amongst yourselves, I ask you

10   use that common sense, use the common sense that you use every

11   day of your lives, and ask yourselves, does anything that the

12   defendant told you about what he did that day make sense to

13   you, especially in light of the evidence that you've seen and

14   the other testimony you've heard?  Or did they sound like the

15   self-serving statements of a man who wants you to let him off

16   the hook for what he did at the U.S. Capitol on January 6th?

17         Don't let the defendant off the hook for what he did

18   that day.  His actions speak for themselves, no matter how you

19   look at it.

20         I'm just about finished, but before I conclude, I

21   have one last exhibit to show you.  I don't think you've seen

22   this one before.  It's a side-by-side video of the officer's

23   body-worn camera and one of the open source videos with a

24   different angle.  So let's take a look at what really happened

25   that day.

1           (Played video.)

2           Members of the jury, there's only one logical

3   conclusion here, and that's to find the defendant, Thomas

4   Webster, guilty of all charges.  Thank you.

5           THE COURT:  All right.  Mr. Kelly, thank you.

6           It is ten after three.  Let's take our break, after

7   which we will hear from the defense.  So, it's 3:10 now.  Let's

8   get started at 3:25.  We'll see you all very soon.

9           (Whereupon the jurors leave the courtroom.)

10          THE COURT:  Okay, everybody, I'll see you in 15

11  minutes.

12          Mr. Monroe, just be mic'd up and ready to go.

13          (Recess.)

14          THE COURTROOM DEPUTY:  Jury panel.

15          (Whereupon the jurors enter the courtroom.)

16          THE COURT:  Okay.  Mr. Monroe, are you ready to go?

17          MR. MONROE:  Yes, Your Honor.

18          THE COURT:  All right.

19          MR. MONROE:  Your Honor, counsel, ladies and

20  gentlemen of the jury.  Good afternoon.

21          When we started this case I told you that I was only

22  going to be armed with one weapon, and that's the truth.  I

23  just stuck with what I knew to be true, and I only bothered

24  with those pieces of evidence that I could back up with the

25  truth, because as an attorney, and you're defending someone in

 1    Mr. Webster's spot, I think that's the best way to travel.

 2    Because the truth -- and what I mean by the truth, I mean the

 3    whole truth has this in mistakable quality, it permeates and

 4    saturates everything that occurs on a certain event.  And for

 5    those people that do their earnest and best to suppress the

 6    truth, it just has that funny way of just coming right back and

 7    staying with them and dogging with them.  Because the truth

 8    can't be changed.  You can't change the truth.

 9          That being said, when, when in today's society, when

10    are we going to accept acts of police misconduct?  When is that

11    acceptable?  Is it acceptable on a Sunday?  On a quiet street

12    somewhere here in D.C.?  Is police misconduct acceptable in the

13    back of some police squad car on a Friday night?  Is it

14    acceptable when you have a police officer manning a police line

15    at the Capitol?  Are we ever going to accept police misconduct

16    in our presence when we see it in its real form?  In its

17    truthful form?  In its whole form?

18          And I'm not talking about the form that Officer

19    Rathbun wants to tell his lieutenant, his detective, this good

20    special agent, the Department of Justice.  Heck, he can't even

21    tell the whole truth to his brother.  And this is what the

22    government's case is built on, the word of an officer like

23    Officer Rathbun?

24          But why is this man so reluctant to tell us the whole

25    truth when, you know, when you have a case with so much

1    photographs and videos.  You tell your client, well, we don't

2    need much in the way of witnesses, we'll just play the video,

3    and they'll honestly and truthfully, the jury, will look at the

4    video and arrive at the same simple, straightforward notion,

5    that we're dealing with a bad cop.  A cop that doesn't know how

6    to conduct himself professionally in what is honestly and

7    truthfully a difficult situation.

8              And as I said in our opening, how do we know that's

9    true?  You only need to look to this man's left and right and

10   look at the brave, dedicated and professional officers who were

11   manning the same police line and judge their conduct with what

12   you see Officer Rathbun perpetrates.

13             Let's start the video.

14             Now, you're going to have to excuse me.  If you

15   happen to see me at a Best Buy sometime in the future, you know

16   I'm not much into the technical part and computers.  So I've

17   stumbled a lot in the trial.  And because that's my deficit, I

18   hope you don't hold that against Mr. Webster.  That's my own

19   shortcomings.

20             But we have the first picture up, it's Government

21   Exhibit 205.  This is where I would ask you to focus, this

22   moment in time, because we know where Thomas Webster is, we

23   know where Officer Rathbun is.  And this is where Officer

24   Rathbun is telling this man, "Oh, yeah, you want to fight?

25   Bring it.  Bring it."  And in Mr. Webster's passion, he's

1   responding to this taunt.  He's responding to this type of

2   incitement, because as an old cop, this man knows what a bad

3   cop looks like.  And that's what a bad cop looks like.  And how

4   do we know?  Because you look at that picture, you can see what

5   the good cops are doing; they're manning the police line,

6   they're not getting involved in what the -- the rubbish that

7   the civilians are saying.  They're ignoring them and making

8   sure that they maintain a professional barrier.

9          And this is what happens -- not from me, not from

10  Mr. Webster, but from the video.  Government's 205.  And what's

11  unique about a video?  Does the video have a friend?  No.  Does

12  the video have a job they have to protect?  No.  They have a

13  family they have to protect?  No.  Did the video have any

14  motive to tell you something that's not there?  No.  It's just

15  going to show you what was playing in front of the lens.  And

16  this is what happened, after the wave.

17          (Video playing.)

18          Now let's talk about the flag for a moment.  Can we

19  all agree that based upon the evidence presented, that

20  Mr. Webster arrived on the Capitol grounds with a flag attached

21  to a flagpole.  Is that a simple, truthful proposition?  I'm

22  talking about the moment he steps on the Capitol, he's got the

23  flag in his hand, with the flagpole.  And that's all that is,

24  is flag with a flagpole.  And we can see from the photographs,

25  there are literally thousands of people holding signs and

1    flags.  There's nothing of particular import about the fact

2    that he's got a flagpole and a flag or a sign.  We all know

3    that they offer some type of expression for the person holding

4    it, whatever they want to say with their flag.  This is, after

5    all, America.  We get to put whatever flag we want out in front

6    of our porch, to say whatever it has to say.  We don't

7    challenge that, that's just your right to express yourself the

8    way you want.

9            The flag only becomes an issue after Mr. Webster is

10   punched.  And Mr. Webster tells you -- I spent time, in detail,

11   with the man -- once the flag comes apart in its natural

12   separated part -- not like the government would like to

13   suggest -- this flag, this pole was not one piece, it was

14   separate pieces from the time he took it from New York down

15   here to D.C.  And when it comes apart, now he's got the lower

16   end in his hand.

17           But at this point in time, what -- what is

18   Mr. Webster using the bottom portion of his flagpole?  He's

19   using it to protect himself from an officer that just punched

20   him in the face.  Now, I don't know if you heard Officer

21   Rathbun description.  He wants you to believe that,

22   unfortunately, his hand -- I'm sorry, let me get it right.

23   That Mr. Webster's face somehow came in contact with his open

24   hand.

25           Now, I'll put this to you:  If it's a palm strike or

1    a punch, and it acts -- the same force that you see the video,

2    what does it really matter?  Does if change the fact that we're

3    not -- change the fact that we're dealing with a dishonest,

4    unprofessional police officer who now took it upon himself to

5    punish my client for expressing himself in a way that he found

6    objectionable?  That's what we got.  That's the A, B, C of this

7    case.

8         Now, the truth also has another quality, because when

9    the truth works against your interests, you have to -- you have

10    to possess some courage to carry the truth.  And, again, I'm

11    talking about the whole truth, not just the part that Officer

12    Rathbun wants to sell to the lieutenant or the detective or

13    this good special agent.  Because we know that the truth means

14    the entire truth, what happened.

15         But what's his motive?  Why does this man have such

16    difficulties telling us with the whole truth?

17         This is in evidence, ladies and gentlemen.  This is

18    part of his department's policy under Defendant's 46.  Take a

19    look at subcapital D:  "Any excessive force by a member may

20    subject him or her to disciplinary action and possible criminal

21    prosecution or civil liability."

22         Now, I would put it to you this way:  Do you think

23    any of the other civilians standing on the appropriate side of

24    this police line have any happy thoughts for the officers

25    standing there at the same time Mr. Webster approaches?  Do you

1     see any of those officers strike out against those protestors?

2          The government was good enough to show us -- or,

3     bring here before us, in this courtroom, a perfectly good

4     Capitol police officer.  Now, she doesn't compare anywhere in

5     size to Officer Rathbun or even Mr. Webster.  So it would have

6     to have taken her an immense amount of courage to show the type

7     of restraint she needed to show in order to keep her from

8     acting out against anybody, if she knew what she was going to

9     do would be wrong.  How many people cursed her out, called her

10    things that she didn't think was right?  She didn't punch

11    anybody.  And I'm sure she was just as scared as my client was

12    after he was punched by Officer Rathbun.

13          Defendant's 1, two-page document.  I would encourage

14    you to read it.  It's dated July 6 and 7 -- I'm sorry.  January

15    6 and 7.  Literally the night of the incident.  Things just

16    went down.  Rathbun is at the hospital and now he has to

17    provide information that's going to be part of the department's

18    official report.  Does he mention anywhere in those two pages

19    that he had what one of the officers said was a -- I think it

20    was a detective said it was a serious encounter with

21    Mr. Webster?

22          Now, I'm sure as a police officer you have to deal

23    with physical entanglements with a civilian, you know, now and

24    again.  But why would you report on a cut on your finger and

25    not report on having been taken to the ground by Mr. Webster?

1    I'll tell you why, because this officer didn't want it to be

2    known that he had any involvement with Mr. Webster, because he

3    started it.  Because it was his misconduct that brought about

4    this whole encounter.  And like we said, if you -- if you

5    possessed the truth and that truth is going to damage you, you

6    got to have courage to let it out.  You got to have courage to

7    say, listen, time out; before we get too far with this guy with

8    the red, white, and black jacket, I got something I got to get

9    off my chest.  I punched this man and that's why he went after

10   me and that's why he took me to the ground.

11        Did he tell his lieutenant, at Howard University

12   Hospital, that he was involved with Mr. Webster?  No.

13        Now, just about a week later he talked to Detective

14   Lauderdale.  Now, I would describe Detective Lauderdale, at

15   best, as a reluctant witness.  Because, reluctantly, he did not

16   want to tell me that during a long interview, over several

17   days, he did not mention once to him that he had punched

18   Mr. Webster.  Now, why is that?  Well, they had the bodycam

19   video that the government just loves to show you, over and over

20   again.

21        So, being logical people who may be afraid of the

22   whole truth, they take a look at Officer Rathbun's video camera

23   that comes you've his chest, the video cam, and they play it

24   from end to end.  They see the part involving Mr. Webster.  But

25   does it show Officer Rathbun doing this (indicating), the

1    signing for a fight?  Does it show the punch depicted in the

2    other videos?  No.

3           So, Officer Rathbun tries to deceive the Metro PD, he

4    tries to deceive the special agent.  But now you got three

5    perfectly sound lawyers in front of you.  They can see the same

6    video we can see, but yet they want to believe that this man

7    wasn't punched with the violence and force that's so perfectly

8    and obviously displayed in the video.

9           Why?  What's the big deal?  You're involved in an

10   encounter with a protestor.  The big deal is somehow,

11   somewhere, the truth may just fizz up to the top, and maybe

12   some lawyer some day may find another video that shows the

13   whole truth, all of it, including the part where you punch my

14   client so hard you almost took him to the ground.

15          Queue it up.

16          THE COURTROOM DEPUTY:  Unplug it and plug it back in.

17          MR. MACHNICKI:  Okay.  This one?

18          MR. MONROE:  No, full one.  Defendant 17.

19          Folks, let's play through Defendant's 17.  And I beg

20   of you, if there's any doubt about the veracity of my

21   statements, please go back to this video.  It's not my video,

22   it's not Mr. Webster's video.  This came off the web.  Some

23   civilian was holding up a camera or cell phone and this was

24   what captured -- this was captured after our good special agent

25   already made the decision to arrest Mr. Webster.  Did you hear

1    that part?  The special agent didn't know that Rathbun was

2    responsible for punching Mr. Webster, and that's why the two of

3    them came together.

4             So let's see what the Special Agent didn't have when

5    he decided to arrest my client.

6             (Video playing.)

7             Folks, did my client, right side of his face, did it

8    accidently land in front of Officer Rathbun's left hand or

9    fist?  Is that the news you're going to get sold here?  You're

10   going to let my client get convicted and charged based upon

11   that rubbish?

12            Let's play this forward.  I want to make a real

13   simple point.  This video does a good job with it.

14            (Video playing.)

15            Now, in its totality, did you ever see Mr. Webster

16   strike Officer Rathbun with the pole?  No.  In fact, Officer

17   Rathbun told you he didn't.  Now, if you know this man is

18   about -- can punch you again -- listen to the judge and how

19   he's charged you, about your right as a civilian, as a citizen

20   when you -- when someone uses force against you, you can use

21   that amount of force which is reasonable so that you're not

22   hurt.

23            But what did Mr. Webster say?  I mean, after all, 20

24   years NYPD, firing range, private security detail for the

25   mayor, he uses that amount of force to keep this man from

1    hitting him again without hurting him.  That is as much as you

2    can expect the law to offer.  That is as much as you could

3    expect any person to do under this set of difficult

4    circumstances.

5                (Video playing.)

6                Now I've stopped the action at 58 seconds.  But,

7    isn't it true that by about 2:28 p.m. on January 6, there are

8    tens of thousands of people on the Capitol grounds?  And we

9    know -- and good enough for the government to show us, by

10   virtue of the timeline video that they display, by the time

11   Mr. Webster gets there all that fencing and all those signs are

12   gone.  So what does that say about his knowledge or his --

13   notice to him that he's not supposed to be there?

14               I mean, he's literally walking down the streets with

15   thousands of people.  He says it's best if they get to the

16   Peace Circle there, and he wants to see what's going on.  Does

17   he have any sign or opportunity to know that he's not supposed

18   to be where he is?

19               Now, he then leans on his law enforcement training,

20   he says, "If I see a sign, I'm going to turn around.  If I have

21   an officer tell me to turn around, I'm going to turn around."

22   Right?  Isn't that what he told me?  But I want to go to this

23   police line and see why I'm seeing so many blooded civilians.

24   And the further he gets, the madder he gets because more and

25   more people pass him, they're hurt.

1          But let's take the facts through its natural paces.

2    So, when officer -- I'm sorry, Detective Lauderdale first

3    presented the case to Detective Rathbun, he didn't even know or

4    remember, allegedly, this encounter.  He had forgot about it.

5    It's about eight days after January 6.  And he gets a telephone

6    interview from an FBI agent, a special agent.  That should

7    always make you sit straight up in your chair and pay

8    attention.  But, nothing in there about any punch.

9          This good man told you, straight out, "He never told

10   me."  But, why?  If it happened, and you thought it was

11   justified, like the officer now wants to sell you, why not

12   disclose it?  Why not make it part of the official record?

13   Because it wasn't justified.  It wasn't justified.  It wasn't

14   professional.  It wasn't a conduct exhibited by the fellow

15   officers that you see here.

16          One more chance to see the truth, the whole truth.

17   This is an enhancement of 17.  We slowed it down.

18          (Video played.)

19          Was that justified?  Did Mr. Webster have that

20   coming?  Was he posing a danger to that officer by speaking out

21   the way he was, even as he's pointing?  Is that the way we

22   expect officers to conduct themselves?  Are you willing to be

23   sold down the river on a story that officer -- that my client's

24   right on his face accidently made contact with Officer

25   Rathbun's left open palm or fist?

1          Folks, sometime a flagpole and a flag is all that is.

2     That's all it was.  At best, if you listen to Mr. Webster's

3     testimony and observe his conduct, he's, at best, reluctantly

4     there.  He's only responding to the abuse he's seeing

5     perpetrated against other civilians; he wants to see what's

6     happening.  But when he gets to that police line, that flag in

7     his hand is only used for his own protection.  And just as soon

8     as Officer Rathbun reaches out on that flagpole, Mr. Webster

9     lets it go.

10          And that whole altercation where they go down to the

11     ground, do you see my client punch Officer Rathbun?  Do you see

12     him kick him?  Do you see him get the pole back from him?  No.

13     He gets him down on the ground, to a place where he feels as

14     though he's not going to hurt him again, and he lets him back

15     up.  Officer Rathbun goes his way, Mr. Webster goes his.

16          Was there any evidence presented to you that my

17     client was engaged in any other acts of violence on the Capitol

18     on January 6?  No.  Any evidence that he destroyed any

19     property?  No.  That was conceded.  Any evidence he ever went

20     inside the Capitol?  No.  That wasn't his intention, that

21     wasn't why he was there.

22          You have to let the truth capture this moment.

23     Regardless of this man's politics, regardless of his

24     intentions, we can see what happened here, notwithstanding the

25     information the officer withheld from his police department,

 1   from the FBI, from his brother.  Because the truth, the whole

 2   truth just permeates, just engulfs this case, because we got

 3   the information that Officer Rathbun hoped that no one would

 4   ever get.  We got the video of actually what happened, not what

 5   he wants to tell you.

 6            This case cries out for acquittal.  This case cries

 7   out that this good man did not knowingly enter these grounds at

 8   a time when he thought he didn't have to be there.  This case

 9   cries out for you to stand up for him and say, yes,

10   Mr. Webster, you had the right to defend yourself after getting

11   punched in the face by this officer who did nothing but lie to

12   us this whole trial.  Acquit this man.  Send him back to

13   New York.  Get behind the truth, and I'm talking about the

14   whole truth.  Thank you.

15            THE COURT:  All right.  Mr. Monroe, thank you.

16            All right.  Rebuttal from the government?

17            MS. NIELSEN:  Yes.  Thank you, Your Honor.

18            (Pause.)

19            Sorry about that.  Had to clean up a bit.

20            Can you hear me?  Is it on?  Okay.

21            Good afternoon.  I'm kind of sorry that we have to do

22   a little bit more of this, but I need to go over a couple of

23   matters that were brought up by Mr. Monroe.

24            Mr. Monroe is going to try and rewrite history.  You

25   saw -- you heard the defendant, on the stand yesterday, say

1     that when he was at the Capitol on January 6th, he felt like

2     his roles were reversed with Officer Rathbun.  And that's

3     exactly what he's trying to do here today.  He's trying to

4     reverse the roles of the two tables here.  He's trying to make

5     himself into the victim of what you just heard Mr. Monroe call

6     a bad cop.  But the evidence does not support this.  The

7     evidence does not support Mr. Monroe's assertion that his

8     client is entitled to a self-defense defense in this case, and

9     I'm going to tell you why.

10          There are three reasons why.  And you've heard the

11    judge give you the instruction and I'll walk you through the

12    evidence and why it shows that self-defense is not a defense to

13    which this defendant is entitled in this case.

14          The first reason is that Mr. Webster was the initial

15    aggressor here.  I know that Mr. Monroe has told you that his

16    client knew nothing and had nothing -- did nothing wrong until

17    he got punched.  And he keeps using this word "punched" by

18    Officer Rathbun.  But we know from the video, from all the

19    videos we've seen -- because it's not just one, we have many

20    videos that have been shown to all of you this week -- that

21    Mr. -- that there are, shall we say, interpretations of what

22    happened to Mr. Webster.

23          I'll show you the video one more time, the first 20

24    seconds of the body-worn camera from Officer Rathbun and then

25    talk a little bit about what we're seeing there.

 1                    (Video played.)

 2                    I'll try it with sound now.

 3                    (Video played.)

 4                    All right.  We'll go back and play that from the

 5       beginning.

 6                    (Video playing.)

 7                    So I'm going to stop it at 7 seconds there, just so

 8       that you can see, as I'm sure you're already well aware, that

 9       when Mr. Webster comes up to the police line that day, he is

10       already, in his terms, upset.  He's angry.  He comes up and he

11       starts yelling, he starts pointing at Officer Rathbun.  And you

12       can see in the body-worn camera that Officer Rathbun's hand, on

13       the right-hand side -- nope, I take that back, the left-hand

14       side, is waving him off, is waving him off.  But Mr. Webster

15       continues.

16                    (Video played.)

17                    All right.  And I'm just going to stop it there

18       again, because we just saw something that Mr. Webster made a

19       big deal about yesterday.  He said that he knew, when he was on

20       the stand, he knew that that flag was going to be considered to

21       be a potential weapon from his experience as a police officer.

22       From his experience in being in situations like this, he knew

23       his flagpole was going to be considered as a potential weapon.

24       So he said he was careful about how he was using it.  You just

25       saw him moving it back and forth in his hand.  But he knows at

1       this point in time the officers on the other side of the line

2       are looking at his flagpole as a potential weapon.

3                    (Video played.)

4                    All right.  And there we see it.  It's actually

5       Mr. Webster who invites Officer Rathbun to come over and fight.

6       He says, "Take this shit off.  Take your shit off."  We've

7       heard from a number of law enforcement officers what that

8       means.  That means take off your belt, take off your badge

9       let's do this *mano a mano*.  He's the one that invites Officer

10      Rathbun to come over and take his badge off and fight him.

11                   And then, as you can see right here, he pushes the

12      bike rack into Officer Rathbun.  He pushes it into Officer

13      Rathbun.  At this point he is the aggressor, the initial

14      aggressor.  And for that reason, he is not entitled to claim a

15      self-defense claim to the assault on Officer Rathbun.

16                   But let's look at this a little bit more.

17      Mr. Webster has made a big deal about that, the hand motion

18      from -- the supposed hand motion from Officer Rathbun, the hand

19      motion like this (indicating).  We didn't see that on this

20      film, did we?  And this shows a lot of Officer Rathbun's hand.

21      If you see any other video that shows it, I would be very

22      interested in it because we do not see that hand motion that's

23      been suggested by Mr. Webster in any of the videos that have

24      been shown this week.  We do see Officer Rathbun's hand doing

25      this (indicating) to keep Mr. Webster away and other protestors

1    away from the police line.

2          Finally, I want to just point out, in terms of this

3    point about being an initial aggressor, Mr. Monroe has made

4    a -- has talked a lot about the fact that his client is a

5    former police officer.  And you've heard about some of the

6    experiences of Mr. Webster from himself when he was sitting on

7    the stand.  He told you that it was really important in

8    situations like this not to escalate.  Deescalation was very

9    important.  And yet, all you see, all you see from one who is

10   supposedly trained in how to deal with these situation, a

11   20-year veteran cop, there's no deescalation on his part, but,

12   in fact, escalation at every possible turn.

13          (Video played.)

14          All right.  I'm going to stop that there, at 22

15   seconds.  That's 22 seconds from the point where Mr. Webster

16   arrives at the police line, where Officer Rathbun is behind the

17   police line in front of him.  Mr. Webster testified he doesn't

18   know Officer Rathbun, he's never seen him before.  He comes

19   there and within 22 seconds he has his flagpole out, he is

20   beating it against the bike rack, at Officer Rathbun.  He

21   breaks it -- whether it comes apart from two pieces or whether

22   it's broken really doesn't make any difference in this case.

23   He has used it with enough force to make it come apart and then

24   continues to use it as a club to beat at the officers who are

25   on the other side of the bike rack at this point.  They're on

1      the other side.

2              So for that reason, Mr. Webster is not entitled to a

3      self-defense defense in this case, because he was the initial

4      aggressor.

5              But there are two other reasons.  The second reason

6      is that to be entitled to assert self-defense, the defendant

7      has to actually be reasonably -- reasonably believe that he is

8      in danger of imminent bodily harm.  He has to actually believe

9      that, that he's in danger of imminent bodily harm.

10             Now, there's very little evidence that we have seen

11     of that.  We have many videos, we have many still images that

12     have been shown this week, and I would struggle to find a photo

13     where we could show you fear on the face of this officer.  Now,

14     we know he sat on the stand and he said he was terrified of

15     Officer Rathbun, that he was terrified that he was going to

16     come into the other side of the bike rack and do something to

17     him.  So he said that, but let me show you what we actually

18     see.

19             (Played video.)

20             I'm going to take this down and show you a few still

21     shots that make the point.

22             You have to ask yourself, does that look like the

23     face of someone who is fearful of what the person in front of

24     them is going to do to them.  Does that?  Does that?

25     (Indicating.)  And, in fact, I asked Mr. Webster what he felt

1   like, what the face was that that's on there.  And he said it

2   was anger.  He was angry, he felt violated, and that's why he

3   went after Officer Rathbun.  He wasn't afraid.  The evidence

4   doesn't show that he was actually afraid that something was

5   going to happen to him.  He was angry, he felt violated, and he

6   thought that this cop wasn't doing the procedure that he

7   thought he should and he was going to school him.

8          And he schooled him.  Because you can see it here,

9   the officer is on the ground and Mr. Webster has him down on

10  the ground and is pulling his gas mask and his helmet off, or

11  attempting to pull them off with his hands.

12         Now, the third reason that Mr. Webster is not

13  entitled to a self-defense defense in this case is that to be

14  entitled to that defense, the person who has been attacked is

15  only allowed to use a reasonable amount of force to counter and

16  in response to what has happened to them.

17         So in this case the assertion is that Mr. Webster was

18  punched by Officer Rathbun.  Now, again, I think there is a

19  dispute about that.  We've shown the image that shows that what

20  appears to have happened is that Officer Rathbun's hand, open

21  hand, made contact with the right side of Mr. Webster's face as

22  he was trying to push him away from the bike racks.

23         But, nevertheless, whether he was pushed with an open

24  hand, whether he was punched, the response that Mr. Webster had

25  was to violently smash at Officer Webster and the officers

1    around him with a metal pole, so hard that you can hear it

2    clang against the bike rack in front of him, so hard that it

3    broke.  Now, Mr. Monroe, says, well, but he didn't punch him.

4    He didn't punch him, so -- I mean, he tackles him later, he

5    tried to pull off his gas mask, he choked him trying to pull of

6    his helmet, but he didn't punch him.  And have you to ask

7    yourself, is this too much?  Is this excessive force?  Wouldn't

8    equal force or reasonable force have been to push back on

9    Officer Rathbun?  Maybe to punch him?  But no, he uses a

10   weapon, a metal pole to smash at him, like a bat, and then

11   tackles him to the ground and tries to rip off his gear.

12         Now, Mr. Monroe talk a little bit about Officer

13   Rathbun not filling out forms properly, not telling people all

14   about this incident.  But this is a red herring.  Again, he's

15   trying to focus us on Officer Rathbun's conduct and not his

16   conduct, and Officer Rathbun's conduct at that time.

17         Officer Rathbun's conduct afterwards is not relevant

18   here.  He sat on the stand and told you that he had pushed this

19   individual.  He pushed him several times.  We can see it on the

20   images, we can see it in the video.  You'll be able to see it

21   when you take it back.  What's relevant here is what happened

22   on that day, what you can see between these two individuals,

23   not whether or not Officer Rathbun fills out forms properly or

24   tells everything to his boss at every turn.  That's -- Officer

25   Rathbun is not on trial here.

1              And, finally, Mr. Monroe asserts, once again, that

2      his client -- his client didn't know that he was not allowed to

3      be on Capitol grounds that day.  His client saw tens of

4      thousands of people at the Capitol at 2:28, when he was at the

5      front of the police line.  There were tens of thousands of

6      people there, and so Mr. Monroe asserts that he had no idea,

7      Mr. Webster would have no idea that it was not right for him to

8      be in that area.

9              He points out, and I remember Mr. Webster saying

10     yesterday that he had several rules:  If he saw a sign or if he

11     was told by an officer to turn around, that he would.  Well,

12     Mr. Webster violated both of those on January 6th.

13             As Mr. Webster made his way from the back of the --

14     from the grassy area of the Lower West Terrace up to the area

15     with the stone, he testified that he saw teargas, he

16     experienced teargas, smelled it, knew it was in the air.  He

17     saw flash bangs.  As an experienced officer he, and he admitted

18     on the stand he knew that that was -- those assets were used

19     for crowd dispersal, and indicated that a crowd was not

20     supposed to be where it was.

21             Then he got up to a police line.  A police line, he

22     said, was a definite parameter.  When you see a perimeter with

23     bike rack and you see officers in hard gear behind it, that

24     means you are not supposed to go beyond that.  We saw on the

25     video here, Exhibit 204, you see Officer Rathbun using his hand

1    like this, saying, "Don't come here."  It was a clear sign.

2    All of that was a clear sign.  And an officer telling him, "You

3    are not to go beyond this point."  And yet, as my colleague

4    Mr. Kelly showed you in the video, after he banged his flagpole

5    down at Officer Rathbun, he and his compatriots overran that

6    police line, moved up towards the stage and ultimately

7    Mr. Webster moved up onto the inaugural stage and stayed there

8    for over an hour, watching other officers being pulled out of

9    the tunnel.

10           Ladies and gentlemen, the evidence in this case does

11   not support a self-defense defense for this defendant.  The

12   evidence in this case, as my colleague has suggested, supports

13   a verdict of guilty on all counts.  And that's what we ask you

14   to consider as you go back.  Thank you.

15           THE COURT:  Okay.  Thank you, Ms. Nielsen.

16           Okay.  Ladies and gentlemen, we've now heard the

17   closing statements of the parties and counsel.  What's left for

18   me to do is to give you some very brief instructions before you

19   begin your deliberations.  I think this will take not even 15

20   minutes.  But I think what we'll do, at 4:30, at a minimum what

21   we'll do is retire and get organized and then, you know, we'll

22   have you finish up at 5 o'clock today.  Okay?  And it will take

23   us a little bit of time to get you the instructions and all the

24   exhibits, but at least it will be useful to get started.

25           So before I excuse you to deliberate, I want to

1    discuss a few final matters with you.  When you return to the

2    jury room you should first select a foreperson to preside over

3    your deliberations and to be your spokesperson here in court.

4    There are no specific rules regarding how you should select a

5    foreperson.  That is up to you.  However, as you go about the

6    task, be mindful of your mission:  To reach a fair and just

7    verdict based on the evidence.  Consider selecting a foreperson

8    who will be able to facilitate your discussions, who can help

9    you organize the evidence, who will encourage civility and

10   mutual respect among all of you, who will invite each juror to

11   speak up regarding his or her views about the evidence, and who

12   will promote a full and fair consideration of that evidence.

13           I would like to remind you that in some cases, and

14   not only this one, there may be reports in the newspaper or the

15   radio, internet, or television concerning this case.  There is

16   such media coverage of this case and you may be tempted to

17   read, listen, or watch it.  As I've reminded you throughout,

18   you must not read, listen to, or watch such reports because you

19   must decide this case solely on the evidence presented in this

20   courtroom.  If any publicity about this trial inadvertently

21   comes to your attention, do not discuss it with any other

22   jurors or anyone else.  Just let me, the law clerk, or the

23   courtroom deputy know as soon as it happens and I will then

24   briefly discuss it with you.

25           As you retire to the jury room to deliberate, I also

1    wish to remind you an instruction I gave you at the beginning

2    of the trial.  During deliberations you may not communicate

3    with anyone not on the jury about this case.  This includes any

4    electronic communication, such as email, text, or blogging, or

5    any social media.  In addition, you may not conduct any

6    independent research or investigation during your

7    deliberations.  This means you may not do any research in

8    person or electronically via the internet or in any other way.

9          If it becomes necessary during your deliberations to

10   communicate with me, you may send out a note through the

11   deputy, Mr. Douyon, signed by your foreperson or by one or more

12   members of the jury.  No member of the jury should try to

13   communicate with me except by such a signed note, and I will

14   never communicate with any member of the jury on any matter

15   concerning the merits of this case, except in writing or orally

16   here in open court.

17         Bear in mind that you are also -- also that you are

18   never, under any circumstances, to reveal to any person -- not

19   to the clerk or to me -- how jurors are voting until after you

20   have reached a unanimous verdict.  This means that you should

21   never tell me, in writing or in open court, how the jury is

22   divided on any matter; for example, 6-6 or 11-1 or in any other

23   fashion, or whether the vote favors the government, the

24   defendant, or is on any issue in the case.

25         It is your duty as jurors to consult with one another

1   and to deliberate expecting to reach an agreement.  You must

2   decide the case for yourself, but you should do so only after

3   thoroughly discussing it with your follow jurors.  You should

4   not hesitate to change an opinion when convinced that it is

5   wrong.  You should not be influenced to vote in any way on any

6   question just because another juror favors a particular

7   decision or holds an opinion that is different than yours.  You

8   should reach an agreement only if you can do so in good

9   conscience.  In other words, you should not surrender your

10  honest beliefs about the effect or weight of the evidence

11  merely to return a verdict or solely because of other jurors'

12  opinions.

13          Now, the attitude and conduct of jurors at the

14  beginning of their deliberations are a matter of considerable

15  importance.  It may not be use for a juror, upon entering the

16  jury room, to voice a strong expression of an opinion on the

17  case or to announce a determination to stand for a certain

18  verdict.  When one does that at the outset, a sense of pride

19  may cause that juror to hesitate to back away from an announced

20  position after a discussion of the case.  Furthermore, many

21  juries find it useful to avoid an initial vote upon retiring to

22  the jury room.  Calmly reviewing and discussing the case at the

23  beginning of deliberations is often a more useful way to

24  proceed.  Remember that you are not partisans or advocates in

25  this matter, but you are the judges of the facts.

1          A verdict must represent the considered judgment of

2     each juror, and in order to return a verdict, each juror must

3     agree on the verdict.  In other words, your verdicts must be

4     unanimous.

5          The question of possible punishment of the defendant

6     in the event of a conviction is not a concern of yours and

7     should not enter into or influence your deliberations in any

8     way.  The duty of imposing sentence in the event that a

9     conviction rests exclusively with me.  Your verdict should be

10    based solely on the evidence in this case, and you should not

11    consider the matter of punishment at all.

12         I will be sending into the jury with you the exhibits

13    that have been admitted into evidence, except for the

14    recordings which may only be partially admitted.  You may

15    examine any or all of the exhibits that you -- excuse me, you

16    may examine any or all of them as you consider your verdicts.

17    Please keep in mind that exhibits that were only marked for

18    identification but were not admitted into evidence will not be

19    given to you to examine or consider in reaching your verdict.

20         If you wish to see or hear portions of the video or

21    audio recordings that I have admitted into evidence and that

22    may not be with you, you will have exhibits available to you --

23    you'll have all the other exhibits available to you for your

24    deliberations.

25         I will provide you with a copy of my instructions.

1    Each of you will have a copy of the instructions.  During your

2    deliberations you may, if you want, refer to those

3    instructions.  While you may refer to any particular portion of

4    the instructions, you are to consider the instructions as a

5    whole and you may not follow some and ignore others.  If you

6    have any questions about the instructions, you should feel free

7    to send me a note.  Please return your instructions to me when

8    your verdict is rendered.

9            You will be provided with a verdict form for use when

10   you have concluded your deliberations.  The form is not

11   evidence in this case and nothing in it should be taken to

12   suggest or convey any opinion by me as to what the verdict

13   should be.  Nothing in the form replaces the instructions of

14   law I've already given you, and nothing in it replaces or

15   modifies the instructions about the elements which the

16   government must prove beyond a reasonable doubt.  The form is

17   meant only to assist you in recording your verdict.

18           When you have reached a verdict, please send me a

19   note telling me you have reached a verdict, and have your

20   foreperson sign the note.  Do not tell me what your verdict is.

21   The foreperson should fill out and sign the verdict form that

22   will be provided and we will then call you into the courtroom

23   and ask you for your verdict in open court.

24           For my last instruction, if I could just ask the

25   parties to get on the phone for a moment.

 1                (Bench discussion:)

 2                Has the government redacted the video that I said

 3       would only be admitted in part?

 4                MS. NIELSEN:  Yes, Your Honor, we have.

 5                THE COURT:  So that is ready to go back?

 6                MS. NIELSEN:  It will be on the disk that will be

 7       sent back to the jury.

 8                THE COURT:  And, Mr. Monroe, did you redact the

 9       general order portions of it that you want to go back?

10                MR. MONROE:  So, I only put in pages 5 and -- I

11       believe it's 15.  I was just going to send those back, sir.

12                THE COURT:  All right.  Well, we'll -- we can work to

13       get that redacted with respect to the only portions that were

14       actually shown to the jury.

15                MR. MONROE:  Yeah.

16                THE COURT:  We can do that.

17                MR. MONROE:  Okay.

18                (Open court:)

19                THE COURT:  One minor correction.  I suggested that

20       there might be a video that wouldn't be going back to you.  I

21       stand corrected, that's why I wanted to talk to the parties.

22       You will have all of the exhibits back with you, including all

23       of the video events that you have seen.  So you will have all

24       of that with you during your deliberations.

25                All right.  The last thing I must do before you begin

1    your deliberations is to excuse the alternate jurors.  As I

2    told you before, the selection of alternates was an entirely

3    random process; it's nothing personal.  We selected two seats

4    to be the alternate seats before any of you entered the

5    courtroom.

6             This is always a difficult moment because all of you,

7    I have seen throughout, have paid close attention and care and

8    given your full consideration of the case.  But, we do have to

9    excuse the alternate jurors.  So at this time I'm going to

10   excuse the jurors who are in seats five and seven, and I'll ask

11   you to accompany Mr. Douyon.  He will gather some additional

12   information from you.  And I want to thank you for your

13   service.

14            Before you leave, I'm going to ask you to tear out a

15   page from your notebook and just write down your name and

16   daytime phone number and provide it to Mr. Douyon.  I do this

17   because it is possible that we will need to summon you back to

18   rejoin the juror in case something happens to a regular juror.

19   Since that possibility exists, I'm also going to warn you not

20   to discuss the case with anyone until we call you.  My earlier

21   instruction on the use of the internet still applies:  Do not

22   research the case or communicate about it on the internet or

23   anywhere else.  In all likelihood, we will be calling you to

24   tell you that there's been a verdict and you are now free to

25   discuss the case.  There is, however, as I said, the smallest

1   chance that we will need to bring you back.  So it's critically

2   important that even while you are waiting to hear from us, that

3   you not check social media about this case, read any of the

4   media about this case, just on the offhand chance that you may

5   need to be brought back for your deliberations.

6           Again, I want to thank you very much for your

7   service, and Mr. Douyon will give you further information as

8   needed.  So thank you very much to jurors in seats 5 and 7.

9           (Whereupon jurors 5 and 7 leave the courtroom.)

10          THE COURT:  Okay.  It's never easy seeing the

11  alternates going.  It's almost like losing members of your

12  family.

13          So that will be the conclusion of my instructions.

14  So it is now 4:20.  I'm going to excuse you all or have --

15  excuse you all to return to the other courtroom now.  We'll

16  give you until 5 o'clock today to get organized, begin your

17  discussions, choose your foreperson.

18          It will take us a few minutes to gather up all the

19  exhibits, make copies of the instructions, which we will get

20  back to you as soon as we can.  I think all of that should,

21  hopefully, be done by 5.  But in the event it's not, you'll

22  certainly have it first thing Monday morning.  I will ask you

23  to back here about no later than 9:20 Monday morning, so you

24  can begin your discussions at 9:30.  Under no circumstances

25  should you begin deliberations until everyone is in the room

1    and back together.  So that means no sort of side conversations

2    among individual jurors.  All of your deliberations must occur

3    in the presence of all the other jurors.

4            It is not my practice to call you back in at the end

5    of the day.  Mr. Douyon will simply just knock on your door at

6    the appropriate time and excuse you.  But, again, the same

7    instructions that I've given you previously are particularly

8    important now.  And I know you're tired of hearing them.  But

9    no social media, no news reports, no communicating with anyone,

10   except your fellow jurors, about the case.

11           When you return Monday morning, again, I won't bring

12   you back into the courtroom.  You'll simply, once everybody has

13   arrived, at that point you can begin your deliberations for the

14   day.

15           All right.  With that -- and the last thing is this,

16   this is entirely up to you, I'm not giving you an instruction

17   on this one way or another:  If you would prefer to take your

18   masks off while you deliberate, and everybody agrees to that,

19   that's fine by me.  If everybody unanimously agrees and you're

20   comfortable with that, okay; not a problem.  But if somebody is

21   reluctant to do that, I would just ask you to be respectful of

22   that person's choice and maintain your masks during your

23   deliberations.  So that's your call.

24           Okay.  All right.  Thank you very much.  Mr. Douyon

25   will show you to where you need to be, and we will get you the

```
 1    exhibits, the jury instructions, and the exhibit form as soon
 2    as we can.  Thank you all.
 3                 (Whereupon the jurors leave the courtroom.)
 4                 THE COURT:  All right.  Have a seat everyone.  I'll
 5    wait for Mr. Douyon to come back.  But I take it all of your
 6    exhibits are ready to go.  It sounds like they're close to
 7    ready to go?
 8                 MS. NIELSEN:  Yes, Your Honor.  The government's are.
 9                 THE COURT:  And, Mr. Monroe, you've got your
10    exhibits?
11                 MR. MONROE:  Yeah, this is the one I have, this is
12    Defendant's Exhibit 46.
13                 THE COURT:  Okay.
14                 MR. MONROE:  It's the front cover page and page 5 and
15    15.  I'll show it to --
16                 THE COURT:  I guess, why don't -- Ms. Montgomery can
17    help you get that redacted, however it needs to get redacted
18    before we send it back.
19                 MR. MONROE:  I thought they wanted to take a look at
20    it?
21                 THE COURT:  You all talk about it.  But my
22    expectation is only the portions that were shown to the jury
23    should go back, and the cover page.
24                 MR. KELLY:  That's the government's understanding as
25    well, Your Honor.
```

1          THE COURT:  So we can work on that.  It won't take

2     very long to get that accomplished.

3          We will get all the instructions together and get

4     those to the jury, get the verdict form to the jury.  You know,

5     they're just going to get organized.  And I certainly don't

6     expect to hear from them the rest of the day.

7          It's not my practice, as you already heard, to bring

8     everybody back and then dismiss everybody at 5 o'clock.  But

9     that said, obviously, just in an abundance of caution, stick

10     around here until 5.  Make sure you're back here no later than

11     9:30 Monday morning.  You should be within shouting distance of

12     the courthouse.  And by that I mean within ten to 15 minutes.

13          Make sure Mr. Douyon has contact information for

14     counsel so that if we do get a note at any point in time, we

15     can have you all get back here as soon as possible.

16          Okay.  Any questions about anything as we conclude?

17          MS. NIELSEN:  No, Your Honor, from the government.

18          MR. MONROE:  Judge, what would you like to me to do

19     with this paper exhibit, Defendant Exhibit 1?  Just give it

20     your clerk?

21          THE COURT:  Give it to Mr. Douyon.  Any paper

22     exhibits, make sure Mr. Douyon has it so he can get it back to

23     the jurors.

24          Okay.  To counsel, well done, nice job, everybody.

25     We'll just wait to see what the jury does.  Thanks, everybody.

1    Have a nice weekend.  I'm sure we will not see you before the

2    end of the day.  Don't wait for me, everybody.  Thank you.

3              (Pause.)

4              MS. NIELSEN:  Your Honor --

5              THE COURT:  Counsel, just hang on a second because I

6    want to make sure you all have a final copy of the jury

7    instructions -- or, you know, we can just email it to you,

8    that's fine.

9              MR. KELLY:  Thank you.

10             THE COURT:  Thank you very much.

11             MR. KELLY:  Your Honor, I apologize.  Did you want

12   the parties -- I know you said you weren't going to bring the

13   jury in, do you want the parties actually in the courtroom at

14   9:30 Monday morning?

15             THE COURT:  No.

16             MR. KELLY:  Just in shouting distance, as you said.

17             THE COURT:  Mr. Monroe, if I wasn't clear, you don't

18   need to be back in the courtroom at 9:30.  I'm not going to

19   bring the jury in.

20             MR. MONROE:  You don't?  Okay.  I will be close

21   enough where you can tell me.  All right?

22             THE COURT:  Yes, please.

23                           *   *   *

24

25

1          CERTIFICATE OF OFFICIAL COURT REPORTER

2

3          I, JANICE DICKMAN, do hereby certify that the above and

4     foregoing constitutes a true and accurate transcript of my

5     stenographic notes and is a full, true and complete transcript

6     of the proceedings to the best of my ability.

7                         Dated this 30th day of April, 2020

8

9

10                         _____

11                         Janice E. Dickman, CRR, CMR, CCR
                           Official Court Reporter
12                         Room 6523
                           333 Constitution Avenue, N.W.
13                         Washington, D.C.  20001

14

15

16

17

18

19

20

21

22

23

24

25